**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

FILED
MAGISTRATE JUDGE P. MICHAEL MAHONEY
United States District Court
MAY 26 2010

| | | |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

**FINAL PRETRIAL ORDER**

This matter having come before the Court at a pretrial conference held pursuant to Fed. R.

Civ. P. ("Rule") 16, and the parties having appeared through their respective counsel, it is ordered as

follows:

This is an action for violation of civil rights brought pursuant Title VII of the Civil Rights

Act of 1964 as amended by the Civil Rights Act of 1991 and the subject matter jurisdiction of this

Court is invoked under 28 U.S.C. §§ 1331, 1367. Jurisdiction is not disputed.

Unless otherwise noted, all the following stipulations and statements were submitted and are

attached to and made a part of this Order:

(a)     Each party has attached as schedule A, a comprehensive stipulation or statement of

all facts he, it or they believe to be uncontested, which will become a part of the evidentiary record

in the case (and which, in jury trials, may be read to the jury by the court or any party);

(b)     The parties stipulate and agree that the following short description of the case to be

read to prospective jurors:

Plaintiff, Otto May, Jr., claims that between approximately May, 2002 and through December, 2005, his employer, defendant Chrysler Group LLC did not take steps reasonably intended to stop harassment of him at its Belvidere Assembly Plant and that the harassment was because of his race, ethnic background and religion. Chrysler denies all of plaintiff's claims.

(c)     Each party has attached as schedule C, a list of all exhibits each expects to be offered in evidence with the opposing party's objections to each, if any. Unless otherwise ordered, 14 days prior to trial each party will submit a trial exhibit list in accordance with the Court's standing order on final pre-trial orders;

(d)     Each party has attached as schedule D, a list of names and addresses of the potential witnesses to be called by each;

(e)     Each party intending to call an expert witness has attached as schedule E, stipulations or statements setting forth the qualifications of each expert witness in such form that the statement can be read to the jury at the time the expert witness takes the stand;

(f)     Each party intending to utilize part or all of any deposition has attached as schedule F, a list of all depositions, and designated page and line numbers, to be read into evidence and statements of any objections thereto;

(g)     Plaintiff has attached as schedule G, an itemized statement of damages;

(h)     Defendant has attached as schedule H, a concise statement of each claim against it and any affirmative defense and waivers of any claims or defenses that have been abandoned by it;

(i)     The parties have reserved and will submit at least 14 days prior to trial or as otherwise ordered by the Court, the following:

(1)     trial briefs;

(2)     one set of marked proposed jury instructions, verdict forms and special interrogatories, if any and

(3)     a list of the questions the party requests the court to ask prospective jurors in accordance with Fed. R. Civ. P. 47(a);

(j)     Not applicable;

(k)     Each party has attached as schedule K, motions *in limine*;

(l)     Each party needing any special equipment for trial has attached as schedule L a list of such equipment;

(m)     The attorneys acknowledge they have read the Court's Trial Procedures-Civil Case. Each party has completed discovery, including the depositions of expert witnesses. Except for good cause shown, no further discovery shall be permitted.

Plaintiff believes that trial of this case is expected to take 8 days. Defendant believes that trial of this case is expected to take 5 days.

Number of Jurors ___7___

It is the parties' preference that the issues of liability and damages should not be bifurcated for trial. On motion of any party or on motion of the Court, bifurcation may be ordered.

The parties have not consented to trial of this matter by a Magistrate.

**THIS ORDER WILL CONTROL THE COURSE OF THE TRIAL AND MAY NOT BE AMENDED EXCEPT BY CONSENT OF THE PARTIES AND THE COURT, OR BY ORDER OF THE COURT TO PREVENT MANIFEST INJUSTICE.**

Possibility of settlement of this case was considered by the parties.

Dated: 5/26/10

_____
Magistrate Judge P. Michael Mahoney

APPROVED AS TO FORM:

___/s/ Karen J. Doran_____
Attorney for Plaintiff
Karen Doran
Doran Medina LLC
2625 Butterfield Road, Ste. 138S
Oak Brook, IL  60523

___/s/ Stephen E. Balogh_____
Attorney for Defendant
Stephen E. Balogh
WilliamsMcCarthyLLP
120 W. State St., Ste. 400
P.O. Box 219
Rockford, IL 61105-0219

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

OTTO MAY, JR.,       )
      )
      Plaintiff,       )
      )    Case No. 02 C 50440
      v.       )
      )    Judge Frederick J. Kapala
      )
CHRYSLER GROUP LLC,       )    Magistrate Judge P. Michael Mahoney
      )
      Defendant.       )

### FINAL PRETRIAL ORDER: PLAINTIFF'S SCHEDULE A

1. From approximately May, 2002 through December, 2005 Otto May, Jr. was harassed in violation of Title VII and 42 U.S.C. § 1982 by employees of Defendant.

2. All of the harassment against Plaintiff took place on Defendant's property.

3. There is no provision in any contract that Defendant has with any union that requires it to seek or get permission from the union in order to install any type of surveillance equipment.

4. There is no provision in any contract that Defendant has with any union that requires it to notify any union that it intends to use or is using surveillance equipment.

5. Defendant never discovered who harassed Plaintiff.

6. Defendant never interviewed anybody from the list of suspects Plaintiff provided it.

7. Defendant never terminated or otherwise disciplined any of its employees for harassing Plaintiff from 2002 through 2005.

8.     Defendant failed to photograph every incident of harassing graffiti.

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S UNDISPUTED FACTS
## SCHEDULE A

1. Plaintiff, Otto May, Jr., has worked for Chrysler at its Belvidere Assembly Plant ("BAP"), since 1988, as a pipefitter.

2. May is a member of the UAW and the local for the BAP, Local 1268. The terms and conditions of May's employment at the plant are covered by a collective bargaining agreement between the UAW and Chrysler.

3. For much of the relevant time period, May worked maintaining equipment within the Paint Department (where the car bodies are actually primed and painted) during second shift (approximately 2:30 p.m. to midnight).

4. For a period of time in 2004 and 2005, May worked maintaining equipment in the Assembly Department, usually on third shift (approximately midnight until 7:30 a.m.).

5. May is Hispanic, was born in Cuba and moved to the U.S. as a young child and professes to be a Messianic Jew, or a "born again" Christian with a Jewish heritage.

6. In May, 2002, May began to complain to security personnel at the BAP that his cars were being vandalized while in an employee parking lot to the east of the plant.

- 1 -

7. In August, 2002, May noticed graffiti, the words "Chuck + Otto" drawn inside a heart, inside a freight elevator inside the plant near the T-1 column. (Within the BAP, there are structural support columns which are labeled in an alphanumeric grid with numbers on one axis and letters on the other. This grid is used to identify locations within the plant so that this particular elevator is closest to the column T-1.)

8. May complained to security personnel about this graffiti on August 17, 2002. On August 28, 2002, May complained to a supervisor that similar graffiti had again appeared in the elevator, this time with the words "Cuban fag" in indelible marker. The graffiti was removed after the Labor Day weekend on September 3, 2002.

9. Over the next several months, the instances of graffiti continued, usually in areas of the paint department that would be accessed by May, but not always in areas that would be generally accessed by production workers.

10. For example, graffiti occurred on May's locker, near May's toolbox in the paint booth, in stair wells leading up to the paint booth, in freight elevators in both ends of the plant, in a break room, in various bathrooms, in fan plenum housings above the paint booth and in a tool crib. The graffiti was always done with an indelible marker and always in what appeared to be the same hand.

11. The nature of the graffiti is consistent in that it specifically refers to May's national origin and religion and is pejorative; an example would be "Otto die fuken cuban fag jew niger lover." [*sic* throughout].

12. In September, 2002, May discovered the first of what would become a series of ten threatening notes. The first was in his personal toolbox which he kept in a "clean room" between the north and south paint booths. May reported the note to plant security and to the Belvidere Police.

13.    The notes appeared sporadically, the last one being found in December, 2005. Of the ten, seven have been in or on May's personal toolbox. One was taped to the inside of the door to an electrical control panel, one was taped inside a door to a tool storage area and one was written on a piece of cardboard and left on top of May's locker in the Assembly Department.

14.    The fifth note, chronologically, was discovered by May inside the cover door of a large electrical control panel inside the paint booth. On finding this note, May called the Belvidere Police who had taken two of the previous notes as evidence. When the police arrived, however, BAP human resources informed them that Chrysler was going to retain possession of this note just long enough for examination by privately retained forensics experts.

15.    There have been no incidents of vandalism, notes or graffiti since December, 2005.

16.    When May complained, after the fact, that his cars were being vandalized, he was allowed to park in the salaried employees' lot so that his car could be monitored by security personnel. May's assigned space in the parking lot is under video surveillance by security personnel.

17.    The first instance of offensive graffiti was reported by May was on the Friday before a Labor Day holiday and it was removed immediately on Tuesday when the plant returned to production.

18.    On the occurrence of the second reported instance of graffiti, the BAP human resources department reiterated that this and any future incident should be digitally photographed, recorded, investigated and removed, all as rapidly as possible. Part of the investigation would include security personnel or human resources personnel interviewing the employee who discovered the graffiti as well as any employees who were in the area at the time of discovery.

19.    May was interviewed on several occasions by human resources personnel from both the BAP and the Chrysler Office of Diversity regarding possible motives, evidence or suspects.

20.     In addition to regular diversity training conducted by Chrysler for all of its employees on at least a semi-annual basis, Chrysler:

(a)     mailed copies of its anti-harassment policy (Policy 3-6) to all BAP employees in paychecks in late 2002;

(b)     had the Human Resources Manager for the BAP (an executive level employee) personally met with maintenance department employees in late 2002 and told them that harassment of May or any other employee would not be tolerated and that, if caught, the culprit would be terminated and prosecuted;

(c)     had the Maintenance Area Manager (an executive level employee) for the Paint Department met with all of his personnel in early 2003 and again told them that harassment of May or any other employee would not be tolerated and that, if caught, the culprit would be terminated and prosecuted;

(d)     retained a forensic document examiner in February, 2003, in order to assist it in identifying the culprit;

(e)     retained the services of a forensic laboratory in order to examine one of the original notes for fingerprints or other relevant evidence;

(f)     gathered original hand-printing samples from its BAP employees for comparative use by forensics experts;

(g)     gathered attendance data from the BAP to use in creating a matrix of maintenance employees who were in attendance at or near the time of incidents of graffiti or notes;

(h)     gathered timekeeping data from the BAP gate system to use in creating a matrix of maintenance employees who were in attendance at or near the time of incidents of graffiti or notes;

(i)     considered the installation of surveillance cameras at the BAP.

21.     The Belvidere Police Department has also investigated every incident involving a note, including submitting original notes to the Illinois State Police Crime Laboratory for forensic analysis and the BAP has cooperated with local police in sharing information.

22.     None of the efforts of the Belvidere P.D. or Chrysler resulted in a positive identification of the individual conducting the harassment of May, although timekeeping records, attendance date and forensic examination have combined to eliminate many from suspicion.

23.     During the time the harassment was occurring, May did not miss any work or lose any time as the result of the harassment and he continues to work at the BAP as a pipefitter.

24.     May's primary care physician and a licensed clinical social worker, Stephen Kiley, with whom he treats, have diagnosed May as suffering from a social adjustment disorder with depressive features as the result of the stress at the workplace, particularly the harassment.

25.     Psychological testing and a psychiatric interview conducted pursuant to Fed. R. Civ. P. 35 have concluded that May is "malingering Post Traumatic Stress Disorder" and "[May] feels the job is beneath him and he is deserving of specialized treatment. He seeks these perks through distortion, deception and displacement of blame and manipulation for secondary gain." (Report of Dr. Rosalind Griffin, M.D., p. 7.)

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

OTTO MAY, JR.,        )
                            )
       Plaintiff,       )
                            )    Case No. 02 C 50440
     v.                 )
                            )    Judge Frederick J. Kapala
                            )
CHRYSLER GROUP LLC,    )    Magistrate Judge P. Michael Mahoney
                            )
       Defendant.    )

## FINAL PRETRIAL ORDER: PLAINTIFF'S SCHEDULE C

| | Description | Objection |
|---|---|---|
| 1 | Butch Barber interview re: Kline1987 (DC 253) | relevance |
| 2 | Wood notes re: Myers pushes Plaintiff 11/4/97 (DC 247-48, 297-304) | relevance |
| 3 | Wood notes re: Plaintiff flat tire and bent truck antenna 11/1997 (DC 248) | relevance |
| 4 | Plaintiff's locker missing, personal belongings found in dumpster 9/28/98 (DC 265-68) | relevance |
| 5 | 9/7/98 May grievance against Kline for race discrimination (DC 269-70, 275-84, 286-94, 334-59) | relevance |
| 6 | Plaintiff accuses Myers of discrimination 10/8/98 (DC 260-64, 266) | relevance |
| 7 | 2/20/01 Kline evaluation shows "repeated issues with supervision of some minority employees" (DC 829) | relevance |
| 8 | Kline demoted to hourly 1/1/01 (DC 830) | relevance |
| 9 | 3/7/02 incident report re: vehicle damage (May 76-77) | |
| 10 | Stumpf radio incident 3/26/01 (DC 230-33) | relevance |
| 11 | Plaintiff's autos are vandalized 2/21/02 (DC 224) | |
| 12 | Spike under Plaintiff's car tire 5/12/02 (DC 219-21; May 79, 81) | |

| 13 | Emails re: parking 5/22/02-8/17/02(DC 179-80, 208-09, 215-18) | |
|----|----|----|
| 14 | 6/16/02 elevator graffiti (May 73) | |
| 15 | Kline's grievance of 8/22/02 termination (DC 804-06) | relevance |
| 16 | Carlin note in toolbox 9/3/02 (DC 100-103, 171-75, 507) | |
| 17 | 9/7/02 Meeting with Plaintiff (DC 100-103) | |
| 18 | Death threat in toolbox 9/12/02 (DC 96-99) | |
| 19 | 9/14/02 Interview notes of Lanning (DC 94-95) | |
| 20 | Note re: Kline counseling session 9/12/02 (DC 807-08) | relevance |
| 21 | Graffiti on door 9/19/02 (DC 92-93, 5973-82) | |
| 22 | Death threat 9/20/02 (DC 510) | |
| 23 | 9/23/02 graffiti in elevator(DC 67-70, 5984-88) | |
| 24 | Harassment talks 9/26 and 9/27/02 (DC 71-85) | |
| 25 | Kline reinstated 9/30/02 (DC 809, 811-25) | relevance |
| 26 | Graffiti in restroom 9/30/02 (DC 62-66) | |
| 27 | (unknown date) Meeting with Plaintiff to discuss Defendant's response to Hostile Work Environment (DC 57, 59-60) | |
| 28 | 9/30/02 Budden notes (DC 58,61) | |
| 29 | Email re: Plaintiff's OSHA complaint 9/30/02 (DC 51-56) | relevance |
| 30 | Graffiti in vestibule 10/21/02 (DC 49-50, 6002-06) | |
| 31 | Graffiti in break area 10/28/02 (DC 43-48) | |
| 32 | Budden notes re: telephone conversations with Plaintiff 10/31/02-11/1/02 (DC 40) | |
| 33 | Graffiti in Pipefitter crib 11/6/02 (DC 37-39) | |
| 34 | Graffiti in paint lobby 11/18/02 (DC 33-36) | |
| 35 | Graffiti in restroom 12/3/02 (DC 25) | |
| 36 | Death threat in toolbox 12/7/02 (DC 27-28, 30-31) | |
| 37 | Email from Matthews to McPherson re: notes and Plaintiff's car 12/18/02 (DC 26) | |

| 38 | Letter from Kline's therapist notifying Defendant he's no longer in therapy 12/30/02 (DC 826-27) | |
| 39 | Telephone call with Belvidere PD regarding hate notes. 1/3/03 (DC 23-24) | |
| 40 | Case Information Form re: Anti-Defamation League 1/6/03 (DC 659) | relevance |
| 41 | Graffiti in restroom 1/13/03 (DC 372-84) | |
| 42 | Graffiti in spray booth 1/15/03 (DC 1) | |
| 43 | Huller meetings with Plaintiff 1/16, 1/17, 1/23, and 1/24/03 (DC 637-42, 743-50) | |
| 44 | Graffiti in stairwell 1/22/03 (DC 2-8) | |
| 45 | 2/21/03 Email from Harvey to McPherson re: paint lobby bulletin board (DC 6433-34) | |
| 46 | 2/26/03 Laliberte adn Kuburn notes re: meeting with an employee re: Mexican "jokes" (DC 6443-49) | relevance |
| 47 | Verbal altercation between Randy Daniels and Plaintiff 4/4/03 (DC 409-11) | relevance |
| 48 | 4/7/03 Budden note re: locker damage (DC 412-13) | |
| 49 | Graffiti in storage room 3/12/03 (DC 398-400) | |
| 50 | Death threat in toolbox 3/17/03 (DC 516) | |
| 51 | Management's actions to May's harassment claims (undated) (DC 643-45) | |
| 52 | Case Information Form 3/24/03 (DC 630) | |
| 53 | "What we did" email 4/1/03 (DC 404) | |
| 54 | Plaintiff's lockers vandalized 4/2/03 (DC 412-13) | |
| 55 | Graffiti in stairwell 5/5/03 (DC 429-32) | |
| 56 | Matthews email re: originals of death threats 5/15/03 (DC 433) | |
| 57 | Graffiti in Clearcoat North and Production Sprayers 5/19/03 (DC 434-36) | |
| 58 | Graffiti and death threat 6/9/03 (DC 446-49, 5933-38) | |
| 59 | Tire damage to bike 6/10/03 (DC 455-60) | |

| 60 | Log books collected 6/27/03 (DC 461) | |
|----|---------------------------------------|---|
| 61 | Graffiti in restroom 7/2/03 (DC 462-65) | |
| 62 | Graffiti in restroom 7/3/03 (DC 466) | |
| 63 | Graffiti in spray booth mezzanine 7/10/03 (DC 467-69) | |
| 64 | Graffiti in restroom and clean room 8/11/03 (DC 470-72) | |
| 65 | Graffiti in restroom 8/15/03 (DC 473-74) | |
| 66 | Graffiti 8/22/03 (DC 476-78, 554) | |
| 67 | Graffiti on air supply unit 9/3/03 (DC 479-83) | |
| 68 | Timesheet faxes 9/4/03, 10/1/03, 10/20/03, 10/31/03, 11/3/03, 11/4/03, 11/12/03, 11/15/03 (DC 970, 972, 987, 998, 102-30) | relevance |
| 69 | Notes re: Graffiti found 1/5/04, 1/7/04 (DC 1028) | |
| 70 | Graffiti on toolbox and toolchest 1/21/04 (DC 562-75, 584, 587, 6102-06) | |
| 66 | Threatening note in toolbox 2/9/04 (DC 612) | |
| 71 | Death threat on toolbox 2/24/04 (DC 585-86, 626-28, 5970-72) | |
| 72 | Graffiti in Andover office and in pipefitter crib 3/15/04 (DC 576-84, 621-23) | |
| 73 | Photos of footprints on mat in front of Plaintiff's lockers 3/16/04 (DC 617) | |
| 74 | Graffiti in restroom 3/22/04 (DC 597-98) | |
| 75 | Otto May – Chronology of Events (date unknown) (DC 1051-52) | |
| 76 | Large foamboard poster created by Defendant (date unknown) | |
| 77 | Amended Complaint | relevance |
| 78 | Answer to Amended Complaint | relevance |
| 79 | Notes re: threatening notes 10/5/04 (DC 4896-4913; May 1067) | |
| 80 | Notes re: something hit Plaintiff 10/15/04 (DC 4914-16; May 1068-71, 1080-81) | |
| 81 | 10/16/04 note with swastika and dead bird (4917-23) | |
| 82 | 11/17/03 death threat (DC 5939-41, 5945-58, 5960-69) | |

| 83 | 10/20/03 graffiti (DC 6098-6101) | |
| 84 | undated chronology (DC 5827) | |
| 85 | 4/1/03 Otto May Timeline (DC 5828-32) | |
| 86 | undated notes re: Omar Sep. Complaints about Kline (DC 6436-44) | relevance |
| 87 | 2/2/05 vehicle damage (DC 6649-52) | |
| 88 | 2/21/05 graffiti (DC 6654-68) | |
| 89 | 6/29/05 graffiti (DC 6679, 6681) | |
| 90 | Photos of graffiti (May 84, 85, 87-91, 96-98, 459-501, 523-536, 548-576, 589-616, 632-47, 769-74, 777-90, 793-817, 1050-52, 1129 | |
| 91 | Plaintiff's notes of events (May 346-70, 502-20, 541-45, 577-78, 586-88, 630-31, 684-87, 706-07, 775-76, 791, 818, 1057-66, 1086, 1072-79, 1087-90, 1111, 1119-28, 1138-43) | |
| 92 | Belvidere Police Reports (May 537-40, 875-997) | |
| 93 | Belvidere Police Reports re: vehicle damage (May 824-43) | |
| 94 | Therapy documents (May 709-15, 717-28, 730-53, 1012-48, 1116, 10001-60 | |
| 95 | 3/18/04 meeting notes (May 819) | |

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S EXHIBIT LIST
## SCHEDULE C

| Exhibit # | Description | Plaintiff's objections |
|---|---|---|
| 1 | Report of Calvert Enterprises (two volumes) | See Plaintiff's motion *in limine* |
| 2 | Report of Dr. Rosalind Griffin, M.D. (8 pages) | See Plaintiff's motion *in limine* |
| 3 | Chrysler Policy 3-6 | |
| 4 | Central H.R. Notebook as maintained by Kim Kuborn (one volume) | |
| 5 | DVD of interior of plant and graffiti/note locations | |
| 6 | Schematic of Plant floor with incident locations | |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

OTTO MAY, JR.,                    )
                                 )
            Plaintiff,           )
                                 )      Case No. 02 C 50440
      v.                         )
                                 )      Judge Frederick J. Kapala
                                 )
CHRYSLER GROUP LLC,              )      Magistrate Judge P. Michael Mahoney
                                 )
            Defendant.           )

## FINAL PRETRIAL ORDER: PLAINTIFF'S SCHEDULE D

1.    Otto May, Jr.
      c/o Karen Doran
      20 Danada Square West, Suite 149
      Wheaton, IL 60189
      *Objection:*

2.    D. Stephen Kiley, LCSW
      Glenwood Center, Ltd.
      2823 Glenwood Ave.
      Rockford, IL 61101-3542
      *Objection:*

3.    Kimberly Kay Kuborn
      c/o WilliamsMcCarthy, LLP
      120 West State Street
      Rockford, Illinois 61105
      *Objection:*

4.    Scott Huller
      c/o WilliamsMcCarthy, LLP
      120 West State Street
      Rockford, Illinois 61105
      *Objection:*

5.    Sheila Matthews
      c/o WilliamsMcCarthy, LLP
      120 West State Street
      Rockford, Illinois 61105
      *Objection:*

6.     Sgt. Brad Lasswell
City of Belividere Police Department
401 Whitney Blvd.
Belvidere, IL 601008
*Objection:*

7.     Richard McPherson
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

8.     Zachary Budden
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

9.     Todd A. Hudson
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

10.     Robert Kertz
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

11.     Judith Caliman
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

12.     Bertone
c/o WilliamsMcCarthy, LLP
120 West State Street
Rockford, Illinois 61105
*Objection:*

13.     Thomas Harvey
c/o WilliamsMcCarthy, LLP
120 West State Street

Rockford, Illinois 61105
*Objection:*

14.    Winkleman
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

15.    Anthony Minneyfield
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

16.    Terrance Walker
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

17.    Darnel Lewis
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

18.    Robert Yates
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

19.    Finch
     c/o WilliamsMcCarthy, LLP
     120 West State Street
     Rockford, Illinois 61105
     *Objection:*

20.    George Campa
     *Objection:*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S WITNESS LIST
## SCHEDULE D

Defendant, Chrysler Group LLC reserves the right to call in its case in chief any and all of the witnesses listed by plaintiff in this order. Chrysler specifically reserves its right to call witnesses not listed by either party in rebuttal as provided in the Federal Rules of Civil Procedure, the Federal Rules of Evidence and the Local Rules for the U.S. District Court for the Northern District of Illinois. Below are listed the names and a contact address for each of the witnesses reasonably expected to be called by Chrysler Group LLC during the trial of this matter:

Otto May, Jr.
6245 Deepwood Drive
Cherry Valley, IL 61016

Richard McPherson
Senior Human Resources Manager
Belvidere Assembly Plant
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL 61108

Kimberly Kuborn
Labor Relations Supervisor
Belvidere Assembly Plant
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL 61108

Steve Hughes
Paint Department Area Manager
Belvidere Assembly Plant
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

Anthony Minneyfield
Production Supervisor, Paint Dept.
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

Thomas Harvey
Maintenance Supervisor, Paint Dept.
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

James Fransen
Maintenance Supervisor, Paint Dept.
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

Craig Anderson
Process Reliability Supervisor, Paint Dept.
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

Marty Hicks
Maintenance Supervisor, Assembly Dept.
Chrysler Group LLC
3000 Chrysler Dr.
Belvidere, IL  61108

Scott Huller
(former) Office of Diversity
Chrysler Group LLC
1000 Chrysler Drive
Auburn Hills, MI  48326-2766

Stephen Kiley, LCSW
Glenwood Center
2823 Glenwood Ave.
Rockford, IL 61101

Det. Brad Laswell
City of Belvidere Police Department
401 Whitney Blvd.
Belvidere, IL 61008

Jack Calvert
Calvert Forensic Enterprises
14716 Route 173 East
Harvard, IL 60033-9195

Rosalind E. Griffin, M.D.
31330 Northwestern Highway, Suite C
Farmington Hills, MI 48334

Sgt. Brad Laswell
Belvidere Police Department
615 N. Main St.
Belvidere, IL 61008

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

|  |  |  |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S SCHEDULE E
## EXPERT WITNESS STATEMENTS

Defendant, Chrysler Group LLC, intends to call two testifying experts, Jack Calvert, a

forensic document examiner, and Rosalind Griffin, M.D., a psychiatrist. The following are

defendant's proposed statements of qualifications to be read to the jury when each takes the stand:

### Dr. Rosalind E. Griffin, M.D.

Dr. Rosalind "Roz" Griffin is a board certified psychiatrist. She received her
M.D. from Wayne State University School of Medicine in Detroit, in 1977. After an
internship in family medicine at Harper-Grace Hospital in Detroit, Dr. Griffin did a
residency in psychiatry at Sinai Hospital of Detroit. Dr. Griffin is currently on the
faculty of Wayne State University School of Medicine as a Clinical Assistant
Professor. Additionally, she is the Medical Director of the Sinai Hospital Hearing
Impaired Professional Services program and has hospital staff privileges at Detroit
Medical Center – Sinai Hospital and William Beaumont Hospital in Detroit. Dr.
Griffin is a National Examiner for the American Board of Psychiatry and Neurology
and is a Diplomat of that board. She is licensed to practice medicine in Michigan
and is a member of multiple professional associations. Dr. Griffin is in private
practice as a clinical psychiatrist providing psychotherapy to adults and adolescents
and has a sub-specialty in forensic psychiatry.

1

Jack E. Calvert

Jack Calvert is a forensic document examiner. Mr. Calvert has been certified as a forensic document examiner by the American Board of Forensic Document Examiners as a Diplomat, since 1978. Mr. Calvert was a Michigan State Trooper and involved in the examination of questioned documents. From there he became an Examiner of Questioned Documents for the federal Bureau of Alcohol, Tobacco and Firearms at its Crime Laboratory in Chicago. Next, he went on to be the co-founder of the Internal Revenue Service, Criminal Investigation Division National Forensic Laboratory in Chicago, Illinois, where he served as a Senior Examiner of Questioned Documents for ten years. He was the Director of the IRS-CID, National Forensic Laboratory for eleven years until his retirement in 1994. Mr. Calvert has been in private practice as a forensic document examiner since. During his career with the government and in private practice Mr. Calvert has testified extensively both in criminal matters and in civil suits, giving testimony in cases in 26 states and 10 different federal judicial circuits. Mr. Calvert has served as an instructor and lecturer in forensic document examination and is widely published in the field of forensics.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

OTTO MAY, JR.,                    )
                                 )
                Plaintiff,       )
                                 )    Case No. 02 C 50440
        v.                       )
                                 )    Judge Frederick J. Kapala
                                 )
CHRYSLER GROUP LLC,              )    Magistrate Judge P. Michael Mahoney
                                 )
                Defendant.       )

## FINAL PRETRIAL ORDER: PLAINTIFF'S SCHEDULE G

Plaintiff's damages:

1.    Compensatory damages: to be determined by the jury

2.    Punitive damages: to be determined by the jury

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

OTTO MAY, JR.,                          )
                                        )
                Plaintiff,              )
                                        )       Case No. 02 C 50440
        v.                              )
                                        )       Judge Frederick J. Kapala
                                        )
CHRYSLER GROUP LLC,                     )       Magistrate Judge P. Michael Mahoney
                                        )
                Defendant.              )

## DEFENDANT'S SCHEDULE H
## CLAIMS AND DEFENSES

Defendant, Chrysler Group LLC, provides the following statement of claims against it and

affirmative defenses raised by it:

The only claim against Chrysler is that the actions it took to stop the behavior occurring at its Belvidere Assembly Plant and directed against Otto May, Jr., were in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, in that those efforts were not reasonably intended to stop the behavior.

For its affirmative defenses to plaintiff's claims, Chrysler avers that it acted reasonably, swiftly and appropriately to stop the behavior and that, in fact, the behavior has ceased. Chrysler also avers that plaintiff has suffered no injury in fact or actual damages as the proximate result of any act or omission by Chrysler.

1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

OTTO MAY, JR.,                    )
                                 )
          Plaintiff,             )
                                 )     Case No. 02 C 50440
                                 )
     v.                          )     Judge Frederick J. Kapala
                                 )
                                 )     Magistrate Judge P. Michael Mahoney
CHRYSLER GROUP LLC,              )
                                 )
          Defendant.             )

## FINAL PRETRIAL ORDER: PLAINTIFF'S SCHEDULE K

Please find the attached Motions in Limine from Plaintiff

1.    Motion in Limine 1: Plaintiff's Motion to Bar Defendant From Relying on Results
      of Psychological Exams It Administered to Plaintiff

2.    Motion in Limine 2: Plaintiff's Motion to Exclude Jack Calvert as Expert
      Forensic Document Examiner

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| OTTO MAY, JR., | | |
| | Plaintiff, | Case No. 02 C 50440 |
| v. | | |
| | | Judge Philip G. Reinhard |
| CHRYSLER LLC, | | |
| | Defendant. | Magistrate Judge P. Michael Mahoney |

**Plaintiff's Motion in Limine No. 1**
**Plaintiff's Motion to Bar Defendant From Relying on**
**Results of Psychological Exams It Administered to Plaintiff**

Plaintiff, Otto May, Jr., by and through his attorney, Karen J. Doran, moves this Court to bar Defendant from relying on results of psychological exams it administered to Plaintiff and in support thereof states as follows:

1. On April 2, 2008, Defendant filed a motion to compel Plaintiff, pursuant to F.R.C.P. 35, to submit to a battery of psychological examinations.

2. Plaintiff objected, arguing that the proposed tests were neither relevant nor reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd., v. Charmichael*, 526 U.S. 137 (1999).

3. The Court granted Defendant's motion, finding Plaintiff's objections to be premature.

4. On May 27 and 28, 2008, Plaintiff took seven psychological exams administered by Defendant's psychologist, Thomas Dudgeon.

5. The seven tests were:

    a. The Minnesota Multiphasic Personality Inventory-2 (MMPI-2);

    b. The Thematic Apperception Tests (TAT);

    c.    The Millon Clinical Multi-Axial Inventory III (MCMI-III);

    d.    The Miller Forensic Assessment of Symptoms Test (M-FAST);

    e.    The Paulhus Deception Scales (PDS);

    f.    The Occupational Stress Inventory - Revised (OSI-R); and

    g.    The Sentence Completion Series - Work (SCS-W).

6.    Dudgeon then prepared a report based on the results of those tests and Defendant has produced that report in compliance with FRCP 26(a)(2).

7.    In addition, Defendant provided a copy of Dudgeon's report to psychiatrist Rosalind Griffin to prepare her for her clinical examination of Plaintiff.

8.    Griffin prepared her own report based in part on Dudgeon's analysis of the results of the tests he administered to Plaintiff and Defendant produced Griffin's report pursuant to FRCP 26(a)(2). (Def. Trial Exhibit 2.)

9.    Plaintiff objects to Defendant relying on the results of these seven tests because they are not reliable means of determining whether a victim of hostile work environment harassment based on national origin and religion has suffered or is suffering rom emotional distress because of the hostile environment.

10.    These tests do not meet the requirement of reliability enunciated by the Supreme Court in *Daubert* and *Kumho Tire*.

11.    Defendant, of course, bears the burden of establishing that each test meets this standard with regard to the issue in this case, with is **whether Mr. May suffered mental distress as a result of the hostile work environment he was subjected to from 2002 through**

·**2005**. Chrysler must prove that the tests are valid to this case – that they measure, with adequate precision – Mr. May's distress.

12.    Chrysler has not and cannot do this.

13.    Chrysler has not provided any evidence whatsoever to prove for each of the tests (MMPI-2, TAT, MCMI-III, M-FAST, PDS, OSI-R, and SCS-W) (1) whether it has been or can be tested, (2) whether it has been subject to peer review and publication, (3) its known or potential rate of error, and (4) whether it has been generally accepted in the relevant community. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999). Instead, Chrysler provides mere statements unsupported by citations or even references to reliable sources. (Def's Response to Pl.'s Motion to Bar Psych Exams, Doc 118.)

14.    Rather than providing proof, for example, that any of the seven tests relied upon are widely accepted methods employed in the mental health community to determine whether a victim of hostile work environment harassment has suffered emotional distress as a result of the harassment, it only quotes its proffered expert who opines that these tests are good generally.

15.    Because it cannot explain to the court that each test has been tested and shown to be a valid means of measuring hostile work environment mental health damages, Defendant simply concludes that Dr. Dudgeon's "explanations of scoring and meaning of scores as compared to others taking each test" somehow proves that these methodologies have been tested.

16.    Because it cannot cite studies by relevant professionals that support the use of these tests for the issue at hand, Chrysler states that both of its doctors have been published. Even

if that was on point, which it's not, that statement is false – at least there is no evidence in the record to suggest that Dr. Dudgeon has published anything.

17.     Rather than providing this court with each test's known or potential rate of error, Chrysler is silent on the issue.

18.     Chrysler evades its obligation and instead tells this court that its doctors are licensed, that one is an M.D., and that both are "trained" and "knowledgeable." For reasons not entirely clear, it cites an Illinois statute concerning disclosing psychological records. Defendant argues that by enacting the Mental Health and Developmental Disabilities Confidentiality Act, the Illinois General Assembly recognizes that "psychological testing" is both objective and fair. Not only is this a misstatement of the statute, it's a red herring. The statute, of course, has no relevance to whether Chrysler's seven tests are sufficiently reliable under *Daubert* to allow the jury to ultimately rely on them in this case.

19.     Neither does turning to Dr. Dudgeon's report avail Chrysler of its burden of proof. The report does not cite any authority, statistics, or research of any kind to support Dr. Dudgeon's conclusory statements concerning the tests. There isn't an iota of evidence in that document to support the notion that any of the tests – alone or together – have the ability to determine mental distress based on a hostile work environment. There is no authority cited for the proposition that a reasonable number of mental health professionals even use these tests to measure that. There isn't a shred of evidence that the tests – any of them – have an acceptable error rate.

20.     Chrysler's reliance on case law fares no better. As *Daubert* makes imminently clear, the reliability analysis is case sensitive, it's fact specific. The inquiry is not whether these

tests are reliable *per se*, it is whether these tests are reliable in helping the jury to determine a fact at issue.

21.     Chrysler wants to rely on *Bertaut v. U.S.*, 852 F.Supp. 523, 527 (E.D.La. 1994), but that case proves unhelpful. The issue in *Bertaut* is whether the plaintiff suffered neurological damages from being inoculated by the United States government for swine flu. As part of the Rule 35 exam, she submitted to the MMPI – *to determine whether she suffered a neurologic impairment*. *Id.* Testing for a physical impairment is a far cry from determining whether someone was emotionally effected by events.

22.     Defendant also cites *U.S. v. Thomas*, LEXIS 3266 (D.Md. 2006) for its use of the MMPI. But that case is not useful either as the exam was used there to determine whether a criminal defendant accused of child sexual exploitation and the receipt of child pornography should be detained pending trial. In other words, whether the defendant posed a threat to society. The issue in this case is so vastly different that the relevance and usefulness of the exam in that case cannot possibly be used to determine whether it is so in ours.

23.     For further support in relying on the MMPI-II, Chrysler cites *Gardner v. Barnhart*, LEXIS 12147 (N.D.Ill. 2004) where the test was administered to determine whether a person was eligible for social security benefits. This is a very different issue than Mr. May's emotional distress damages.

24.     Chrysler cites *Johnson v. Sullivan*, LEXIS 4876 (C.D.Ill. 1992) to support the Millon Test's usefulness in the case at bar. However, like the tests in *Barnhart*, in this case the Millon Test was administered to determine whether the plaintiff's low I.Q. qualified him for

social security benefits – a completely different rationale for relying on the test than the instant case.[1]

25.     *U.S. ex rel Gacy v. Welborn*, LEXIS 12498 (N.D.Ill. 1992) cannot help Chrysler get Mr. May's test results in front of the jury because the issue in that case – whether the test is a reliable means to determine whether the notorious serial killer, John Wayne Gacy, was insane – is vastly different than the issue in our case.

26.     Chrysler takes pains to distinguish this case from *Usher v. Lakewood Engineering & Mfg. Co.*, 158 F.R.D. 411 (N.D.Ill. 1994), which is understandable since Judge Shader found the MMPI-II and the TAT to lack probative value in that employment discrimination case.[2] Because they are not a reliable means of determining mental distress damages stemming from employment, the tests were barred. Chrysler argues that unlike the *Usher* defendant, which it maintains utterly failed to present the court with any evidence of the test's reliability, it has. However, where in fact the *Usher* defendant actually did "provide some general information about the tests and their utility,"*id.* at *413, Chrysler has not.

27.     It cites instead to *Chrissafis v. Continental Airlines, Inc.*, LEXIS 12800 (N.D.Ill. 1997). Notably, Magistrate Judge Guzman in *Chrissafis* distinguished *Usher* on the basis that the airline had abandoned all of the tests at issue in *Usher*, save the MMPI-II. *Id.* at *12. But the

---

[1]Dr. Griffin's report states that Mr. May's "IQ would be considered lower than normal indicating borderline intelligence," a conclusion that is not only irrelevant and highly prejudicial, but downright mean. (Def. Trial Exhibit 2, p. 6.)

[2]The defendant abandoned the Millon Test when the plaintiff objected to its inappropriateness and appreciable rate of error.

*Chrissafis* court does not analyze that test's ability to determine mental distress damages in the employment setting – as *Usher* does.

28.     Chrysler argues that Mr. May can simply use cross examination to attack the reliability of the tests in front of the jury, but Plaintiff need not be subjected to such a heavy burden. Indeed, ***Daubert's* gatekeeping function** prevents that and places the burden squarely on the shoulder of the party seeking to use the tests.

29.     Chrysler must prove that these tests measure mental distress stemming from a hostile work environment. It has not because it cannot. Perhaps one of the tests can measure a serial killer's sanity. Perhaps another can determine whether a person is "disabled" in order to qualify for disability benefits. But that does not help Chrysler in this case.

WHEREFORE, Plaintiff, Otto May, Jr., respectfully requests that this Honorable Court GRANT his motion to bar Defendant from relying on results of psychological exams it administered to Plaintiff and for such other and further relief this Court deems just and equitable.

> Respectfully submitted,
> Otto May, Jr.
> By One of His attorneys
>
> s/Karen J. Doran

Karen J. Doran
Atty No. 6282773
20 Danada Square West
Suite 149
Wheaton, IL 60189
(630)368-0200 (p)
(630)368-0202 (f)
karen@doran.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| OTTO MAY, JR., | | |
| | Plaintiff, | Case No. 02 C 50440 |
| v. | | Judge Frederick J. Kapala |
| CHRYSLER LLC, | | |
| | Defendant. | Magistrate Judge P. Michael Mahoney |

**Plaintiff's Motion in Limine No. 2**
**Plaintiff's Motion to Exclude Jack Calvert as Expert Forensic Document Examiner**

Plaintiff, Otto May, Jr., by and through his attorney, Karen J. Doran of DoranMedina, LLC, moves this court to exclude the expert testimony and report of forensic document examiner Jack Calvert ("Mr. Calvert"). In support of this motion, Plaintiff states as follows:

## I.  INTRODUCTION

1.     Plaintiff, Otto May, Jr. ("Mr. May" or "Plaintiff"), alleges employment discrimination in the form of a hostile work environment based on national origin (Cuban), race (Hispanic), and religion (Jewish) against his employer, Defendant Chrysler LLC ("Defendant" or "Chrysler").

2.     The hostile work environment consisted mainly of incidents of anonymous graffiti, notes, and other vandalism, and continued from in or around 2002 through 2005 at Chrysler's Belvidere Assembly Plant ("BAP").

3.     All of the writings found were hand printed.

4.     On September 26, 2006, this court denied Chrysler's motion for summary judgment on this issue.

5.     On or around Tuesday, June 17, 2008, Plaintiff received from Defendant, pursuant to F.R.C.P. 26(a)(2)(B), a report dated July 10, 2007 from Jack Calvert ("Mr. Calvert"), a forensic document examiner.

6.     In this report, Mr. Calvert explains that he was hired to (1) "[e]xamine and compare questioned hand printing appearing in harassment messages on various notes and graffiti to determine how many authors prepared them," and (2) "[e]xamine collected and requested known exemplars of different individuals to establish or eliminate them as authors of the questioned material." Calvert Report 10.

7.    He states that he examined copies or originals of 25 anonymous documents ("questioned exemplars") and copies or originals of writing samples from 28 Chrysler employees ("known exemplars").[1]

8.    The report does not explain or even address why he was directed to examine those particular 25 questioned exemplars, as they are a mere sampling of the actual graffiti and notes found.[2]

9.    The report does not explain or even address why out of the thousands of BAP employees he was directed to examine and compare handwriting samples from those 28.[3]

10.    Mr. Calvert opines that he is "virtually certain one person printed the questioned hand printing" on the 25 unknown exemplars.

11.    Mr. Calvert does not render an opinion as to who authored some or all of the 25 unknown exemplars he did examine. Indeed, he opines that he cannot eliminate or identify seven out of 28 people – a full quarter of the employees he investigated – as the author of the 25 anonymous writings. He further states that from four of these seven, he needs to examine "additional like, original, collected hand printed exemplars" to enable him to possibly render "a more definitive opinion." *See e.g.* Calvert Report 12-13. For reasons Calvert fails to explain in his report, he has different criterion for additional exemplars from the remaining three. For one he needs "additional original, contemporary, collected hand printed exemplars" (Calvert Report 13), for another, he needs "additional original contemporary, collected hand printed upper and lower case exemplars," (Calvert Report 13). For the last, he states that its "necessary" for him to examine "additional collected, original, contemporary, normal course of business hand printed exemplars" before he can "render a more definitive opinion."

---

[1] Mr. Calvert's report lists known exemplars from 54 employees, however he also states that Chrysler had eliminated 26 of those employees as suspects and the report does not include any conclusions or other evidence that Mr. Calvert examined any documents from these 26 people. Calvert Report 14-15.

[2] Several dozens of separate notes and graffiti were found.

[3] For example, Mr. May provided Chrysler with a list of suspects, however Chrysler failed to provide Calvert with samples from some of those suspects.

12.     Nowhere in his report does Calvert explain his disparate treatment of these seven suspects.

13.     On July 22, 2008 Plaintiff filed a Motion to Exclude Jack Calvert as Expert Forensic Document Examiner, which was denied without prejudice as premature on December 15, 2008.

## II.   ARGUMENT

This Court should exclude Defendant from presenting any expert forensic document examination evidence at trial. Defendant's expert report is not sufficiently detailed or thorough under F.R.C.P. 25(a)(2)(B). Moreover, any expert testimony on this subject is not relevant to the issue in this case. In addition, the field of forensic document examination (a.k.a. "handwriting analysis") does not stand up under Daubert/Kumho Tire.[4]

### A.     *The expert report fails to comply with F.R.C.P. 26(a)(2)(B)*

Before we even get to F.R.E. 702 or Daubert/Kumho Tire, Defendant's expert report "must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." Salgado by Salgado v. GMC, 150 F.3d 735, 742, n. 6 (7th Cir. 1998) (citation omitted). The report must contain "a complete and detailed statement of all opinions to be expressed at trial and the basis and reasons in support of those opinions. In simple language, this means that the report must contain all information relating to 'how' and 'why' the expert reached the conclusions and opinions contained within the report." Id. (Emphasis added.) The goal, of course, is "to eliminate surprise, avoid unnecessary depositions and reduce costs." Id.

Mr. Calvert's opinion fails to meet these standards. His report ignores the "hows" and "whys" and goes straight to his conclusions. Nowhere does he explain or define the terms he uses or the professional, scientific, or technical standards he relies on in rendering his opinions. Under "Method of Examination" – where one would expect to find this important information, he lists the tools he used to examine the documents (e.g. microscopes) and that he "compared" the documents to one another. Calvert Report 10. He simply states that "[t]he examination took into consideration proportional size and spacing, letter formation and placement, common personal characteristics, the presence of natural variances, and the lack of significant differences" as well as "common letter

---

[4]Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

Page 3

formations, relative spacing and size ratios [could this be proportional size and spacing?], ... letter placement, 'run together' words, variances, ... and any attempts of disguising or altering 'normal' hand printing." Id. This is where the report falls short.

The report must go beyond the general description of handwriting analysis and lay out the examiner's standards, rules, and tests. That is, in order to comply with F.R.C.P. 26(a)(2)(B), Mr. Calvert must explain how he "took into consideration" elements such as proportional size, proportional spacing, letter formation, etc. Furthermore, he must explain what "personal characteristics" are "common" and how he came to such a conclusion. He must explain what a "natural variance" is and go on to state what determines a "difference" in his book and further what makes a difference "significant."

Looking to his "Results" section, one sees how these shortcomings render this report vague and incomplete. In concluding that he is "virtually certain one person printed the" 25 questioned exemplars, he cites, for example,"natural variances ... but no significant differences" among the samples however he does not explain what or how many "natural variances" he found or why the type and number of variances he found led him to his conclusion. Calvert Report 11.

When Mr. Calvert compares Plaintiff's writing to the questioned exemplars, he continues to eschew the "hows" and "whys" and simply states his conclusions: "The formation of letters, the proportional size, height, width, spacing, and letter placement of the questioned entries ... were in agreement with those of Otto May's exemplars." Calvert Report 14. Though he lists "[b]aseline control, connecting strokes, 't' crossings, 'I' dots, and border alignment of Otto May's exemplars" as being "consistent with the questioned hand printing," he does not explain what "baseline control" is or how Mr. May's is allegedly "consistent" with the questioned exemplars. Is it consistent with all 25 or just one? The report does not say. What are "connecting strokes" and how are Mr. May's "consistent" with the questioned documents? Moreover, what constitutes "consistency" for Mr. Calvert? What quantifiable or qualitative standards does he rely on in rendering this opinion? We do not know.

**B.**     ***Expert forensic document examination testimony is not relevant to any fact at issue.***

If this Court determines that Mr. Calvert's report is sufficiently detailed and thorough, then it must turn to F.R.E. 702 which requires it to determine whether Chrysler's proffered expertise is

sufficiently reliable to aid the jury in understanding the evidence or determining a fact at issue. Kumho Tire v. Carmichael, 526 U.S. 137 (1999); F.R.E. 702.

Chrysler admits that **"Calvert is not offered to help the jury understand the evidence."** (Def. Response to Pl.'s Motion to Exclude Calvert, p. 12, Doc 111.) This crucial concession means that the report simply does not fit within Rule 702 because, by Defendant's own admission, neither the report nor Calvert's testimony is intended to help the jury understand the evidence. Because Chrysler has admitted this, the proffered evidence is not proper expert evidence under Rule 702 and should not be admitted into evidence at all.

This Court denied Chrysler's motion for summary judgment with respect to Mr. May's claim of hostile work environment discrimination based on his national origin, race, and religion. In so doing, it found that Chrysler "does not dispute, nor could it realistically, that these events were severe and pervasive and objectively and subjectively hostile. Instead, defendant argues that there is no basis for it to be liable because it has done everything it can to stop the graffiti and notes." Op. Denying S.J. at 2, 02 C 50440, Doc. No. 80.

Calvert's report is not even relevant under 401 because it is dated years after the harassment ceased. As such it doesn't help the jury determine whether Chrysler took all steps reasonably calculated to prevent or end the harassment. Just as, for example, any evidence concerning dissemination of Chrysler's anti-harassment policy after the harassment ended is not relevant information for the jury.

Chrysler's true intent is to try and convince the jury that Mr. May cannot be ruled out as having written the harassing notes and graffiti and thus possibly created this whole hostile environment himself. The law of this case is that Mr. May was subjectively offended by the notes and graffiti. (Op. Denying S.J. at 2, 02 C 50440, Doc. No. 80.) There is no question that Mr. May found the notes and graffiti subjectively offensive. Any evidence that casts doubt on that finding only confuses the issues before the jury and threatens to contradict the law of this case. Chrysler has never been able to prove to anyone -- least of all itself -- that Mr. May was the perpetrator. There is no affirmative defense. Chrysler never took any actions based on the theory that he may have written the notes and graffiti or based on Calvert's opinion that based on the material Chrysler gave him he cannot rule out May as a suspect.

Page 5

The only fact at issue for the jury to decide is whether Chrysler took "reasonable steps to correct the [hostile work environment and/or] prevent [the] harassment from recurring." Fed. Civ. Jury Instructions of the 7th Cir. 3.04 (2005). Neither Mr. Calvert's report nor expert testimony is relevant to this issue. He is not an expert concerning what steps an employer must take to assuage this burden. What is more, his report and expert testimony would likely confuse the issues and the jury and would certainly be more prejudicial than probative. It is not the jury's purview to determine the culprit of the graffiti, notes, and vandalism – that is not an issue in this case. (Even if it was, Mr. Calvert cannot finger who was behind all of the harassment complained of in this case, nor does his report provide the tools to do so to the laypeople of the jury.)

## C.     The report should be excluded under F.R.E. 403.

All aspects of Calvert's report are irrelevant and more prejudicial than probative. Chrysler failed to provide this court with any evidence that it took Calvert's conclusions or opinions into consideration as part of its duty to take all steps reasonably calculated to prevent or stop the harassment. To be sure, Chrysler's response brief makes much of 26 eliminated suspects, however the report makes clear that their elimination had nothing whatsoever to do with Calvert's conclusions or opinions – Chrysler itself eliminated these folks from the running based solely on its internal investigation concerning their attendance.[5] (See Calvert's report page 14: "I was informed by [Chrysler's] personnel office that their records eliminate the following [26] persons from authoring the questioned hand printing" and indeed his report does not include any analysis on their exemplars.) If the jury were to see this report, they would find that a "forensic document examiner" eliminated scores of people from suspicion, but not the plaintiff. However this court has found that Mr. May suffered from harassment and Calvert does not state that he did it, nor did Chrysler provide Calvert with additional documents as he requested so that he can "render a more definitive opinion." (Calvert Report, 14.) Moreover, Defendant gave Calvert only a sampling of the harassing statements

---

[5]Based on this logic, Chrysler should have eliminated Mr. May as a suspect since he was "not present on one or more of the dates" the graffiti was found. (Calvert's Report, 14.) For example, he was on vacation when graffiti was found on January 5 and again on January 7, 2004. (See handwritten note at the bottom of Exhibit A; see dated entry on Defendant's chronology of events, Exhibit B.) Nevertheless, Chrysler did not tell Calvert that he was eliminated from suspicion.

and despite Calvert's caveat to his conclusions concerning May that he in fact requires additional exemplars "to render a more definitive opinion," Chrysler did not oblige. (Calvert Report, 14.) This casts serious doubts as to the relevance, then, of Calvert's opinions where Chrysler failed to provide him with adequate information.

The vast majority of Calvert's report focuses on highlighting Plaintiff as a suspect. Indeed, although Calvert concludes that he cannot rule out seven people as suspects, explaining that in order to do so Chrysler needs to provide him with additional exemplars – something it did not do (Calvert Report, 12-14) – May is the only suspect with an entire section comparing side-by-side his handwriting with that of the harassing notes and graffiti. The slant of the report is therefore much more prejudicial than probative as it dedicates a significant portion to casting doubt on May's status of victim. Chrysler has conceded that there is only one issue before the jury. This court has ruled as a matter of law that Plaintiff has carried his burden of proving the elements of a hostile work environment – that it is both objectively and subjectively offensive. Chrysler lacks sufficient evidence to refute the fact that Mr. May was offended by the notes and graffiti for purposes of liability – and it has lost its chance to do so. Moreover, Chrysler took no action based on Calvert's opinion that May could possibly be the suspect.

The report should be excluded under F.R.E. 403 because of its unfair prejudice (it's skewed to fingering May as the author of the anonymous notes and graffiti). This prejudice greatly outweighs any modest relevance the report has to the issue at hand.

**D.** ***Forensic document examination fails 702's reliability test under* Daubert/Kumho Tire.**

If this court determines that Mr. Calvert's report and testimony satisfies the relevancy prong of Rule 702, Chrysler must still prove that this evidence is reliable by meeting the standards of Daubert (if Chrysler argues that handwriting analysis is a science) or Kumho Tires (if it argues it is a technique or other specialized knowledge).

Specifically Mr. Calvert's testimony (1) must be based upon sufficient facts or data, (2) it must be the product of reliable principles and methods, and (3) he must have applied those principles and methods reliably to the facts of this case. F.R.E. 702. It is Chrysler's burden to prove all of these things. See e.g. U.S. v. Saelee, 162 F.Supp. 2d 1097, 1101 (D.Alaska 2001); U.S. v. Starzecpyzel, 880 F.Supp. 1027, 1031 (SDNY 1995).

This Court's gatekeeping function is to "ensure that the testimony is sufficiently reliable to qualify for admission." Laramee v. Warn Industries, Inc., 2004 LEXIS 13899 (N.D.Ill. July 16, 2004) (J. Mahoney). It must not be based on "subjective belief or speculation" and must rest on a "reliable foundation." Trustees of the Chicago Painters & Decorators Pension v. Royal International Drywall & Decorating, 493 F.3d 782, 787 (7th Cir. 2007). The focus is on principles and methodology. Winters v. Fru-Con Inc., 498 F.3d 734, 742 (7th Cir. 2007). The Court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993). To do this, the Court may look at:

- whether the technique or methodology at issue has been or can be tested,
- whether it has been subject to peer review and publication,
- its known or potential rate of error, and
- whether it has been generally accepted in the relevant community.

Id. at 593-94. The focus of this inquiry is not on the dependability of the expertise generally, but on its dependability in its application to the task at hand. The "science" at issue is "handprinting analysis" which is one category of forensic document examination.

### 1.    U.S. v. Fujii, 152 F.Supp. 2d 939 (N.D.Ill. 2000)

The Court in U.S. v. Fujii, 152 F.Supp. 2d 939 (N.D.Ill. 2000) (J. Gottschall) granted a motion to exclude handwriting expert testimony after conducting a Daubert hearing. It found the testimony inadmissible because it crumpled under three of Daubert's four proposed standards. Id. at 940. First, studies validating the technique are few, despite handwriting analysis' long history of use, and the few that do exist have been criticized for methodological flaws. Id. Second, there is no unbiased and financially disinterested peer review in the field – acceptance has largely been driven by handwriting experts. Id. citing U.S. v. Hines, 55 F.Supp. 2d 62 (D.Mass. 1999). Finally, the court found that the potential rate of error is almost entirely unknown. Fujii, 152 F.Supp. 2d at 941.

In addition, the handwriting analysis in Fujii failed to meet the Daubert test because the questioned exemplars was handprinting. "Typical handwriting analysis involves cursive writing, and the record is devoid of evidence that there is even a recognized field of expertise in the identification of handprinting." Id. A witness for the party seeking to exclude the evidence testified that he was

aware of only one study of the reliability of hand printing identification and only 13% of the experts tested got the right answer – 45% identified the wrong person. Id.

Also, the Fujii court excluded the expert witness because it could not determine the reliability of hand printing identification when the author in question is a foreign-trained writer. The court found that troubling. Id. at 942.

The case at bar has striking similarities to the Fujii facts. In this case all of the harassing graffiti and notes were hand printed. Chrysler provided Mr. Calvert with stacks of Plaintiff's exemplars to compare to the questioned documents. Like the foreign-born suspect in Fujii, Mr. May was also born, raised, and educated outside this country, in Cuba.

For the same reasons the district court in Fujii excluded the handwriting expert, this Court should exclude Mr. Calvert's testimony and report.

### 2. U.S. v. Saelee, 162 F.Supp. 2d 1097 (D.Alaska 2001)

Chrysler may attempt to convince this Court to allow Mr. Calvert to testify solely as to his opinion concerning similarities and differences between the writing, like the Government tried to do in U.S. v. Saelee, 162 F.Supp. 2d 1097 (D.Alaska 2001).[6] But there the court followed Fujii and excluded hand printing comparison evidence.

First the Government sought to admit the testimony under F.R.E. 701, however because the witness offered his testimony based on "(1) his scientific examination of the defendant's known handwriting, (2) his study of handwriting habits as the basis of handwriting identification principles, and (3) his comparative evaluation of the two writings (presumably the similarities and differences between known and questioned writings as now proposed by the Government)" he clearly was not testifying as a lay witness and thus the court rightly excluded his testimony under 701. Id. at 1100 (internal quotes and citations omitted.)

In determining whether the witness could testify pursuant to F.R.E. 702, the court found that all of the Daubert tests fit the case, however, like Fujii, the Court found handwriting analysis failed those standards. In determining whether the theories and techniques of handwriting comparison have been tested, the court found that although possible to do so, there is a dearth of such studies. Id. at

---

[6] Barring that, the Government proposed to admit its expert's testimony under F.R.E. 901 to authenticate and identify the evidence. The court rejected that under F.R.E. 701.

1101. Specifically the court found no empirical evidence on the proficiency of forensic document examination, little empirical evidence on the basic theories upon which the field is based (i.e. no two people write alike, no one writes the same way all of the time), no empirical research on the theory of probability on which handwriting analysis is based (no measurements, no calculations, report no probability of coincidental matches), and no empirical foundation at all to asserted special expertise in pointing out similarities or differences in hand printing. Id. at 1104. The court concluded that "[t]he technique of comparing known writings with questioned documents appears to be entirely subjective and entirely lacking in controlling standards." Id.

As to the known or potential rate of error of forensic document examiners, the Government's witness testified to a study showing 6.5% error rate, however the defense contradicted him with three subsequent studies by the same researcher showing nonexperts doing about as well as experts. The court thus determined that little is known about the error rate – one study showing examiners correct 13% of the time, another showing examiners incorrect **all** of the time Id. at 1103.

Another Daubert standard: – the existence of standards in making comparisons between known and questioned writings – did not fare well either. The court found no evidence concerning what an abnormal, unnatural manner of writing would do to either the analysis or error rates, what constitutes sufficient quality of documents to study, or what constitutes sufficient quantity of documents to study.

The one Daubert standard that did fare well (as in Fujii) – general acceptance – nevertheless did not persuade the court which found that prior to Daubert and Kumho Tires handwriting analysis was generally accepted, "[h]owever, the fact that this type of evidence has been generally accepted in the past by courts does not mean that it should be generally accepted now, after Daubert and Kumho." Id. at 1105.

The Saelee court was unpersuaded by the expert's basis for his conclusions. He simply identified "significant identifying characteristics," saying "nothing about what characteristics he found in the documents examined ... except that there was 'an overwhelming combination' of common identifiers as to one questioned document." Id. at 1101. The expert failed to explain how one identifies such characteristics, what they mean, and how many are necessary for a positive opinion.

The court found that the government "failed to prove that Mr. Cawley's proposed testimony as to similarity between known and questioned documents would be the product of reliable principles and methods." Id. at 1105 (quotes omitted). "In the absence of tested principles for making comparisons, Mr. Cawley's testimony as to similarities would itself be nothing more than a set of subjective observations and little different from an unsupported opinion as to the fact of authorship of a document. Mr. Cawley's testimony is as likely to mislead a jury as to assist it in determining the facts of this case. It is therefore excluded entirely." Id. at 1105.

In the instant case, Mr. Calvert fails to state even whether he relies on standards in making comparisons between questioned and known exemplars, much less what those standards, controls, or principles are. For example, lacking is any explanation as to what Mr. Calvert believes constitutes a sufficient quality or quantify of documents to examine or compare. This is particularly troubling given that for more than half – 18 – of the 28 suspects' exemplars he examined, Mr. Calvert opined that their known writings "contained insufficient writing characteristics similar to those found in the questioned materials ... to warrant further examination or comparison." Calvert Report 14. For nearly every one of these 18 people, Mr. Calvert relied on only a two-page employment application – many of which date back decades (indeed for one suspect, for reasons Calvert does not state, Calvert rules him out based on an employment application dated 1966!) Moreover, there is no evidence even to suggest that the "known writing samples" from the 28 employees were verified to have been written by those people – there are no affidavits or other sworn statements. Given that the majority of the documents relied on are employment applications, it is possible, if not probable, that at least some of those people had others fill out their applications, such as spouses or other family members.

In addition, Mr. Calvert fails to define the terms he uses in his report. For example, he opines that there is "considerable evidence" (a phrase highly prejudicial to a jury on its own part) pointing to Mr. May as the author, however he does not state what his standards are in determining when compared hand printing and/or handwriting exemplars are "similar," "in agreement," "consistent," or "different," though his opinions rely on these terms. He does not explain how he distinguishes between variations that signal a different author and variations that are normal deviations by a single writer, thus his conclusions are wholly subjective.

This Court should follow Saelee's rationale and exclude similarity/difference evidence from Chrysler.

3.   **U.S. v. Brewer, 2002 LEXIS 6689 (N.D.Ill. 2002) (J. Lefkow)**

Following <u>Fujii</u> and <u>Saelee</u>, the court in <u>U.S. v. Brewer</u>, 2002 LEXIS 6689 (N.D.Ill. 2002) (J. Lefkow), also excluded handwriting analysis testimony. The court went so far as to eschew a <u>Daubert</u> hearing, instead relying on "these very recent handwriting analysis cases" given their similarity to the proffered testimony. <u>Brewer</u> at 25. The court concludes that "unless some new studies have been conducted in the past six months, the government would be hard-pressed to establish that Seiger's testimony would be sufficient under <u>Daubert</u>." <u>Id.</u>

In this post-<u>Daubert</u> and <u>Kumho Tire</u> landscape, the state of the law, particularly in this District, is to exclude forensic document expert testimony. Courts have recently found that field to lack necessary studies validating and authenticating the technique; to lack general acceptance by unbiased, financially disinterested peers, and utterly to fail to demonstrate a reliable potential rate of error.

**III.   CONCLUSION**

As Chrysler cannot demonstrate that Mr. Calvert's report is detailed and thorough and that Mr. Calvert's testimony passes muster under Rule 702 and <u>Daubert/Kumho Tire</u>, this Court should exclude his report and testimony.

WHEREFORE, Plaintiff, Otto May, Jr., respectfully requests that this Honorable Court EXCLUDE Chrysler's proffered expert witness, Jack Calvert, from testifying during the trial of this case, EXCLUDE Chrysler use of the Calvert report, and for such other and further relief this Court deems just and equitable.

Respectfully submitted,

Otto May, Jr.
By One of His attorneys

s/Karen J. Doran

Karen J. Doran
Atty No.  6282773
20 Danada Square West
Suite 149
Wheaton, IL 60189
(630)368-0200 (p)
(630)368-0202 (f)
karen@doran.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 02 C 50440 |
| v. | ) | |
| | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

## SCHEDULE K
## DEFENDANT'S MOTIONS *IN LIMINE*

Defendant, Chrysler Group LLC, moves this Court for entry of an order barring plaintiff from introducing into evidence in the trial of this case the evidentiary matters more fully described below:

1.     Any testimony or evidence regarding the discrimination or retaliation which plaintiff allegedly suffered from Chrysler Group LLC, including any evidence of plaintiff being denied overtime and/or being disciplined. This Court has previously ruled, as a matter of law, that plaintiff failed to establish a *prima facie* case that similarly situated employees were treated more favorably, resulting in summary judgment on all of the plaintiff's discrimination claims, other than that for a hostile work environment. Indeed, this Court has previously ruled that the *only* issue for trial is whether Chrysler's attempts at remediation of graffiti, threatening notes and vandalism at its Belvidere Assembly Plant were reasonably intended to stop the behavior. (*See* 9/26/06 Order, granting Summary Judgment as to all claims except the hostile work environment claim). Accordingly, any evidence that plaintiff was discriminated against by Chrysler or was retaliated

1

against by Chrysler is irrelevant and/or its prejudicial effect outweighs its probative value. Fed. R. Civ. P. 403.

2.     Any testimony or evidence of a discriminatory hostile work environment directed toward or involving any employee or at any facility other than Belvidere Assembly, where such evidence or testimony is intended to create the impression that Chrysler Group LLC has not taken swift and appropriate measures reasonably intended to stop the behavior. This Court has previously ruled, as a matter of law, that plaintiff failed to establish a *prima facie* case that similarly situated employees were treated more favorably, resulting in summary judgment on all of the plaintiff's discrimination claims, other than that for a hostile work environment. Indeed, this Court has previously ruled that the *only* issue for trial is whether Chrysler's attempts at remediation of graffiti, threatening notes and vandalism at its Belvidere Assembly Plant were reasonably intended to stop the behavior. (*See* 9/26/06 Order, granting Summary Judgment as to all claims except the hostile work environment claim). Accordingly, any evidence to tending to suggest that Chrysler does not address discrimination in a reasonable, timely and appropriate manner other than the factual evidence related to this case would be hearsay and/or irrelevant and/or its prejudicial effect outweighs its probative value. Fed. R. Civ. P. 403.

3.     Any testimony or evidence regarding the length of time it took this lawsuit to proceed to trial, or reference to the death of plaintiff's original attorney, Charmaine Dwyer, as any such testimony is immaterial, may improperly imply that such delay was the fault of the defendant and/or would only evoke the sympathy of the jury. Fed. R. Civ. P. 403.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

OTTO MAY, JR., )
)
Plaintiff, )
) Case No. 02 C 50440
v. )
) Judge Frederick J. Kapala
)
CHRYSLER GROUP LLC, ) Magistrate Judge P. Michael Mahoney
)
Defendant. )

## DEFENDANT'S SCHEDULE L
## EQUIPMENT NEEDED

Defendant, Chrysler Group LLC, will need a DVD player/projector capable of publishing to the jury an audio/video recording of the interior of the Belvidere Assembly Plant as it existed at the time of the incidents giving rise to plaintiff's complaint (see Defendant's Schedule C, Exhibit 5).

1