**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | No.  02 C 50440 |
| | ) | |
| vs. | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTIONS *IN LIMINE***

Plaintiff, Otto May, Jr. ("May"), has filed two motions *in limine* seeking to bar the testimony of two witnesses disclosed by Chrysler Group LLC ("Chrysler") pursuant to Fed. R. Civ. P. 26(a)(2). The motions both seek exclusion by the district court pursuant to its gatekeeper function as described in *Daubert v. Merrel Dow Pharmaceuticals,* 509 U.S. 579 (1993).

First, May seeks to exclude the report and testimony of Dr. Rosalind Griffin, M.D., a board certified psychiatrist, because she relied, in part, on standardized psychological tests such as the MMPI-II in evaluating the plaintiff.  Second, May argues that the report and testimony of Jack Calvert should be excluded because his work as a forensic document examiner does not meet the reliability criteria necessary for admissibility.

In both instances, the background, training, and experience of the expert witnesses is beyond reproach.  In both instances, the bases for their opinions are peer reviewed and widely accepted and relied upon in their respective fields.  In both instances, their opinions will provide information to the jury which will aid it in its understanding that is central and relevant to plaintiff's claims in this suit.  As such, both motions *in limine* should be denied.

## LEGAL STANDARD

In ruling on plaintiff's motions *in limine*, the district court must analyze the proffered evidence under the framework of Federal Rule of Evidence 702 and the methodology for determining reliability outlined in *Daubert*. *American Honda Motor Company, Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). The non-exhaustive list of guideposts for the court to consider includes: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the relevant scientific, technical or professional community. *Id.* The district court should examine such factors as whether the testimony relates to matters growing out of research conducted independently from the instant litigation or if it appears to have been developed expressly for the purpose of testifying in this case. *Id.*

The focus of the analysis must be on the soundness of the methodology that is used, not on whether the conclusions of the expert are correct. *Deputy v. Lehman Brothers, Inc.*, 345 F.3d 494, 506 (7th Cir. 2003). This involves consideration of the proposed expert's full range of practical experience as well as academic or technical training. *Smith v. Ford Motor Company*, 215 F.3d 713, 718 (7th Cir. 2000). Next, the Court must determine whether the expert's testimony will aid the trier of fact. *Trustees of the Chicago Painters Savings Plan Trust Funds v. Royal International Drywall and Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007).

If the court finds that the evidence is sufficiently reliable, it must then engage in a second step and determine whether the evidence or testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. *Trustees of the Chicago Painters Savings Plan Trust Funds v. Royal International Drywall and Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007).

ARGUMENT

**1. Dr. Griffin's Report and Testimony Are Reliable and Will Aid the Trier of Fact in Understanding a Key Fact in Issue.**

Plaintiff does not so much attack forensic psychiatry or Dr. Griffin as unreliable as he attacks the psychological testing underlying, in part, her evaluation. Through a licensed clinical social worker who provides treatment to May, May will introduce evidence that he has suffered from severe emotional trauma, including post-traumatic stress disorder, proximately caused by the threatening notes and graffiti to which he was subjected at Chrysler's Belvidere Assembly Plant. May refused to submit to psychological examination by defendant so this Court ordered that he submit to mental examination pursuant to Fed. R. Civ. P. 35.

Initially, May met with and was clinically interviewed by Dr. Thomas Dudgeon, Ph.D., a licensed psychologist ("Dudgeon"). Dudgeon also administered a battery of standardized psychological examinations over a day and then prepared a written report. That report was forwarded to Dr. Rosalind Griffin, M.D. ("Griffin"). Griffin then conducted a face-to-face clinical interview with May and reviewed deposition testimony, Kiley's clinical records and Dudgeon's report and prepared a report of her findings. Griffin's report and the bases therefore were all disclosed to plaintiff's counsel pursuant to Fed. R. Civ. P. 26(a)(2), because it is Griffin that Chrysler has disclosed as its testifying witness on the issue of plaintiff's mental state.[1] (A copy of Dr. Griffin's curriculum vitae as disclosed in this case is attached hereto as Exhibit A.)

Plaintiff chose not to take Griffin's deposition but did make a request pursuant to the Illinois Mental Health Act that all of the original testing materials used by Dudgeon be provided to another

---

[1] Dr. Griffin's and Dr. Dudgeon's reports are provided to the court under seal as exhibits to this memorandum and are e-filed with the clerk in accordance with local rules.

licensed psychologist for evaluation, Dr. Kyle Cushing, Ph.D. That request was complied with and, in keeping with the confidentiality provisions of the Mental Health Act, the transfer from one psychologist was direct and counsel for the parties have not seen those materials.

May now seeks to exclude Griffin's testimony because it relies, in part, on the tests administered by Dudgeon. May does not argue that the tests are unreliable but, instead, argues that Chrysler has not shown them to be reliable. It speaks volumes that having had his own psychologist, Cushing, provided with copies of the testing materials, May is still unable to present any evidence that the examinations administered here are thought unreliable or are not accepted in the community of psychology and psychological professionals.

The standardized psychological tests administered include: the Minnesota Multiphasic Personal Inventory-II ("MMPI-II"); the Millon Clinical Multi-axial Inventory-III ("MCMI-III"); the Thematic Apperception Test ("TAT"); the Miller Forensic Assessment of Symptoms Test ("M-FAST"); the Paulhus Deception Scales ("PDS"); the Occupational Stress Inventory - Revised ("OSI-R"); and the Sentence Completion Series-Work ("SCS-W"). Dudgeon administered these tests and compiled the results. He then provided the results to Griffin for her use in preparing her mental status examination of May.

In a letter dated March 20, 2008, Griffin states that in doing mental status examinations, she routinely employs the psychological testing which May seeks to exclude, and notes that these tests use "empirical objective scoring" and have "widely been used nationally as an accepted form of cognitive and diagnostic validity." (*See* March 20, 2008, letter attached as Exhibit B).

There is an abundance of authority, too, showing that these standardized tests are reliable enough to be routinely admitted in cases where a party's mental state is in issue. "[I]t appears that

-4-

the MMPI-2 satisfies the requirements of *Daubert* and the conclusion derived from the results could possibly aid the trier of fact." *Chrissafis v. Continental Airlines, Inc.*, No. 95 C 5080, 1997 WL 534874, *4 (N.D. Ill. 1997) (granting defendant's motion to compel a mental examination utilizing the MMPI-2); *see also, Chrissafis v. Continental Airlines, Inc.*, No. 95 C 5080, 1998 WL 100307, *1-2 (N.D.Ill. 1998) (denying substantially all of the plaintiff's motion *in limine* to bar a psychologist's testimony based on results of the MMPI-2). The MMPI is "the most accepted psychological test" and "the most widely used and researched psychological test available." *Hirschheimer v. Associated Metals & Minerals Corp.*, No. 94 CIV. 6155 (JKF), 1995 WL 736901, *4 (S.D.N.Y. 1995); *See also, Bertaut v. U.S.*, 852 F.Supp. 523, 527 (E.D.La. 1994); *U.S. v. Thomas*, No. CRIM. CCB-03-0150, 2006 WL 140558, *13 (D.Md. 2006). When introduced through the testimony of a psychiatrist, test results from exams such as the Rorschach and MMPI-II should be given "great weight" by administrative law judges. *Gardner v. Barnhart,* No. 02 C 4578, 2004 WL 1470244 *14 (N.D. Ill. 2004).

  The MCMI-III has also been routinely admitted and relied upon in disability hearings contemplated in the Code of Federal Regulations governing Social Security disability benefits. *Johnson v. Sullivan*, No. 90-1352, 1992 WL 78777 *8 (C.D. Ill. 1992) *citing* 20 C.F.R. Part 404, Subpt. P, App. 1. This is also true of the OSI and SCS tests. *See Attia v. Astrue*, No. 1:06-cv-00778-SMS, 2007 WL 2802006 at *26 (E.D. Cal. 2007); *Farfan v. Apfel,* No. 97 C 4574, 1998 WL 677169 at *4 (N.D. Ill. 1998).

  The M-FAST, also commonly relied upon in the social security context, has also been used to aid the trier of fact in determining whether a sex offender was competent to stand trial. *U.S. v. Mason,* 2008 WL 89760 at *5 (M.D. Fla. 2008). TAT test results have been held to be sufficiently

reliable, providing a jury with beneficial insight into the reasons and bases underlying expert opinions for purposes of denying habeas corpus in John Wayne Gacy's death penalty case. *U.S. ex rel Gacy v. Welborn*, No. 89 C 6392, 1992 WL 211018 (N.D. Ill. 1992) *passim.*

As the court pointed out in *Chrissafis*, questions about the accuracy and reliability of such objective psychological exams can be brought out in cross-examination in order to avoid the threat that the jury might be unduly impressed by the results of such testing. 1997 WL 534874 at *4 (N.D. Ill. 1997). Further, these types of tests are not meant "as a stand alone tool, but rather only meant to generate hypotheses which may then be tested through the subsequent clinical interview." *Id*. This is exactly how the test results provided by Dudgeon were utilized by Griffin, and the context in which they will be explained to the jury.

The only test administered to plaintiff which is not cited in judicial opinions is the PDS, or Paulhus Deception Scales test. The PDS consists of a 40 item self-reporting test which measures the tendency of the test taker to give socially desirable responses in an effort to impress others. It is commonly administered as part of a battery of other tests in an effort to determine whether the test taker is purposefully self-enhancing, or unconsciously inflating their self-descriptions because of egotistical self-regard and self-importance. Again, it is just one of a battery of tests commonly used to paint a complete psychological profile, not "a stand alone tool." *Chrissafis*, 1997 WL 534874 at *4.

Illinois law, too, recognizes the reliability of standardized psychological testing as an aid to the trier of fact in assessing the mental health of a party. For example, the Illinois Marriage and Dissolution of Marriage Act expressly allows the state courts to order evaluations and testing by court appointed experts such as psychologists, psychiatrists and counselors in custody proceedings.

750 ILCS 5/604.5, 5/605. As previously noted, the Illinois Mental Health and Developmental Disabilities Act protects compromise of psychological testing:

> (c) Psychological test material whose disclosure would compromise the objectivity or fairness of the testing process may not be disclosed to anyone including the subject of the test and is not subject to disclosure in any administrative, judicial or legislative proceeding. However, any recipient who has been the subject of the psychological test shall have the right to have all records relating to that test disclosed to any psychologist designated by the recipient. Requests for such disclosure shall be in writing and shall comply with the requirements of sub-section (b) of Section 5 of this Act.

740 ILCS 110/3(c).

The Mental Health Act is then incorporated by reference into the Illinois Clinical Professional Counselor Act, which also makes psychological testing a privileged communication. 225 ILCS 107/75. Thus, the law recognizes the legitimacy of psychological testing as a diagnostic tool.

The fact of the tests' standardization speaks to their being peer reviewed and also augers to the examinations not being tailored to this suit but generally used and accepted in the community of clinical psychologists.

In attacking the psychological testing, May attempts first to distinguish the large body of authority arguing that unless some other case involved a plaintiff who was claiming a hostile work environment based on his race, national origin and religion, those cases should have no weight. May's argument forgets that Griffin will not testify on causation, she will only testify as to his mental state at the time she examined him. Why May is emotionally traumatized, if he is, is not her issue; only whether he suffers from the mental and emotional maladies identified by May's witness, Kiley.

Indeed, May can point to only one case in which a district court barred admission of psychological testing results. May quotes *Usher v. Lakewood Engineering & Mfg. Co.,* 158 F.R.D. 411 (N.D. Ill. 1994) where the district court wrote the "exams at issue...were found to be unreliable." 158 F.R.D. 411 (N.D.Ill. 1994). Unlike this case, however, the party seeking to bar the reports from being admitted had provided the court with "substantial information demonstrating the inadequacy of the correlation factors and the validity factors of all five of the tests in question." In that case, rather than addressing the question of validity, the defendant responded by "emphasizing the propriety of its access to a mental examination." 158 F.R.D. at 413. The district court did not allow the testing because the plaintiff had "the far better argument," and at no time did it reach the reliability of the testing itself. *Id.* at 413-14.

Unlike the situation in *Usher*, May's motion *in limine* is noticeably devoid of any evidence or authority calling the validity of the tests into question. Examination of Dudgeon's report reveals that it includes a narrative and subjective explanation of every test administered. Additionally, there are explanations of scoring and meaning of scores as compared to others taking each test, demonstrating peer review and prior reliability and testing of the methodology. For each test given, there is both a description of limitations on results and a general statement that no one test should be relied upon solely; that it is the use of the tests in combination that allow meaningful and reliable conclusions to be drawn. *See Chrissafis*, 1997 WL 534874 at *4.

It has been demonstrated that psychological testing of the type administered by Dudgeon and used by Griffin in her evaluation is peer reviewed, generally accepted in both the psychological and legal communities and not prepared uniquely for this litigation. However, the Court must still determine whether admission of Griffin's testimony and report would aid the jury in understanding

some element of the case or deciding a fact in issue. *See* F.R.E. 702.

May has placed his mental state squarely in issue by claiming that as a proximate result of the harassing behavior at Belvidere Assembly, he has suffered extreme emotional distress in the form of a social adjustment disorder with depressive features and post-traumatic stress disorder. May has listed his treating licensed clinical social worker, Kiley, as a witness who will testify on his opinions regarding the nature and extent of May's "psychological injury." (Final Pretrial Order, Plaintiff's Schedule D, ¶ 2). Indeed, this Court ordered May to submit to a mental examination by defendant's experts pursuant to Rule 35 *because* May's mental state is in issue. May's psychological state is a fact at issue. So, the results of his mental examination by Griffin, including psychological testing she relied upon, are relevant and admissible at trial because a distinct relationship exists between the test results and "a matter probably provable in the case." *Huddleston v. U.S.,* 485 U.S. 681, 689 (1988).

"Factors such as traumatic experiences, personality type, recent or historical stressors, and the presence or absence of a mental illness may affect the plaintiff's perception of workplace incidents. These factors may also affect the severity of the emotional injury and the plaintiff's ability to overcome it." Richard A. Bales & Priscilla Ray, M.D., *The Availability of Rule 35 Examinations in Employment Discrimination Cases,* 16 REV. LITIG. 22 (1997). The test results, report and testimony of Dr. Griffin will assist the trier of fact to understand and determine whether he suffered, and the nature and extent of, any psychological injury suffered by May. *See Ammons v. Aramark Uniform Services, Inc.,* 368 F.3d 809, 816 (7th Cir. 2004).

**2. Jack Calvert's Testimony is Reliable and Will Assist the Jury in Understanding the Evidence and Determining a Fact in Issue.**

May's second motion *in limine* seeks to bar the report and opinion of defendant's proffered expert, Jack Calvert. Calvert is a forensic document examiner who has prepared a report and is expected to testify on his examination of graffiti and threatening notes (the "questioned documents"), as well as comparative exemplars of hand printed documents, and provide his opinions in two areas: (1) whether the notes and graffiti share a single author; and (2) whether any of the authors of known exemplars may be eliminated as the source(s) of the questioned documents.

May seeks to exclude Calvert's testimony on several bases: that Calvert's report does not include the "how and why" of his opinions; that Calvert's opinions and report is not relevant and is more prejudicial than probative; that Calvert's report is not reliable within the meaning of *Daubert*; and, because under *U.S. v. Fujii*, 152 F.Supp. 2d 939 (N.D.Ill. 2000), a "handwriting expert" was barred from testifying.

Examination of Calvert's report, which includes his curriculum vitae, shows that May's arguments regarding the reliability of Calvert's methodology are ill founded. (See Exhibit C).

To begin, Calvert is more than qualified in terms of experience, training and knowledge to render an opinion in the field of forensic document examination. The Court of Appeals for the Seventh Circuit has previously found that the experience, knowledge or training of a document examiner were sufficient to allow the expert to testify. *See U.S. v. Tipton*, 964 F.2d 650, 653 (7th Cir. 1992). That forensic document examination is a recognized and accredited field is demonstrated by Calvert's own appointment as a Diplomat of the American Board of Forensic Document Examiners, a distinction he has held since 1978. During his long and distinguished career in law

enforcement, he has worked as an examiner of questioned documents for various governmental agencies including the Michigan State Police, the Federal Bureau of Alcohol, Tobacco and Firearms, as the co-founder of the Internal Revenue Service Criminal Investigation Division National Forensic Laboratory and as Director of the IRS National Forensic Laboratory for 11 years until his retirement in 1994. Since 1994, Calvert has operated his own forensic laboratory from his home in Harvard, Illinois.

He has provided testimony in twenty-six states and in ten federal circuits. Indeed, within this circuit and district, there are individuals who have been criminally convicted based in part on Calvert's testimony as a forensic document examiner. *See, e.g., U.S. v. Scott*, 660 F.2d 1145, 1169 (7th Cir. 1981). His curriculum vitae shows a vast amount of experience and training, both as student and mentor, in the field of forensic examination of questioned documents. The fact that Calvert was the director of the IRS Criminal Investigations Division National Forensic Laboratory clearly establishes that there is a community of forensic experts that test, review, standardize and apply the science of document examination.

May also asserts that Calvert's report is not detailed enough to satisfy the disclosure requirements of Rule 26(a)(B)(2). Again, simple review of the report reveals expert conclusions well supported by detailed methodology. The findings are 15 pages long and describe: the scope of the examination requested; specifically what was examined; the various methods of examination employed; the results of each examination with conclusions; and the peer reviewed and generally accepted science behind each method of examination as used in community of forensic document examination.

The report includes hundreds of digital color photographs of questioned documents. Additionally, there is an appendix to the report (not attached to this memorandum but provided to plaintiff) which includes reproductions of the hundreds of known documents (handwritten employment applications, work logs, *etc.*) which Calvert examined to form a basis for comparison to the unknown or questioned documents.

The examination methods included the use of hand held lenses, a low power stereomicroscope, digital enhancement and reduction, electrostatic detection apparatus and a video spectral comparator. Spectrographic analysis was used to compare types of ink, the amount of pressure applied by the author(s) while printing by hand and the direction of pen strokes as revealed by such things as the bending of fibers in the paper. Calvert took into consideration proportional size and spacing, letter formation and placement, common personal characteristics, natural variances and the lack of significant differences in the various exemplars. Using time and attendance records, many of the known exemplars could be eliminated from consideration ("These individuals were not present on one or more of the dates the twenty-five questioned notes were found." Report, p. 14).

Paraphrasing, Calvert: (1) believes that the graffiti and notes were prepared in a forced and unnatural style that connotes a deliberate attempt to disguise the author; (2) is "virtually certain" that all of the notes and graffiti were authored by the same individual; and (3) to varying degrees of scientific certainty, believes that many individuals can be eliminated from suspicion. (Report, *passim*).

Rule 26(a)(2)(B) requires that an expert's report be detailed and complete, including the substance of the testimony which the expert is expected to give so that opposing counsel need not be forced to take a deposition in order to avoid ambush at trial. *Salgado by Salgado v. General*

*Motors Corp.,* 150 F.3d 735 at fn. 6 (7th Cir. 1998) (citations omitted). Calvert's report clearly provides plaintiff with all of the information needed; plaintiff is satisfied enough with the detail of Calvert's report that he has chosen not to take his deposition apparently confident he will not be ambushed at trial.

May repeatedly refers to Calvert rather pejoratively as a "handwriting expert," and asserts that such testimony is not reliable within the meaning of *Daubert*. In doing so, May incorrectly moves the focus of the inquiry away from the soundness of the methodology and attempts to impugn the body of forensic science and, thereby, Calvert's conclusions. *Deputy*, 345 F.3d at 506.

*Deputy* is particularly instructive as in that case, the district court was held to have incorrectly barred the testimony of a document examiner on the issue of comparison of a signature on two documents. *Id.* The district court in *Deputy* cited seven reasons that it found the expert's opinion to be inadmissible. The Court of Appeals rejected these reasons finding that "these seven stated reasons concerned issues of credibility and persuasiveness, but such considerations are relevant only in valuing the testimony, not in determining its admissibility." *Id.* The case was remanded to the district court with instruction to the lower court to properly function as a gatekeeper pursuant to *Daubert*. *Id.* at 509.

The appellate court specifically addressed whether the expert's testimony should have been allowed under *Daubert*.

> If by 'inconsistencies in her reasoning process' the district court meant that [the expert] failed to follow the proper standards required of handwriting experts, that was an appropriate inquiry under *Daubert*. [The expert] did, however, present evidence as to the methodology used by handwriting experts and which she used in this case, and no evidence was presented to dispute her testimony.

*Id.* at 508.

As described above, Calvert has gone to great length to describe with particularity the methodology employed by forensic document examiners generally and in this case in examining both questioned documents and comparing them to known documents. As in *Deputy*, May has presented no evidence which would call the reliability of the methodology into question or which would dispute Calvert's evidence regarding the science of document examination.

Finally, regarding admissibility of Calvert's testimony under F.R.E. 702, May asserts that his opinions will not aid the trier of fact and that the prejudicial impact his testimony would have on May's case is greater than its probative value. *See* F.R.E. 403. This Court has already determined that the only issue for trial will be whether steps taken by Chrysler in response to vandalism, graffiti and threatening notes directed at May were "reasonably intended to stop the behavior." (Docket Doc. #80, 9/26/06 Order).

Thus, May will undoubtedly focus his trial efforts on expounding on the nature and extent of the horrific behavior directed at him and on Chrysler's apparent (to him) indifference and inaction. He will argue that no matter what Chrysler did, it was both insufficient and ineffective. Chrysler clearly will introduce evidence of everything it did do in its efforts to stop the behavior. The fact that Chrysler was unable to stop the behavior for three years is not relevant, only whether its actions were reasonably intended to stop the notes and graffiti. *Id.; see also Williams v. Waste Management of Illinois,* 361 F.3d 1021, 1030-31 (7th Cir. 2004) *citing Berry v. Delta Airlines,* 260 F.3d 803, 811 (7th Cir. 2001). The ultimate factual determination for the jury is whether Chrysler acted with a reasonable intent to stop the behavior.

Under Rule 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence *or to determine the fact in issue*," expert opinion is admissible.

May was deposed in this case as a fact witness on January 5, 2006. (Calvert's deposition is attached to plaintiff's LR56.1 Statement of Facts in opposition to Chrysler's motion for summary judgment as his Exhibit 63.) Calvert testified that he was hired in February, 2003, to assist Chrysler in identifying the source of the offending graffiti and notes and that it was his understanding at the time of his hiring that his role was as an investigator, not for purposes of litigation support. He also testified, as did Chrysler employees, that from his hiring in early 2003 until his deposition, he had been provided by Chrysler with information concerning every incident of graffiti or a note as it occurred and, in one case, was provided with an original note. He was also given known source documents which had original printed writing samples of maintenance department employees who knew May, such as employment applications and work logs.

It is undisputed in this case that the source of the graffiti, notes and vandalism is a person or persons who know May well, they know his work schedule, what kinds of cars he drives, his personal toolbox and lockers, his ethnicity, *etc.* In 2006, long before his final report as provided pursuant to Rule 26(a)(2) was prepared and disclosed, Calvert had advised Chrysler that there was a high probability that the notes and graffiti were all being done by a single individual. (Calvert deposition, p. 28). This, in turn, allowed Chrysler to focus investigative efforts on timekeeping and attendance records to determine who was in the plant at the times of various incidents to eliminate as suspects those individuals who did not have opportunity. For example, an employee who intensely disliked May was terminated in early 2004 and, thereby, could not have been authoring threatening notes and graffiti after his termination.

Additionally, Calvert has prepared a report as an expert forensic document examiner. His report will aid the jury in understanding both what Chrysler did do to try to stop the graffiti and notes

-15-

and why, despite its efforts, it was unable to stop the behavior for so long. Calvert will not testify that he was able, to a reasonable degree of scientific and forensic certainty, to identify the culprit, only that he was able to reasonably eliminate certain individuals from suspicion.

Calvert's testimony and report are offered to assist the jury in determining *the* fact in issue. F.R.E. 702. May asserts that Calvert's report will prejudice his case because "it's skewed to fingering May as the author of the anonymous notes and graffiti." (Plaintiff's Motion *in Limine* No. 2, p. 7). In fact, the report does nothing to "finger" May concluding only that he cannot be eliminated with a reasonable degree of certainty as the source. Other than the lack of a conclusion otherwise, there is nothing in the report suggesting that May is the source. All evidence has some prejudicial impact on one side or the other. The inquiry under Rule 403 is not whether evidence has any prejudicial impact but whether it is of more probative value than it is prejudicial. Here, Chrysler has shown that Calvert's testimony and reports are reliable, admissible under Rule 702, and will be probative in aiding the jury in determining the ultimate fact in issue.

## Conclusion

For all of the foregoing reasons, Chrysler Group LLC respectfully submits that Plaintiff's Motions *in Limine* Numbers 1 and 2 should be denied and the reports and testimony of Dr. Rosalind Griffin, M..D. and Jack Calvert be admitted.

         /s/ Stephen E. Balogh
Stephen E. Balogh
Attorney for CHRYSLER GROUP LLC
WilliamsMcCarthy LLP
120 W. State St., Suite 400
P.O. Box 219
Rockford, IL  61105-0219
Telephone:  (815) 987-8946
E-mail:  sbalogh@wilmac.com

**CERTIFICATE OF LAWYER**

The undersigned hereby certifies that on July 8, 2010, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Attorney Karen J. Doran
20 Danada Square West, Suite 149
Wheaton, IL  60189

    /s/  Stephen E. Balogh
Stephen E. Balogh
Attorney for defendant,
CHRYSLER GROUP LLC
WilliamsMcCarthy LLP
120 W. State St., Suite 400
P.O. Box 219
Rockford, IL  61105-0219
Telephone:  (815) 987-8946
Facsimile:  (815) 968-0019
E-mail:  sbalogh@wilmac.com