IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| OTTO MAY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 50440 |
| | ) | |
| vs. | ) | Judge Frederick J. Kapala |
| | ) | |
| CHRYSLER GROUP LLC, | ) | Magistrate Judge P. Michael Mahoney |
| | ) | |
| Defendant. | ) | |

**CHRYSLER'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant, Chrysler Group LLC ("Chrysler"), moves this Court for entry of a judgment as a matter of law in its favor and against plaintiff, Otto May, Jr., and dismissing this cause as against Chrysler, with prejudice.

**I.   Introduction**

Plaintiff, Otto May, Jr., has two claims against Chrysler; one pursuant to Title VII and one, based on his race (Hispanic) pursuant to 42 U.S.C. § 1981. The question for the jury is whether the steps taken to remediate acts of vandalism, graffiti and notes directed toward Mr. May from 2002 through 2005 were reasonably intended to stop the harassment.

**II.   Standard for Granting a Rule 50 Motion for Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50 provides that, once a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may grant a motion for judgment as a matter of law against the party. Fed.R.Civ.P. 50(a). Such a motion may be made at any time before the case is submitted to the jury. Fed.R.Civ.P. 50(b). The motion must

1

specify the judgment sought and the facts that entitle the movant to the judgment. *Id*. The standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that "the inquiry under each is the same." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109 (2000) (citations omitted); *accord, Murray v. Chicago Transit Authority*, 252 F.3d 880, 886-87 (7th Cir. 2001).

**III.   Argument**

May asserts that Chrysler has failed in its obligation to act reasonably to stop harassing behavior directed against him at its Belvidere Assembly Plant (õBAPö) between 2002 and 2005. In order prove an actionable claim for a hostile work environment, May must show that:   (1) he was subjected to unwanted harassment; (2) the harassment was because of his protected status; (3) his work environment was so pervaded by prohibited harassment, such as intimidation, ridicule and insult, as to have altered the terms and conditions of his employment that seriously affected his psychological well-being; and (4) there is a basis for employer liability.   *Herron v. DaimlerChrysler Corporation*, 388 F.3d 293 (7th Cir. 2004).

Assuming for the sake of this motion that the harassment was unwanted, pervasive and because of Mayøs protected statuses, it must still be shown that Chrysler failed to take reasonable steps to discover and rectify harassment by its employees or it will not be liable for a hostile work environment. *Baskerville v. Culligan International Co.*, 50 F.3d 428, 431 (7th Cir. 1995).

Since 2002, there were a total of approximately 60 incidents of vandalism, graffiti and notes, combined.   The last known incident, involving graffiti, occurred in December, 2005.   The notes and graffiti are aimed at May and directly reference his race, national origin and religion. The plaintiff has now rested his case and all of the evidence leads to the conclusion that Chrysler

2

acted, from the outset, with speed, vigor and purpose in attempting to stop the behavior. The witnesses called by the plaintiff, particularly Rick McPherson and Kim Kuborn, testified to a group effort both at the local facility and by corporate headquarters to identify and stop the individual responsible for the harassing behavior. They both testified extensively to both measures taken and measures considered.

The only suggestion of a failure to do more by the plaintiff has been a repeated reference to the installation of surveillance cameras and the jury and court have heard that this was considered but not done for both practical and business reasons. Particularly, both McPherson and Kuborn said it was their understanding that the installation of surveillance cameras in the workplace was a mandatory subject of bargaining and would have required the consent of the UAW International. This is, in fact, legally true and correct. *National Steel Corporation v. National Labor Relations Board,* 324 F.3d 928, 932 (7th Cir. 2003).

Our Supreme Court has said that an employer may affirmatively avoid liability for a hostile work environment perpetrated by co-workers where it can show that it has not been negligent in discovering or remedying the harassment.[1] *Ellerth,* 524 U.S. 742, 765 (1998). Upon discovering the harassment, if the employer takes prompt and reasonable measures calculated to end the harassment, its duty is discharged even if the harassment does not stop. *Williams*, 361 F.3d 1021, 1030-31 (7th Cir. 2004) *citing Berry v. Delta Airlines,* 260 F.3d 803, 811 (7th Cir. 2001). Even if the employer's response is lacking, liability will ensue only if it can be shown that

---

[1] Since *Ellerth* requires that the employer raise the reasonableness of its response affirmatively, it is noted for the Court that Chrysler has, in fact, affirmatively pled throughout its answer to the amended complaint that "Chrysler denies it has failed to appropriately respond and take remedial action in response to complaints by May." (Answer, ¶¶ 19, *et seq.*).

the measures taken by the employer were not reasonably likely to prevent the harassment from recurring. *Id.*; *see also, Eade v. Motorola, Inc.*, 2004 WL 2203400 (N.D. Ill. 2004) at *2.

May complained to the BAP in the Spring of 2002, that his car was being vandalized in the employee parking lot. May was allowed to park in the salary employee's lot where his car could be observed by security through the use of video surveillance. The instances of alleged vandalism have all but stopped.

As soon as the notes and graffiti began to occur, Chrysler began an affirmative course of action. Immediately following the discovery of the first note and graffiti, human resources created and directed a process by which every future instance was to be photographed, documented, reported to human resources and any graffiti obliterated. As part of documentation, anyone finding graffiti or a note, as well as anyone in the vicinity at the time of discovery, was to be interviewed.

At the outset, May was interviewed to determine if he could provide any help. Rather than cooperate, May made it known that he did not trust local human resources personnel or his union. A representative of the corporate Workforce Diversity Office came to the BAP to meet with May. Although May did provide this individual, Scott Huller, with a list of names of people who had reason not to like him, he would not cooperate indicating only that it was Chrysler's job to do the legwork necessary for catching someone.

Also at the outset, the Human Resources Manager, Rick McPherson, in an unprecedented move, met personally with all of the maintenance personnel assigned to the paint department. McPherson told them that the behavior would not be tolerated and that the involved employee(s)

4

would be terminated. He also asked for cooperation in the provision of information and stopping the behavior.

Additionally, under the auspices of the human resources office, training sessions were held with every employee of the paint department, including production operators and management to reiterate Chrysler's zero tolerance harassment policies. The written harassment policy was republished by being mailed to every BAP employee (in a paycheck) and disseminated plant wide.

Later in 2002, a new Paint Center Manager, Steve Hughes, met with all of his employees, including maintenance employees, assigned to the paint department, and specifically told them that he would not tolerate the notes and graffiti. He implored his employees to help him catch the culprit so that they could all get back to building cars.

In 2002, management, both locally and at the corporate level, was discussing the possibility of the installation of video surveillance equipment, at least in the paint department. This idea was ultimately rejected as impractical given the size of the plant and the lack of union consent. Indeed, because the installation of cameras in the workplace is a mandatory subject of bargaining (s*ee, e.g., National Steel,* 324 F.3d at 932), McPherson not only consulted with his corporate superiors, but also met with the president of the local union. In that meeting, the local president told McPherson that he did not object to cameras being used to catch whoever was behind the graffiti so long as he had McPherson's promise that, if caught, the offending employee would not be terminated. The idea of not being able to terminate the offending employee was not palatable to Chrysler.

Chrysler has obtained the services of a fingerprint expert and an expert forensic document examiner. To aid these individuals, one of the original notes was retained and protected so it

could be examined by both. Also, original handwriting samples were collected on all maintenance personnel assigned to the paint department, including departmental maintenance logbooks, and provided to the document examiner. Two employees, one supervisory and one hourly, consented to give additional samples for use by the examiner.

In an effort to narrow the population of possible suspects, Chrysler has used its electronic timekeeping system to isolate who was in the plant at the time of discovery of some of the instances of graffiti or notes. Where the time an instance of graffiti or a note was placed could be reasonably isolated, Kuborn has pulled gate rings and crew sheets (payroll documents) showing who was in the plant for a reasonable period of time preceding discovery.

For example, there was an incident of graffiti found in the paint department on January 5, 2004, at approximately 7:30 a.m. January 5, 2004, was a Monday following a two week plant closure for the holidays. There was some certainty that the graffiti had not been there prior to the closure, and it was discovered very quickly after the production employees returned to work that morning. It is unlikely that the graffiti was put up after the production employees had begun to return because of the number of people around. Assuming that the graffiti was put up during plant closure, records were pulled to determine who had been in the plant during the two week break working plant patrol. Records have been pulled on fourteen occasions and there is no single employee, except for May, whose name appears in the records on every occasion.

No reasonable juror could conclude that the steps taken by Chrysler were not reasonably intended to stop the offending behavior. Indeed, the testimony and evidence shows that the steps taken by Chrysler did, in fact, first curtail and then eventually stop the behavior. Chrysler cannot be liable simply because it failed to identify the responsible person. *Williams*, 361 F.3d at 1031.

## V. Conclusion

For all of the reasons set forth in this motion and memorandum, it is respectfully submitted that this Court should enter judgment as a matter of law in favor of Chrysler Group LLC and against plaintiff, Otto May, Jr.

      /s/ Stephen E. Balogh
Attorney for CHRYSLER GROUP LLC
WilliamsMcCarthy LLP
120 W. State St., Suite 400
P.O. Box 219
Rockford, IL   61105-0219
Telephone:   (815) 987-8946
E-mail:   sbalogh@wilmac.com

## **CERTIFICATE OF LAWYER**

The undersigned hereby certifies that on August 30, 2010, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

>Attorney Karen J. Doran
>20 Danada Square West, Suite 149
>Wheaton, IL   60189

>/s/   Stephen E. Balogh
>Stephen E. Balogh
>Attorney for defendant,
>CHRYSLER GROUP LLC
>WilliamsMcCarthy LLP
>120 W. State St., Suite 400
>P.O. Box 219
>Rockford, IL   61105-0219
>Telephone:   (815) 987-8946
>Facsimile:   (815) 968-0019
>E-mail:   sbalogh@wilmac.com