```
 1                THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        WESTERN DIVISION

 3   OTTO MAY, JR.,              )      Docket No. 02 C 50440
                                 )
 4              Plaintiff,       )      Rockford, Illinois
                                 )      Wednesday, August 25, 2010
 5         v.                    )      8:45 o'clock a.m
                                 )
 6   CHRYSLER GROUP LLC,         )
                                 )
 7              Defendant.       )

 8                          VOLUME 1
                        TRANSCRIPT OF TRIAL
 9        BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury

10   APPEARANCES:

11   For the Plaintiff:         MS. KAREN J. DORAN
                                (20 Danada Square West,
12                               Suite 149,
                                 Wheaton, IL  60189)
13
                                MEDINA LAW
14                              (171 S. Oak Park Avenue,
                                 Oak Park, IL   60302) by
15                              MS. DEANNE S. MEDINA

16   For the Defendant:        WILLIAMS MCCARTHY LLP
                               (120 W State Street,
17                              Suite 400,
                                Rockford, IL  61101) by
18                             MR. STEPHEN E. BALOGH

19                             SHOOK, HARDY & BACON
                              (2555 Grand Boulevard,
20                             Suite 2800,
                               Kansas City, MO  64108-6550) by
21                            MR. WILLIAM C. MARTUCCI
                             MS. KRISTEN A. PAGE
22
     Also Present:            MR. ANTHONY MINNEYFIELD
23
     Court Reporter:          Mary T. Lindbloom
24                            211 South Court Street
                              Rockford, Illinois  61101
25                            (815) 987-4486
```

1    (The following proceedings were had in open court, out of

2    the presence and hearing of the jury:)

3         THE CLERK:  02 C 50440, May v. Chrysler.

4         THE COURT:  Good morning.

5         MR. BALOGH:  Good morning, your Honor.

6         MS. DORAN:  Good morning, your Honor.

7         MS. MEDINA:  Good morning, your Honor.

8         THE COURT:  Let's take care of some preliminary

9    matters.  First of all, I will grant the motion for leave to

10   appear pro hac vice by Kristen Page.

11        MR. BALOGH:  That's Kristen Page right there, your

12   Honor.

13        MS. PAGE:  Thank you, your Honor.

14        THE COURT:  You're welcome.

15        The joint stipulation of facts.  Do you want to read it

16   right after opening statements?

17        MR. BALOGH:  I think that would be fine, your Honor.

18        THE COURT:  Do you want me to read it?

19        MS. DORAN:  I'd actually like them read right before

20   opening statements.

21        THE COURT:  All right.  And the statement of the facts

22   that is -- or the statement of the case that I'm going to give

23   to the jurors is the same one that's in the pretrial order.

24        MR. BALOGH:  That's fine, your Honor, with the defense.

25        MS. DORAN:  It's fine with plaintiff, as well.  Thank

PDF created with pdfFactory trial version www.pdffactory.com

1    you.

2           THE COURT:   Pronunciation of the witnesses.   Kimberly

3    K. --

4           MR.  BALOGH:   Kuborn, your Honor.

5           THE COURT:   George Bertone.

6           MR.  BALOGH:   It's Bertone.

7           MS.  DORAN:   This is very helpful.

8           MR.  BALOGH:   The Italian.

9           MS.  DORAN:   The Italian.

10          THE COURT:   Zach Budden.

11          MR.  BALOGH:   Budden.

12          THE COURT:   Scott Huller.

13          MR.  BALOGH:   Huller.

14          THE COURT:   And the joint list that I have is the same

15   list that the jurors have?

16          MR.  BALOGH:   It should be, your Honor, yes.

17          MS.  DORAN:   That's the one that was e-mailed Word

18   Perfect yesterday.

19          MR.  BALOGH:   I think both sides gave the same list to

20   Susan, yes.

21          THE COURT:   Regarding exhibits, thank you for the work

22   that you did.   I suppose I should say prescreening the exhibits.

23   But I have a question for you.   First, plaintiff has proposed 77

24   exhibits.   Defendant has no objection to 71 of those 77

25   exhibits.   Defendant does, however, object to the following

1  proposed exhibits based upon the appropriate scope of the case

2  consistent with the final pretrial order.  And then you give me

3  one, two, three, four, five, and six.  Is that still the same?

4            MR. BALOGH:  Actually, your Honor, I would narrow the

5  objection.  I think five and six on the final list we got are

6  both within the scope of the case.  However, I would think that

7  Exhibits 1, 2, 3, and 4 all predate the scope of the case, and

8  their entry would violate the court's order on the motions in

9  limine.

10           THE COURT:  And so --

11           MR. BALOGH:  I take that back.  It's 1, 2, 3, 4, and 5.

12           THE COURT:  And your objection is that they predate the

13  incidents which form the basis of this suit.

14           MR. BALOGH:  Your Honor, the first incident of

15  vandalism to Mr. May's car is alleged to have occurred in

16  February 2002.  Exhibits 1 through 5 all predate that.  In the

17  motion in limine, the court said we could get into an incident

18  involving Eldon Kline, and you'll see Mr. Kline's name on the

19  list here a couple times, but the incident referred to in the

20  motion in limine was an incident that occurred involving a

21  Hispanic employee by the name of Omar Sepulveda in 2002, and

22  these exhibits don't relate to that incident.

23           THE COURT:  Attorney Doran?

24           MS. DORAN:  Well, we believe that Exhibits 1 through 5

25  give context to the jury.  Again, Exhibits 1 and 3 relate to

PDF created with pdfFactory trial version www.pdffactory.com

1    instances arising between the plaintiff and Mr. Kline in 1998

2    and then Mr. Kline's demotion in 2001.  These give color and

3    context to Mr. May's suspect list that he gave to Chrysler.  It

4    gives them an understanding of why he's on the suspect list, and

5    we believe that the jury has a right to know this stuff so that

6    they can make a determination as to whether or not Chrysler took

7    reasonable steps.  In addition, the Kuborn binder itself has a

8    "what we did" document.

9            MR. BALOGH:  She's referring now, I think, to

10   Defendant's Exhibit Number 1.

11           MS. DORAN:  Well, I'm referring to the central

12   documents binder.  There's a document in here that's numbered --

13   it's like a new Bates number for purposes of the binder

14   itself -- five.  There's information in here that's been

15   redacted.  I believe that counsel probably redacted it for the

16   same reasons that they're bringing up here in court.  I have the

17   unredacted version that was given to us in discovery, and in

18   this version it refers to the information that's in Exhibits 1

19   through 5.

20           So, in other words, this document unredacted, the

21   virgin document that was part of the central documents binder

22   that I think their defense is that this explains what they did,

23   this shows the jury what these people did in response to the

24   harassment.  The original document includes information about

25   the stuff that they're seeking to exclude from trial now.

1          MR. BALOGH:  Your Honor, all of this, quite frankly,

2     from '98 and '01, the Stumpf radio incident, was all dealt with

3     in Judge Reinhard's ruling on the motions for summary judgment

4     and is not at issue in this case.  If we're allowed to start

5     talking about Eldon Kline's run-in with Mr. May in 1998, then

6     we're going to have to start introducing evidence to show that

7     there was an investigation, that it went through the OFCCP, that

8     Mr. Kline was ultimately fired as a supervisor, and it's just

9     going to reopen a can of worms that's been put behind us.

10          THE COURT:  Do you have an exhibit book for me?

11          MS. MEDINA:  Yes.

12          MS. DORAN:  May I respond to that?

13          THE COURT:  Sure.

14          MS. DORAN:  You know, again, the issue is not -- we're

15     certainly by no means going to try to get this information in

16     front of the jury to claim that his cause of action has anything

17     to do with Chrysler properly dealing with the grievance,

18     anything, you know, properly dealing with these allegations of

19     harassment prior to 2001.  We're simply seeking to include this

20     information and show the jury this information so that they

21     understand the full context.

22          Here we have a list where he says Dave Stumpf, John

23     Myers, Eldon Kline I believe are suspects, and this information

24     colors that.  It explains to the jury what did everybody know at

25     this time.  It's not relevant what Chrysler did in response to

1    Mr. May's 2008 grievance.  We don't have to reopen that can of

2    worms.  It's simply relevant that Chrysler knew that Mr. May had

3    claimed race discrimination against, for example, Eldon Kline,

4    had claimed that John Myers was behind knocking over his lockers

5    prior to 2002, had claims that John Stumpf had made a derogatory

6    comment, racist comment, to him over the radio prior to 2002.

7    It colors the suspect list.

8           And the jury, we believe, ought to get that information

9    to be able to make its determination as to whether Chrysler's

10   failure to investigate or failure to talk to these guys after

11   2002 was reasonable, given what they knew.

12          MR. BALOGH:  Your Honor, and here's my concern.  And I

13   understand that plaintiff's counsel is saying this kind of puts

14   in context why Mr. May might have thought these guys were

15   involved.  The problem is if, for example, we talk about the

16   David Stumpf radio incident, which has already been ruled on in

17   a motion for summary judgment, then the jury will be left to

18   wonder, unless we put into evidence the same things that were

19   put into evidence in the motion for summary judgment in

20   Mr. Stumpf's case, that being that there was an investigation,

21   and he was, in fact, disciplined for misuse of the radio.

22          Eldon Kline.  There was an investigation.  He was, in

23   fact, ultimately discharged as a supervisor.  In Mr. Myers'

24   case, there was an investigation.  It was found that Mr. May's

25   accusation regarding the locker could not be substantiated or

PDF created with pdfFactory trial version www.pdffactory.com

1    corroborated. And we have to put all of that into evidence.

2    Again, it's been decided.

3          THE COURT: All right. Let me give it some thought,

4    and I'll give you a ruling before we start calling witnesses.

5          The next paragraph says defendant has proposed five

6    exhibits. Plaintiff objects to portions of Defendant's

7    Exhibit 1 based upon this court's ruling on defendant's motion

8    in limine two. What portions of one do you object to?

9          MS. DORAN: I'm going to withdraw that objection, but I

10    do -- I honestly think that counsel and I can work this out

11    because really -- if I could just have a minute to talk.

12          THE COURT: Sure.

13    (Brief pause.)

14          MR. BALOGH: Your Honor, while they're chatting, just a

15    couple of housecleaning matters. Number one --

16          THE COURT: Housekeeping.

17          MR. BALOGH: Housekeeping. What did I say?

18    Housecleaning? Well, it could use a cleaning.

19          There's a witness that we'll be calling in the defense

20    case, one of the experts, and it is our intent, just so no one

21    is surprised, to ask that witness at some point to use a

22    demonstrative exhibit, to step down from the witness stand and

23    talk to the jury while using the demonstrative exhibit.

24          THE COURT: That's fine.

25          MR. BALOGH: The other thing is, your Honor, and the

1    court may already be aware.  I know that we talked to the CSOs

2    about it.  There is a story about this case in this morning's

3    Register Star, and so we just need to make sure that everybody

4    is cautioned accordingly.

5                THE COURT:  Right.  I'll caution the jury repeatedly

6    through the case that they're to refrain from seeing or hearing

7    any media accounts of the trial while it's in progress.  When we

8    get the jury panel in here, I'll ask them if any of them have

9    seen it.  Then I'll explore with them whether it has predisposed

10   them --

11               MR. BALOGH:  It was on the Register Star website

12   yesterday and then in this morning's paper, same story.

13               And then one other thing and I think Mr. -- did you

14   take care of the exhibits?  I'll stop talking if you did.

15               MS. PAGE:  I don't want to speak for Ms. Doran, but I

16   think we have worked that out.

17               THE COURT:  Okay.

18               MS. DORAN:  See, I knew we could.

19               MS. PAGE:  Yes.

20               THE COURT:  Judith Caliman is not here?

21               MR. BALOGH:  She's not here yet, your Honor.  She'll be

22   here later this morning.

23               MS. DORAN:  Who?

24               MR. BALOGH:  Judith Caliman.

25               MS. DORAN:  Oh, she will be.  Okay.

1      MR. BALOGH:  I've handwritten a list, your Honor, of

2  those that would be off and on present at the defense table.

3      THE COURT:  Tom, can you get that for me?

4      MR. BALOGH:  And the cities that each is from

5      THE COURT:  Will Judith Caliman be here before we call

6  the jury in?

7      MR. BALOGH:  I don't know.  Will Judith be here before

8  we -- I don't know that she'll be here before we start picking

9  the jury, your Honor.

10      THE COURT:  You see, that was the whole idea, though,

11  is to introduce the people at counsel table to the jurors to

12  find out if there's any familiarity.

13      MR. BALOGH:  She missed a flight and got in very, very

14  late last night.

15      MS. DORAN:  She's from Detroit.  I mean --

16      THE COURT:  Okay.  We don't have to worry about that.

17      MS. DORAN:  Yeah.  Plaintiff doesn't -- for the record,

18  plaintiff's not worried about that.

19      THE COURT:  All right.  When she comes in, I'll

20  introduce her to whoever's in the box.

21      MR. BALOGH:  And we're also going to have a corporate

22  representative present at the table.  He's also one of the

23  witnesses.  He's one of the managers from Belvidere Assembly.

24      THE COURT:  I thought that was who Judith Caliman was.

25      MR. BALOGH:  No.  Judith Caliman is from the office of

1    general counsel.  She'll likely be sitting in the back while

2    she's here.  I don't think she intends to -- she doesn't intend

3    to sit at counsel table.

4              THE COURT:  All right.

5              MS. DORAN:  Judith is a witness.

6              MR. BALOGH:  She was, I thought, removed from the list.

7              MS. DORAN:  She's not on my witness list, but she is a

8    witness in this case.  I would object to Chrysler having more

9    than one corporate agent.

10             MR. BALOGH:  She is not the corporate representative.

11             MS. DORAN:  How many people are on that list that you

12   gave to the judge?

13             MR. BALOGH:  Five.

14             MS. DORAN:  Okay.  So, just Judith and --

15             MR. BALOGH:  Judith, Bill, Kristen, me, and Anthony

16   Minneyfield.

17             MS. DORAN:  That's the fellow that's --

18             MR. BALOGH:  He's the manager from Belvidere Assembly.

19   I think his title is actually supervisor.  Isn't that correct?

20   Paint department supervisor?  He's an area manager.  He's been

21   promoted since we took his deposition.

22             MS. DORAN:  He's paint area manager?

23             MR. MINNEYFIELD:  Yes.

24             THE COURT:  All right.  This is Anthony -- he'll be

25   sitting at counsel table then?

1    MR. BALOGH:   Yes, your Honor.

2    MS. DORAN:   We would object to Judith Caliman being in

3    the courtroom then because she -- I may need to call her as a

4    rebuttal witness.

5    MR. BALOGH:   Your Honor, there is absolutely nothing

6    that Judith Caliman can testify to in this case.   She's an

7    attorney for Chrysler.

8    MS. DORAN:   She's all over the documents.

9    MR. BALOGH:   As counsel.   So am I.

10   MS. DORAN:   And her notes concerning a conversation

11   that she had with their HR director is part of the exhibits in

12   this case.   She is a witness.   There are notes that she wrote.

13   THE COURT:   She's not on the list.

14   MS. DORAN:   No.   She was on the list.   I was going to

15   call her, and now I may call her -- I may need to call her as a

16   rebuttal witness.

17   MR. BALOGH:   If that were to happen, your Honor, we

18   would move immediately to quash that.   She's an attorney.

19   Everything -- we've redacted every document she authored as

20   privileged, and there's never been an objection.

21   MS. DORAN:   It's not true, your Honor.   We have

22   documents relating to a conversation that she had with Rick

23   McPherson where he took notes.   We have the document.   It was

24   produced in discovery.   I would be asking her about that.   She

25   is a witness.

PDF created with pdfFactory trial version www.pdffactory.com

1              THE COURT:  Has she entered her appearance?

2              MR. BALOGH:  No, but she's with the office of general

3  counsel.  She's the client here.

4              MS. DORAN:  She can be the client, but Mr. Minneyfield

5  can't be here then.

6              THE COURT:  Well, we're talking about two things.

7  We're talking about who can sit at counsel table, and I agree

8  with you that it's sufficient if one person sits at counsel

9  table.  That will be Mr. Minneyfield.

10             MR. BALOGH:  That's correct, your Honor.

11             THE COURT:  Now we're talking about Caliman can remain

12  in the courtroom  Why don't you have her enter her appearance?

13             MR. BALOGH:  We can do that.  Have her enter her

14  appearance.  This is her, your Honor.

15             THE COURT:  Ms. Caliman, nice to meet you.

16             MS. CALIMAN:  Good morning, your Honor.

17             MR. MARTUCCI:  That's fine, your Honor.

18             THE COURT:  All right.  I'll have her enter her

19  appearance.  I'll give her leave to enter her appearance, and,

20  if she does, then she can remain in the courtroom

21             MR. BALOGH:  We'll get that filed by the end of the

22  day.

23             MS. DORAN:  Well, then I would just want my objection

24  noted for the record, though, that she is a fact witness in this

25  case, and I may need to call her.

1  THE COURT:  All right.  And what's Mr. Minneyfield's
2  office, position?
3  MR. BALOGH:  He is the paint area manager of the
4  Belvidere Assembly Plant.
5  MS. DORAN:  Second shift.
6  THE COURT:  Okay.  Do the parties have any objection
7  during my initial admonitions to the jury to say that Chrysler
8  Group LLC is a limited liability -- is it company or
9  corporation?
10  MR. BALOGH:  It's a company, your Honor.  A limited
11  liability company.
12  THE COURT:  And is entitled to the same consideration
13  as if it were an individual.
14  MR. BALOGH:  Yes, we would urge it.
15  THE COURT:  All right.  That's all I have.  What else
16  do you have?
17  MR. BALOGH:  One other thing, and I think I'm going to
18  let Mr. Martucci handle that.  That has to do with the opening
19  statements.
20  MR. MARTUCCI:  We can wait on that until we select the
21  jury, your Honor, unless you'd like to address it now.
22  THE COURT:  Might as well.
23  MR. MARTUCCI:  And that is the question about use of
24  exhibits.  My request would be that we don't use exhibits as
25  such or the overhead during the opening.  I say that for two

PDF created with pdfFactory trial version www.pdffactory.com

1    reasons, really.  One is --

2              MS. DORAN:  We have no objection to that.

3              MR. MARTUCCI:  Okay.  That's fine.  Thanks so much.

4              THE COURT:  Okay.  Anything else?

5              MS. DORAN:  I do want to just bring up two things, and

6    I ought to have done this with you guys beforehand, but you can

7    imagine.  We do have a protective order in this case, and I

8    wanted to make sure that the court -- everyone was remembering

9    that.  I know that there are documents that have Social Security

10   numbers on them  I'm talking specifically about the Calvert

11   stuff.  So, I just want to make sure that you guys are aware of

12   that and all that good stuff.

13             MR. MARTUCCI:  We are very respectful of that, and

14   thanks for --

15             MS. DORAN:  I'm sure you are.  And we have our own

16   confidential documents under protective order, which are the

17   therapy -- you know, which is in our binder.  It's Exhibit 77.

18   I apologize.  I know I'm talking fast.  And so, that's it.  I

19   just wanted to sort of remind everyone that this protective

20   order is in place.

21             THE COURT:  All right.

22             MS. DORAN:  And then in terms of the jury instructions,

23   I think your Honor was going to think about 3.04.  Has your

24   Honor rendered a decision?

25             THE COURT:  Let me -- let's take it up later.

1    MS. DORAN:   Okay.  That's all I have.

2    THE COURT:   All right.  Why don't you all just sit

3    back, relax, and let me take care of things for a little bit

4    here.  I'll step down for three minutes.  We'll bring the jury

5    in.  Everybody is ready, Tom?

6    THE COURT SECURITY OFFICER:   Yes, sir.

7    THE COURT:   All right.  And then we'll start.

8    (Whereupon, jury selection commenced, and eight jurors were

9    selected to try the issues herein.)

10   (The following proceedings were had in open court, in the

11   presence and hearing of the jury:)

12   THE COURT:   Ladies and gentlemen, from now on whenever

13   you come into the jury room, as soon as your reach your chair,

14   just feel free to have a seat.  You won't have to be invited to

15   sit down.

16   I want to introduce you all to Attorney Judith Caliman.

17   She's in the first row of the courtroom  She is an attorney who

18   is a member of the office of general counsel for Chrysler Group

19   LLC.

20   Now that you have been sworn, I will give you some

21   preliminary instructions to guide you in your participation in

22   the trial.  It is your duty to determine the facts in this case.

23   You will then have to apply the law to those facts.  You must

24   follow my instructions on the law whether you agree with them or

25   not.

1    Nothing I say or do during the course of the trial is

2    intended to indicate nor should it be taken by you as indicating

3    what I think your verdict should be.

4    The evidence from which you will find the facts

5    consists of the testimony of the witnesses, documents, and other

6    things received into the record as exhibits and any facts the

7    lawyers agree to or stipulate to or that the court may direct

8    you to find.

9    From time to time during the case, I may give you

10   instructions on the law that you are to follow and apply in

11   deciding the case.

12   Statements and arguments by the lawyers are not

13   evidence and must not be considered by you as evidence.

14   Objections to questions are not evidence and must not be

15   considered by you as evidence.  Lawyers have an obligation to

16   their clients to make an objection when they believe evidence

17   being offered is improper under the rules of evidence.  You

18   should not be influenced by the objection.  If the objection is

19   sustained, ignore the question and do not speculate on what the

20   witness might have said or what the question implies.  If the

21   objection is overruled, treat the answer like any other.

22   If you are instructed that some item of evidence is

23   received for a limited purpose only, you must follow that

24   instruction.

25   Testimony that the court has excluded, stricken, or

1   told you to disregard is not evidence and must not be considered

2   by you as evidence. You must erase such testimony from your

3   mind.

4         You are to decide the case solely on the evidence

5   presented here in the courtroom Our system of law is based on

6   the principle that a jury will decide the case on the evidence

7   and the law that is applicable to the case, not allowing

8   sympathy, prejudice, fear, or public opinion to influence its

9   decision.

10        There are two kinds of evidence, direct and

11   circumstantial. Direct evidence is the direct proof of a fact,

12   such as the testimony of an eyewitness. Circumstantial evidence

13   is proof of facts from which you may infer or conclude that

14   other facts exist. The law makes no distinction as to the

15   weight to be given either type of evidence. I will give you

16   further instructions on these, as well as other matters, at the

17   end of the case, but remember that you may consider both kinds

18   of evidence.

19        It will be up to you to decide which witnesses to

20   believe, which witnesses not to believe, and how much of any

21   witness' testimony to accept or reject. I will give you some

22   guidelines for determining the credibility of witnesses at the

23   end of the case.

24        Let me make a few comments on your conduct as jurors.

25   First, during the trial you are not to discuss the case among

PDF created with pdfFactory trial version www.pdffactory.com

1    yourselves or with anyone else or permit anyone to discuss it in

2    your presence.  Until you retire to the jury room at the end of

3    the case to deliberate on your verdict, you simply are not to

4    talk about the case.

5            Do not read any newspaper articles or listen to any

6    radio or television broadcasts relating to this case.  If anyone

7    should try to talk to you about this proceeding, bring that to

8    my attention promptly.  I understand that there was an article

9    in this morning's paper in the Rockford Register Star about this

10   case.  Again, you're to refrain from seeing that article or any

11   other article or any other newsprint or radio or television

12   coverage that this case may receive.  If you happen to see

13   something in the newspaper, turn the page.  If you happen to see

14   something -- or hear something on the radio, turn it off or turn

15   the channel.  If you happen to see something on television, as

16   soon as you recognize that it's about this case, turn the

17   television off or turn the channel on the television.

18           Third, do not make any independent investigation of the

19   case by reading materials, attempting any testing, or going to

20   any location where any of the events in this case took place.

21           Fourth, if you recognize a witness, advise the court

22   security officer immediately.

23           Finally, do not form any opinion until all the evidence

24   has been presented, the attorneys have made their arguments, and

25   I have instructed you on the law that you are to follow and

1  apply in making your decision.  Keep an open mind until you

2  start your deliberations at the end of the case.  If any juror

3  violates this rule, you must report that to me as soon as

4  possible.

5  　　　　　You may choose to take notes during the course of the

6  trial.  You do not have to take notes.  That is entirely up to

7  you.  I have no preference one way or the other.  You may use

8  your notes to refresh your memory at the appropriate time.  Your

9  notes are for your own use only.  Do not use -- and not for any

10  other juror's use.  No one will be allowed to look at your

11  notes.  You should rely on your own memory of the evidence.  If

12  your notes conflict with your memory or if someone else's notes

13  conflict with your memory, you are free to use your memory of

14  the evidence.  Just because a juror has taken notes does not

15  mean his or her memory of the evidence has any more weight or

16  significance than the memory of a juror who has not taken notes.

17  　　　　　Until you retire to the jury room to deliberate on your

18  verdict, your notes will not leave this courtroom  At the end

19  of the trial when you are discharged from further service in the

20  case, the notes will be collected and destroyed.  No one will be

21  allowed to look at your notes before they are destroyed.

22  　　　　　During the trial it may be necessary for me to confer

23  with the attorneys out of your hearing in respect to matters of

24  law and other matters that require consideration by the court

25  alone.  I will either send you back to the jury room or listen

PDF created with pdfFactory trial version www.pdffactory.com

1   to the attorneys in the courtroom, but not within your hearing.

2   When such conferences occur, they will be conducted so as to

3   consume as little of your time as may be consistent with an

4   orderly and fair disposition of this case.  In order to conserve

5   juror time, we frequently have these conferences when you are

6   not in the courtroom at the beginning and at the end of the

7   court day.

8        If at any time you cannot hear what is being said in

9   court, please let me know immediately by raising your hand or by

10  getting my attention by some other means.  I will have a

11  statement repeated, or I will have the court reporter read the

12  statement back to you.  It is imperative that you hear

13  everything that is said during the trial.

14       Jurors are not permitted to ask questions of the

15  witnesses.  Please do not talk among yourselves during

16  proceedings in court.

17       I also ask that you do not have any contact with the

18  lawyers in this case or any of the parties.  That includes any

19  kind of conversation.  I have asked the lawyers not to

20  communicate with you.  And so, if you see them around the

21  building, if they don't talk to you, please don't think they are

22  being rude, insensitive, or impolite.  They are merely following

23  my instructions.

24       We have exhibit books for all the jurors?

25            MR. MARTUCCI:  We do, your Honor.

1      THE COURT:  All right.  You will each be given an

2  exhibit book.  They are provided as a convenience to you with

3  the expectation that they will make it easier for you to follow

4  the evidence in the case.  In other words, the parties have gone

5  through the trouble of preparing an exhibit book for each of you

6  as an accommodation or as an aid to assist you.

7      These books contain exhibits that will be used as

8  evidence.  It is possible that some of the exhibits in the book

9  will not be used as evidence.  It is also possible that I will

10  allow into evidence other exhibits that are not contained in the

11  book.  The important thing for you to remember is that during

12  the trial you must look only on those exhibits that I instruct

13  you to turn to.  Do not under any circumstances look on any

14  exhibits that you are not directed to view.

15      And so, your book will have a lot of papers and

16  documents, but it is very important that you not look or view

17  any document until I tell you that it's okay for you to do so.

18  Again, this is an accommodation for you.  This is to help you.

19  This is to make your job easier.  I hope in return that you'll

20  follow my instructions and refrain from looking at any document

21  until I give you permission to do so.

22      The exhibit books will not leave the courtroom  Write

23  your name on your exhibit book.  The exhibit books should be

24  left on your seat when you leave the courtroom for breaks and

25  recesses.  You will be able to take the exhibit book back to the

1   jury room when you are allowed to deliberate on your verdict.

2   You are permitted to make notes on the exhibits, and

3   you will be allowed to make any marks or notations on the

4   exhibits that you wish.  They are your exhibits.  They're for

5   your use, and you can use them as you see fit.  But please keep

6   in mind that you are not to look at an exhibit until directed to

7   do so.

8   The trial will now begin.  The plaintiff's attorney

9   will make an opening statement.  Next the defense attorney may,

10  but not does have to make an opening statement.  Opening

11  statements are simply an outline to help you to understand the

12  evidence.  They are not evidence.  They are not your

13  instructions on the law.

14  After opening statements, the plaintiff will call its

15  witnesses, and counsel for the defendant may cross-examine those

16  witnesses.  Following the plaintiff's case, the defendant may

17  call witnesses whom the plaintiff may cross-examine.  After all

18  the evidence has been presented, the attorneys will give their

19  closing arguments to summarize and interpret the evidence for

20  you, and then I will instruct you on the law.  After that, you

21  will retire to the jury room to deliberate on your verdict.

22  Please listen carefully to the witnesses when they

23  testify.  Although the court reporter is taking notes now, these

24  are not immediately available in a verbatim transcription, and,

25  therefore, you must remember the testimony for your

1    deliberations at the end of the case.

2            If you wish to take notes, the court security officer

3    will give you a notebook.  If you take a notebook, please write

4    your name on the cover and place them on your seat whenever you

5    leave the courtroom

6        (Brief pause.)

7            THE COURT:  All right, folks.  Before we begin, I'm

8    going to give you some stipulations.  These are facts that the

9    parties have agreed to that you may use in your deliberation and

10   your evaluation of the evidence and in arriving at your verdict.

11   These are facts that the parties have agreed are true.

12           First, plaintiff Otto May, Jr. has worked for Chrysler

13   at its Belvidere Assembly Plant since 1988 as a pipefitter.

14           Two, Mr. May is a member of the United Auto Workers and

15   the local for the Belvidere Assembly Plant, Local 1268.  The

16   terms and conditions of Mr. May's employment at the plant are

17   covered by a collective bargaining agreement between the United

18   Auto Workers and Chrysler.

19           Three, Mr. May is Hispanic, was born in Cuba, and moved

20   to the United States as a young child.  He is a Christian with a

21   Jewish heritage and identifies himself as a Messianic Jew.

22           Fourth, there have been no incidents of vandalism,

23   notes, or graffiti since December 9th, 2005.

24           Okay.  We're going to proceed with opening statements

25   after lunch.  I'm going to give you a break for lunch.  We'll

1 come back at quarter to 2:00, and at that time the parties will

2 be able to give you their opening statements.

3 　　　　Again I want to admonish you that as jurors in this

4 case, you're not to discuss the case among yourselves or with

5 anyone else or permit anyone to discuss it in your presence.

6 Refrain from seeing or hearing any media accounts of the trial

7 while it's in progress.  Do not do any independent investigation

8 by doing any research or testing or reading or going to any

9 location where any of the events in this case took place.  If

10 someone tries to contact you about this case, either directly or

11 indirectly, please notify me immediately.

12 　　　　Have a good lunch.  We'll see you at quarter to 2:00.

13 Mr. Ferguson will tell you where to assemble.

14 　　(The following proceedings were had in open court, out of

15 　　the presence and hearing of the jury:)

16 　　　　THE COURT:  All right.  Let me address a few quick

17 matters for you.  As to jury instruction 3.04, as I said during

18 our -- please have a seat.  As I said during our instruction

19 conference, my preference is to use pattern jury instructions

20 when they are applicable.

21 　　　　I do not believe that the court has ruled in this case

22 that the plaintiff was subjected to a hostile work environment.

23 As far as the defendant's concession, it was only during the

24 court's consideration of the motion for summary judgment that

25 the defendant conceded that the behavior had been both severe

PDF created with pdfFactory trial version www.pdffactory.com

1   and pervasive, but that was only for purposes of the motion for

2   summary judgment.  I don't think that that concession carried

3   through for the rest of the trial.

4           In Judge Reinhard's order on the motion for summary

5   judgment, he stated that the defendant does not dispute --

6   again, in my opinion, for purposes of the motion -- nor could

7   it, realistically, that these events were severe and pervasive

8   and objectively and subjectively hostile.  I don't think that

9   that order or that language relieved the plaintiff of its burden

10  to prove those things.  And so, I hope that clears up our

11  discussion we had on 3.04.

12          As to defendant's objection to Plaintiff's Exhibits 1

13  through 5, I'm going to grant that motion.  I'll give you a

14  written order after lunch, and I'll explain in the written order

15  why, but I want to let you know beforehand that I'm going to

16  grant the objection to those exhibits.  It doesn't mean that the

17  plaintiff won't be able to go into the areas covered by the

18  exhibits, but for reasons that I'll explain in my order, I think

19  the objection is well placed.

20          All right.  Anything else?

21          MR. BALOGH:  Conference room, your Honor?

22          THE COURT:  Yes.  I'll have Tim help you out with that,

23  and we'll start at quarter to 2:00.

24      (Whereupon, the within trial was recessed to 1:45 o'clock

25          p.m of the same day.)

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | WESTERN DIVISION |

```
 3   OTTO MAY, JR.,                )      Docket No. 02 C 50440
                                   )
 4                Plaintiff,       )      Rockford, Illinois
                                   )      Wednesday, August 25, 2010
 5          v.                     )      1:45 o'clock a.m
                                   )
 6   CHRYSLER GROUP LLC,           )
                                   )
 7                Defendant.       )

 8                            VOLUME 1
                          TRANSCRIPT OF TRIAL
 9        BEFORE THE HONORABLE FREDERICK J. KAPALA, and a jury

10   APPEARANCES:

11   For the Plaintiff:           MS. KAREN J. DORAN
                                  (20 Danada Square West,
12                                 Suite 149,
                                   Wheaton, IL  60189)
13
                                  MEDINA LAW
14                                (171 S. Oak Park Avenue,
                                   Oak Park, IL   60302) by
15                                MS. DEANNE S. MEDINA

16   For the Defendant:           WILLIAMS MCCARTHY LLP
                                  (120 W State Street,
17                                 Suite 400,
                                   Rockford, IL 61101) by
18                                MR. STEPHEN E. BALOGH

19                                SHOOK, HARDY & BACON
                                  (2555 Grand Boulevard,
20                                 Suite 2800,
                                   Kansas City, MO 64108-6550) by
21                                MR. WILLIAM C. MARTUCCI
                                  MS. KRISTEN A. PAGE
22
     Also Present:                MR. ANTHONY MINNEYFIELD
23
     Court Reporter:              Mary T. Lindbloom
24                                211 South Court Street
                                  Rockford, Illinois  61101
25                                (815) 987-4486
```

1      (The following proceedings were had in open court, out of

2      the presence and hearing of the jury:)

3      MR. MARTUCCI: Your Honor, we both wanted to compliment

4  you. I'm really serious. You asked a ton of questions quickly,

5  and we got through that process really well, and I think we're

6  both really thankful.

7      THE COURT: Thank you very much.

8      MR. MARTUCCI: And I don't think that's an easy

9  assignment.

10      MS. DORAN: It was interesting and -- this was nice.

11      THE COURT: Good. I'm glad you -- I'm glad you're

12  glad.

13      Jim, would you give copies of the order to both sides?

14      MS. DORAN: What's that?

15      THE COURT: I asked the CSO to give you copies of the

16  order.

17    (Brief pause.)

18      THE COURT: Mr. Martucci, where are your friends?

19      MR. MARTUCCI: Your Honor, I think they'll be here any

20  minute. I did ask them to come back at 1:30. So, I'm

21  surprised.

22      THE COURT: All right. Maybe they got delayed through

23  the metal detector.

24      MR. MARTUCCI: Should I explore the hallways, your

25  Honor?

1        THE COURT:   No.

2        MS. DORAN:   There he is.

3        THE COURT:   All right.   Ready for the jury?

4        MS. MEDINA:   We have one --

5        MR. BALOGH:   Yes, your Honor.

6        MS. MEDINA:   We have one issue that we discussed with

7    Mr. Martucci.   We wanted to go ahead and see if we could admit

8    Plaintiff's Exhibits 6 through 77 and --

9        MR. MARTUCCI:   Your Honor, we're comfortable with that.

10   I realize it will probably come after the openings, but those

11   are admissible by agreement.

12       MS. DORAN:   Oh, yes.

13       THE COURT:   All right.   So, you won't require any

14   evidence as to authenticity or foundation or admissibility.

15       MR. MARTUCCI:   That's correct, your Honor.

16       THE COURT:   All right.   Great.

17       MR. MARTUCCI:   And plaintiff's counsel has done the

18   same with respect to our exhibits.   So, I think things will move

19   rather quickly.

20       THE COURT:   Wonderful.   Glad to hear it.   Thank you for

21   your efforts in collaborating that way.

22       All right, Jim   I guess we're ready.

23       MR. BALOGH:   Your Honor, there is one more exhibit

24   binder that we haven't given you yet.   And Defendant's 2 is that

25   big thing that's turned backwards right now.

## Doran - Opening Statement

1        THE COURT:   All right.

2        (The following proceedings were had in open court, in the

3        presence and hearing of the jury:)

4        THE COURT:   Good afternoon, everyone.   As promised, the

5    attorneys will now give their opening statements to you.   I want

6    to remind you that opening statements are not evidence and

7    should not be considered by you as evidence.   Opening statements

8    are a summary by the attorneys of what they expect the evidence

9    will show in this case.

10       Attorney Doran, you may address the jury.

11       MS. DORAN:   Thank you, your Honor.

12        OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

13       MS. DORAN:   Good afternoon, ladies and gentlemen.   My

14   name is Karen Doran.   I'm an attorney, and along with Deanne

15   Medina, we represent the plaintiff in this case, Otto May, Jr.

16       This case is about responsibility.   Chrysler's duty to

17   Otto, Mr. May, was to take steps that were likely to prevent or

18   stop harassment.   Today you'll find out that Mr. May was

19   subjected to three and a half years of some horrific harassment

20   that took the form of graffiti, of notes, death threats,

21   vandalism, crank calls, and various and other things.   You'll

22   find out that the graffiti and the death threats and the notes

23   were found around Mr. May's work area as a pipefitter over at

24   Chrysler's Belvidere plant off of 90.   You'll find out that this

25   stuff showed up in the elevators, in the stairwells, on his

PDF created with pdfFactory trial version www.pdffactory.com

### Doran - Opening Statement

1    lockers, on his toolbox, on his clothes, on his lunchbox, on

2    walls, doors, stairwells, break rooms, file cabinets, restrooms.

3           Chrysler doesn't dispute it.  This is not what that

4    case is about.  This case isn't about, well, this stuff never

5    really happened.  Chrysler is not going to get up here and try

6    to convince you that it never happened.  We don't think that

7    you're going to have any problem at all finding that Mr. May was

8    subjected to harassment, hostile work environment because of

9    his -- that was based on his ethnicity, his national origin, and

10    his religion.

11           As you heard Judge Kapala tell you earlier, we have

12    some stipulated facts.  One of those facts is that Mr. May was

13    born in Cuba, came over to this country, became an American

14    citizen.  He is Hispanic, and his family is of Jewish heritage.

15    They come from Germany.

16           What this case is about is about responsibility.  What

17    was Chrysler supposed to do about this horrific three and a half

18    year nightmare.  What did they do.  They made a binder.  Here it

19    is.  You will get a chance to look at the binder and read what's

20    in the binder.  They had an antidiscrimination policy.  You'll

21    also get a chance to read the antidiscrimination policy, and

22    you're probably going to find that policy is pretty familiar to

23    you.  You guys have all talked about the various jobs that

24    you've had.  I'm guessing that you've seen an antidiscrimination

25    policy that's pretty similar to the one that Chrysler is going

PDF created with pdfFactory trial version www.pdffactory.com

## Doran - Opening Statement

1  to show you.  They'll show you that under their policy their

2  employees had a duty, a responsibility to them, to put them on

3  notice if their employees felt that they were being harassed or

4  discriminated against illegally.

5          But what about Chrysler's responsibility to its

6  employees.  That's what this case is about.  We anticipate that

7  they'll tell you that their HR director, a fellow by the name of

8  Richard McPherson, spoke with about 50 or so employees at

9  Chrysler sometime shortly after the graffiti and the death

10  threats began in 2002 and told these guys -- reminded these guys

11  of the antidiscrimination policy, the policy that I just talked

12  about.  We ask that you think about your own personal

13  experiences when you're listening to the testimony and taking a

14  look at the documents.  Ask yourselves, "Is that enough?"  Do

15  you think that that was likely to stop and prevent the

16  harassment.

17          They'll also tell you that Mr. Balogh over here, their

18  attorney, hired a handwriting analyzer, a fellow by the name of

19  Jack Calvert.  We want you to pay attention to which samples

20  they gave Mr. Calvert.  Out of all of the graffiti, of the

21  notes, of the death threats, which ones did they give to the

22  handwriting analyzer to try to figure out who was doing this.

23  We also want you to consider what handwriting samples of their

24  employees they gave to the handwriting analyzer and ask

25  yourselves why some and not others.  We want you to ask

### Doran - Opening Statement

1  yourselves when you're considering that evidence was that

2  responsible of Chrysler.  Did they do the responsible thing.

3  Did they do what they ought to have done.

4          You won't get any evidence that Chrysler acted on the

5  handwriting analyzer's opinions or conclusions.  In fact,

6  honestly, as we stand here today in 2010 -- and, like I said,

7  this stuff started in '02 and went for three and a half years.

8  As we stand here today, we don't know who did it because, quite

9  frankly, no one's going to put their signature on what you're

10  going to see during this trial.  No one put their signature on

11  the graffiti, on the death threats, on the notes.  So, we don't

12  know who did it.

13          So, we want you to consider, when they're talking to

14  you about this handwriting analyzer, when they present that

15  evidence, we want you to think about whether Chrysler took any

16  steps subsequent to that act.  Not the act itself, not just

17  hiring Mr. Calvert.  Did they take any steps afterwards to stop

18  or prevent the harassment.  That's what this case is about.

19  Responsibility.

20          We also want you to consider what the company didn't

21  do.  Ladies and gentlemen, Chrysler did not put cameras up.  It

22  refused to put cameras up.  It failed to beef up security.  It

23  chose not to interview suspects.  Did Chrysler do what it ought

24  to have done.

25          This is a case about responsibility.  We would like you

PDF created with pdfFactory trial version www.pdffactory.com

### Doran - Opening Statement

1    to compare Otto's actions with those of Chrysler's.  You're

2    going to find out that Otto complained.  He told his bosses.  He

3    told HR.  He told labor relations.  He told corporate diversity,

4    the folks out in Detroit.  The man wrote a letter to the

5    muckety-mucks out in Germany when Chrysler was owned by

6    DaimlerChrysler.  He told everybody, begging for help.  Please

7    stop this.  This has got to stop.  Ask yourselves what Chrysler

8    did.  Did they take any steps that were reasonably likely to

9    stop or prevent this horrible harassment.

10          You know, Otto didn't stop there.  He didn't just

11    complain to Chrysler.  He went to the Belvidere Police

12    Department.  He got the FBI involved.  He called the

13    Anti-Defamation League.  He went to the EEOC.  He went to the

14    papers.  He told everybody.  Look at what's happening to me.

15    Someone help me make this stop.  According to their policy, he

16    did what he was supposed to do.  He notified his employer.

17          What did Chrysler do.  Ladies and gentlemen, that is

18    the question of the hour, and that is up to you to decide.

19    After you hear the evidence, you're going to look at the

20    documents.  You people will sit down together and decide whether

21    Chrysler took reasonable steps that were likely to stop or

22    prevent the harassment.  We think you'll find they did not.

23          Thank you very much for your time.  We appreciate that.

24          THE COURT:  Mr. Martucci, you may open to the jury.

25          MR. MARTUCCI:  Yes, your Honor.

## Martucci - Opening Statement

1        OPENING STATEMENT ON BEHALF OF THE DEFENDANT

2            MR. MARTUCCI:  We cared.  We tried.  We really tried.

3    We dedicated more time, more effort, more focus, more analysis

4    to this than virtually any single employment issue that had come

5    up at this facility here at the Belvidere Assembly facility.

6    Those are the words of Rick McPherson and Kim Kuborn, the folks

7    that were deeply involved in trying to stop this and make sure

8    that Chrysler's policy preventing harassment, stopping

9    harassment was alive and well and that this was a good work

10   environment.

11           Special arrangements had been made for Otto May to park

12   in the east salary lot.  Those are the comments of those in

13   security who moved Mr. May's car from one spot to another so

14   that any issues with the car would stop, and they virtually did,

15   with the exception of one issue that happened sometime

16   thereafter.

17           A quote from Tom Harvey, another Chrysler

18   manager/supervisor you'll hear from  At approximately 7:00 a.m

19   this morning, Tony Minneyfield notified Craig Anderson, another

20   supervisor you'll hear from, of a graffiti event.  Craig

21   notified me immediately.  I took pictures as soon as I could

22   acquire a camera.  By 7:20 a.m, 20 minutes later, the graffiti

23   had been removed.  Tony has been doing regular inspections of

24   the booth area and indicates he did not see this graffiti until

25   today.

### Martucci - Opening Statement

1        Another quote. Steve Hughes, manager who came in in

2  2003, spoke to the group that Mr. May was a part of. I went to

3  Otto. I talked to Otto. I reassured Otto that we would do our

4  best to find this person, and when we find this person, we'll

5  fire them

6        George Bertone, another manager there. The writing.

7  The writing. It seems to be the same every time. Can we check

8  handwriting of some or all of the skilled trades employees? We

9  need to stop this from happening. We need to stop it now.

10       This focus, this book, the Kim Kuborn book, if you

11  will, of various incidents, of interviews, of efforts to stop

12  it, to find out what was going on, Kim Kuborn will tell us this

13  essentially became her job. That in the human resources area

14  and then later when she moved into the labor relations area,

15  this truly became the focus of her job. Perhaps a third or a

16  fourth of her time was spent every day trying to figure out what

17  happened here. She will say we cared. We really tried. We

18  wanted this to stop. This is our place of work. We worked hard

19  to establish a good environment, and we want to maintain it.

20  We've got policies. We've got training. We've had discussions.

21  This must stop.

22       These are all the words of the many people who worked

23  at the Belvidere Assembly Plant. They tried hard to figure out

24  what was going on, how could they stop it. These words express

25  some of the thoughts, some of the steps they undertook to

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1    address the issue, to ensure that the activity stopped.  And,

2    frankly, they didn't stop caring.  They kept trying and

3    eventually -- far too long, but eventually it did stop, and it

4    stopped in large part, if not entirely, because of their

5    efforts.

6              Ladies and gentlemen, good afternoon.  Thanks for being

7    with us.  We deeply appreciate your service.  My name is Bill

8    Martucci.  With me here is Tony Minneyfield, who works at the

9    BAP, the Chrysler facility, and has for a number of years, Steve

10   Balogh, Kristen Page, and Judith Caliman.  And we're here to

11   give you the broadest perspective we can as to what the facts

12   are so you can come to your conclusion that, in fact, reasonable

13   steps were taken to stop this, but it is unfortunate that it

14   happened.

15             It's a privilege to be here to give you insights into

16   what happened.  It's a remarkable facility.  It's a world class

17   place.  And the people there who you'll meet, who will sit on

18   this witness stand, you can decide.  They cared.  They tried.

19   They really tried.  They dedicated more time and focus.  This

20   drove them nuts.  This wasn't what they wanted to have happen.

21   They'd like to see cars go off the assembly line.  They don't

22   want to have to call at 7:00 a.m and get somebody down to sort

23   of wipe something clean at 7:20.  They did it.  They're thankful

24   to do it.  But why was this happening.  And their efforts did

25   pay off because it did stop.

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1       At the outset I want to say some things that you're

2  likely to hear.  This focus here is 2002 to 2005, and the things

3  that happened were not what anybody would want to have happen in

4  a workplace.  But the people at Chrysler didn't want it to

5  happen, either.  They cared about the workplace.  They cared

6  about Otto May.  And they wanted it to stop.  They were

7  committed as individuals and as a team to make sure it stopped.

8  Through their efforts, they made many, many continuing steps to

9  coordinate things, and it did stop in 2005.  There were moments

10  of frustration, but as we take you through what they did, you'll

11  see through the testimony that they narrowed, narrowed, narrowed

12  who the suspect was, and it stopped.

13       Now, let's keep in mind a couple of things.  Otto May

14  still works at the Belvidere Assembly Plant today.  He's worked

15  there consistently through this period of 2002 through 2005.  He

16  works there today.  He hasn't lost a day's pay as a result of

17  this.

18       By way of overview, I want to say a little bit about

19  the Belvidere Assembly Plant.  You probably have a pretty good

20  sense of it.  It is a remarkable facility.  It's not far from

21  here.  As you know, it's located on I-90 in Belvidere, and it's

22  quite an operation.  It employs more than a thousand people

23  today.  It began in 1965.  It's a massive facility.  If you were

24  to drive around the perimeter alone, it takes a fair period of

25  time.  It's been said that perhaps there's approximately

Martucci - Opening Statement

1    four million square feet within the facility, and almost as many

2    as 20 miles of conveyor belt run through it.   At this time the

3    Dodge Caliber, the Jeep Patriot, and the Jeep Compass are being

4    assembled and made there.   In the past the Dodge Neon has been

5    made there.   And there are plans for the future that are kind of

6    exciting.

7            Who's Otto May.   Well, let's start out saying that Otto

8    May is someone that Chrysler cares about.   He's worked there

9    since 1988.   He's been a pipefitter.   He works in the

10   maintenance department, and that means that he works on

11   maintaining the machines that assemble the cars.   As a

12   maintenance employee, Mr. May has access to the entire plant and

13   could work in any area of the BAP, and for sure he's worked in

14   different departments at different times.   You'll find out that

15   when this started, he was pretty much focused on the paint

16   department.   Later he transferred to the assembly area.   But he

17   could work throughout the entire facility.

18           The paint department, as the description paint

19   department might imply, is such that that's where the cars are

20   painted.   For much of the time, that's where a lot of these

21   kinds of -- he was stationed there when a lot of these incidents

22   happened.   In terms of its size and physical location, Tony

23   Minneyfield will tell us it is broken up.   It is spaced apart.

24   There's nooks and crannies.   It's got all kinds of things

25   everywhere, different levels.   It's quite an operation.   It

PDF created with pdfFactory trial version www.pdffactory.com

## Martucci - Opening Statement

1    wouldn't be easy, frankly, to just go, "Bingo. Here we're going

2    to place a guard or a camera or anything like that."

3            At this point you've heard from Otto May's lawyer about

4    some of the incidents that took place at the BAP, and you're

5    going to hear a lot more about specific incidents. But you're

6    also going to hear a lot from Chrysler about what they did in

7    response to these. For now I'd like to just highlight some of

8    the key issues and considerations that were addressed by the

9    people at Chrysler at the time these incidents were going on.

10   They followed through again and again. They cared. They wanted

11   to make it stop. You're going to hear about their experiences,

12   their efforts to make it stop, and you're going to hear it did

13   stop.

14           You're going to hear and you're going to meet Kim

15   Kuborn. She worked in human resources at the BAP. Kim Kuborn,

16   by the time we're done, is going to be a name you're going to

17   know so well. And this is the Kuborn book. Kuborn and

18   McPherson worked together as a team to try to ensure that this

19   would stop, and they consulted with many, many individuals

20   within the BAP and at Auburn Hills, Michigan, the Detroit,

21   Michigan, area where Chrysler headquarters is.

22           The Kim Kuborn story is one that may be moving to you.

23   She started there out of high school. She worked her way up

24   through college and into management, and she worked there a

25   number of years. She, with her coworkers, established a

## Martucci - Opening Statement

1 protocol.  So, what do we do if we see something up on the wall?

2 What do we do if an incident happens?  We've got to protect

3 Otto.   Otto's one of us.  We got to make sure we got a good

4 environment.

5        So, they established that they would photograph

6 whatever was the graffiti or note or whatever, that they would

7 ensure that it was removed or taken down immediately, that they

8 would report it to human resources and keep track of it, and

9 they would gather information about who located it, where it

10 appeared, when it appeared, and who had access to that area,

11 trying to narrow, narrow down the 1,000 potential folks, narrow,

12 narrow down to who may be the person who was involved in this

13 activity.  The Kuborn binder was essential to that process.

14        Now, you're going to hear a lot of other names, as

15 well.  You're going to hear Rick McPherson because Rick

16 McPherson was the person who in 2000 became in charge, if you

17 will, of human resources and labor relations, and he worked

18 carefully with Kim  But there were names before Rick McPherson.

19 For example, you're going to see in some of these memorandums

20 that we go through a name Bob Kertz, who was deeply involved in

21 labor relations.  You're going to see a name Zach Budden.  Both

22 of these gentlemen have memos that are very instructive in terms

23 of the efforts that were undertaken here.

24        But McPherson is a hard driver, and he wanted this to

25 stop, and he worked with Kim, and he worked with others to

PDF created with pdfFactory trial version www.pdffactory.com

## Martucci - Opening Statement

1   ensure that they could do the best that they could.  Now, they

2   consulted with the folks in Auburn Hills.  In a lot of ways,

3   this is a beautiful story about America, corporations trying to

4   make it work.  They put together people from security, from the

5   office of general counsel, in which Ms. Caliman serves, human

6   resources, what they call corporate diversity that does some of

7   their investigations, and they tried to put their heads

8   together.  Labor relations.  How do we best go about this.

9           Well, one of the first things that they thought about

10  is Rick McPherson will have a town hall meeting, and he'll meet

11  with all the people there that work in this general area -- not

12  1,000, but more focused than that -- and explain to them this is

13  our policy.  This means a lot to us.  We respect people.  This

14  stuff is intolerable.  Whoever is doing this will be fired.

15  Bang.  He did that with the first shift.  He did it with the

16  second shift.  He did it with the third shift.  Mr. May was

17  there.  This was support for Otto May.  And it was done in such

18  a way so it wouldn't be clear that it was Otto May that it was

19  about, but it would be more generally done.  The policy was

20  circulated and distributed to others.  Training was held during

21  the normal course.  The training continued.

22          This meeting -- we'll ask McPherson.  Well,

23  Mr. McPherson, how many times did you have these meetings?

24  Well, I worked there nine years.  I had two such meetings.  One

25  time for this, all three shifts, one time for an OSHA matter.

### Martucci - Opening Statement

1    It was a big deal to have this kind of meeting.  Do you think it

2    was effective?  I thought the message got through, but I was

3    surprised we didn't hear more about this.

4          But during this time of much activity -- 2002, 2003,

5    all the way to '05, but really '04 it tapered down a great deal,

6    '05, thank goodness, it ended -- Kim Kuborn and Rick McPherson

7    met virtually every day.  They brainstormed.  How do we make it

8    end.  They looked at every aspect that they could consider.  And

9    they collaborated, as I said, with colleagues at Auburn Hills.

10   They wanted to make sure people knew about this.  Everyone who

11   was involved in this -- Tony Minneyfield, Rick McPherson, Kim

12   Kuborn, Scott Huller -- they had motivation to stop it.  They

13   had motivation to have a good workplace.  They had motivation to

14   have cars coming off the line.  They wanted this to stop.

15         Along with Kim Kuborn and Rick McPherson, you'll meet a

16   number of managers and supervisors from the Belvidere Assembly

17   Plant.  These are the people on the ground, if you will, who

18   worked alongside Otto May.  This is no number thing.  This is

19   Otto May.  They know Otto May.  Otto, how can we help.  We care

20   about this.  Otto, please know what we're doing.  We're taking

21   pictures.  We're putting them in a book.  We're trying to figure

22   out what's going on.  We're talking to the people who may have

23   had access.

24         You're going to meet in the flesh, if you will, real

25   time, George Bertone, Craig Anderson, Tom Harvey, Tony

## Martucci - Opening Statement

1    Minneyfield, Steve Hughes, just some of the people out there

2    that will tell you they cared.  Every one of them will say gosh,

3    I knew the protocol.  I took a picture.  I got down to Kim

4    Kuborn.  I tried to figure out what was going on.  I had ideas

5    on what we might consider doing and some things that we, in

6    fact, did do.  And they did this because they thought it was the

7    right thing to do.  They did it because they are responsible.

8        This case isn't about some company or some group or

9    some amorphous entity.  This is about the people who sit on that

10    stand.  Did they care.  Did they do something.  They did.  They

11    took steps.  For example, when Steve Hughes came in as the

12    manager of the area, he held a meeting, and he made it clear

13    that the commitment to the no harassment policy was the way it

14    was, that he wanted to ensure that whoever committed this was

15    going to be found and, in fact, dismissed.

16        Now, as you listen to Otto May and the people at

17    Chrysler talk about these incidents of graffiti and notes,

18    you'll come to understand that, frankly, throughout the BAP,

19    this area that truly -- nearly 20 miles of conveyor belt, nearly

20    four million square feet, that these were in a variety of

21    places.  Admittedly, some were in his toolbox, some were close

22    to where he worked, but many other places, as well.  They were

23    in remote areas, as Tony Minneyfield and others will tell us.

24    They were in hidden areas.  They were in strange areas.  They

25    were in different departments and nooks and crannies that are

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1    just part of this large manufacturing facility like the BAP.

2    Who cares?  We care because it made it really tough.  If you're

3    going to have cameras, where do you put them  If you're going

4    to have security, where do you put them  If you're going to

5    have an undercover person, where does he or she go.

6              And as I mentioned earlier, Otto May himself as a

7    maintenance employee had access to the entire plant and could

8    work in any area of the BAP, and, in fact, he often worked the

9    third shift, where there weren't as many people around.

10             But notwithstanding these challenges, major challenges,

11   the team, both the corporate team and the local team, considered

12   many options.  They considered -- for example, you'll hear from

13   McPherson and Kuborn a variety of things they considered, but

14   they considered an undercover operation.  Frankly, there hasn't

15   been that much turnover at the Belvidere Assembly Plant.  And if

16   you have contractors, you've got to notify the union a

17   contractor outside is coming in.  They didn't think they could

18   do it in a way that would be secretive, that would be effective.

19   And, frankly, they just thought it wouldn't work.

20             They considered cameras.  This is 2010.  Remember, the

21   facts here start back in 2002.  They really thought about

22   cameras.  They struggled with it.  They thought it was easier

23   said than done.  Due to the feasibility issues of that plant,

24   the way things were laid out, they didn't think cameras would

25   work.  They were concerned about their labor relations issues.

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1    There are cameras that come in as you walk in the facility, and

2    there are gate rings that say when you come in, but there are no

3    cameras in the facility.  They went to the union, Rick McPherson

4    will say.  The union said no.

5          In fairness, it probably wouldn't have worked, anyway,

6    but they did explore it.  Even Otto May, we'll find from notes

7    of these documents, had reservations at one time early on about

8    whether cameras would work.  He, in fact, said to one of the

9    individuals who talked with him early on collaborating how do we

10   make it stop that, in fact, he thought that cameras would just

11   be torn down by the workers as soon as they went up.  But,

12   nonetheless, respectful of Otto's thinking on it, they did

13   explore cameras.  They concluded it would not work because this

14   facility is so broad, the events were in so many different

15   places, they had to consult, they believed, with the union, and

16   the union said no, and they didn't think they could pull it off

17   effectively in a secretive kind of way.  And they were concerned

18   about the reaction on the floor, to be honest about it.  In

19   other words, do people want cameras on them  I realize there's

20   cameras in various environments, but in 2002 there were not

21   cameras in the facility at Chrysler, and they didn't think it

22   would work.

23         But Chrysler wasn't stopping there.  They devoted time

24   to other efforts.  They established a protocol early on for

25   dealing with each incident.  As I said, photograph it, get it

### Martucci - Opening Statement

1   removed, paint it over quickly, interview witnesses, investigate

2   to learn the timing and who had access to that area.  And you're

3   going to hear Ms. Kuborn speak about that a great deal.  They

4   held meetings with employees to explain that the conduct

5   wouldn't be tolerated.  That was done by McPherson, and it was

6   later done by Steve Hughes.

7           They involved a number of people in the effort.  They

8   included corporate.  They partnered with corporate.  They got

9   security involved at the local level.  They got labor relations

10  involved.  They got human resources involved.  They got top

11  management at the BAP.  And they went to corporate.  They got

12  corporate security.  They got corporate diversity.  They got

13  corporate labor relations.  They got the office of general

14  counsel.  And they all wanted to figure out how could they make

15  it stop.

16          Now, they acted promptly every time something happened.

17  There's no question about that.  And it was clear that it was

18  against the policy.  And they cleaned it up.  So, many of these

19  things would not have been seen by more than a person or two.

20  They conducted interviews as to anybody who was there to ask

21  them what they had seen, when they had seen it, did they see

22  anybody else there.

23          And later in January of 2003, Scott Huller came from

24  corporate diversity and interviewed a number of people and spoke

25  specifically with Otto May, and he asked Otto May if he would

## Martucci - Opening Statement

1  give him names of individuals that he thinks he may suspect.

2  Well, in the first meeting that took place for three hours, Otto

3  May didn't give any names, but on the second occasion he did

4  give some names, and those names were considered.  Those names,

5  in fact, were considered in a way that permitted Chrysler to

6  narrow down the people who might have been suspects.  As they

7  looked through the list, they could tell who was in a work area

8  and who wasn't, so they could eliminate people.

9          But they thought, you know, frankly, in addition to

10  restating our policy, putting into place this protocol, the

11  other kinds of things we considered, we need to work with the

12  local police.  So, they worked with the local police.  The local

13  police even reached out to the FBI.  Chrysler actually sent out

14  a lot of information to a forensic lab trying to get as much as

15  they could to solve the problem

16          And when the police were unable to solve it, Chrysler

17  hired a forensic document examiner named Jack Calvert because

18  the thought was that these notes that we'll see seemed pretty

19  similar, and the graffiti seemed pretty similar, if you look at

20  some of those loops and those kinds of things.  So, perhaps if

21  we figure out who it is, maybe we can find other writings and

22  narrow down suspects and, frankly, find the person.

23          Who is Jack Calvert.  He was in law enforcement with

24  the Michigan State Police for a number of years.  He worked at

25  the national level for the IRS on their handwriting examination

PDF created with pdfFactory trial version www.pdffactory.com

## Martucci - Opening Statement

1    process.   He is very well versed in this area.   He got original

2    documents from Kim Kuborn, from Rick McPherson, from Scott

3    Huller, and he examined those documents, and he was able to

4    narrow, narrow, narrow, narrow down the number of people who

5    might be responsible for this.   You'll hear from him   And,

6    frankly, I think you'll be intrigued by the kinds of concerns

7    that he had and some of the conclusions that he drew.

8         But that isn't all that Chrysler did.   People like Tony

9    Minneyfield and other supervisors and managers and those who

10   were in labor relations and HR and security, they did beef up

11   the patrols of that area.   They did walk around more.   They were

12   on the lookout.   And people were finding things occasionally,

13   and we'll find from the evidence that from 2002 to 2003 to 2004

14   to 2005, activity declined, and then it went away.   But

15   remember, Chrysler couldn't figure it out in the end, but

16   neither could the Belvidere Police Department, neither could the

17   FBI, neither could the forensic lab.

18        Now, who's Otto May.   Well, Otto May had a voice in

19   this, and it's an intriguing part of the case because this case

20   is as much about Otto May as it is about the people at Chrysler.

21   Otto May has the ability to speak up on things.   He often was

22   the one who found the graffiti, who found the notes, and,

23   frankly, he often pursued his own path.   Early on Otto May

24   decided he was going to retain his own lawyer, file his own

25   lawsuit, contact outside organizations.   He wanted to have his

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1  own voice.  This is America.  That's fine.  But you're going to

2  find that he was consulted by many people at Chrysler on many

3  occasions asking him to help the BAP in the effort to stop it.

4  Responsibility, as we know, here and throughout the world is a

5  two-way street.

6          Bob Kertz, that name I mentioned who was in labor

7  relations way back in 2002, we'll find spent a great deal of

8  time based on notes that we'll see that will clearly be before

9  us talking with Otto May in trying to establish in the early

10  days leads to the activity.  And Bob Kertz writes that he

11  mentioned to May he was troubled with the fact that May would

12  not reveal the names of those he felt could be responsible.

13  Kertz continued to ask May to reconsider.

14          In the September 2002 discussion that Bob Kertz had

15  with Otto May, Kertz inquired if May had any recent problems

16  with his vehicles, which he did early on in, say, May of 2002,

17  and May indicated he hadn't, and he thought that those

18  responsible for the vandalism to his car were now out of the

19  plant.  The employees were either on layoff or just out of the

20  plant.  And that was September 2002.

21          Unfortunately, on other situations Otto May wasn't very

22  helpful, either.  As I mentioned, he eventually did give

23  information to Scott Huller, but the first time he met with

24  Scott Huller, who came from Auburn Hills diversity, he told

25  Scott Huller, quote, as it appears in Scott Huller's memo, "I'm

PDF created with pdfFactory trial version www.pdffactory.com

### Martucci - Opening Statement

1 not going to hand you someone on a silver platter."

2       Despite this, Chrysler management continued. They

3 cared about Otto. If Otto had some reservations about sharing

4 information, they had to respect that. And, fortunately, as I

5 said, the activity did reduce, and it ended in 2005. Otto May

6 has worked at the facility every day since that he's been

7 eligible to work, including a great deal of overtime, and there

8 was never any break in his work at the BAP.

9       And, finally, as I said, you may ask who is Otto May.

10 How does he see the world. Well, as part of this case, we've

11 had Otto May discuss how he sees the world with a psychiatrist,

12 and when she testifies, Dr. Griffin will provide some insights

13 that will help us understand how from Mr. May's perspective

14 things are such that there may be a certain tendency to distort,

15 there may be a tendency to misunderstand the desire of other

16 people to be helpful.

17       Did Chrysler reasonably undertake steps intended to

18 stop the harassment? It did. It did through many people that

19 you'll see and you'll hear. You'll be astonished with the

20 purpose and the dedication with which they focused on this.

21 You'll find that they really did care, that they tried, that

22 they put a great deal of effort into it, and that it did stop.

23       Please know we regret that anything would ever happen

24 to Otto May that would be a bad thing at the Belvidere Assembly

25 facility. We really do. We care about Otto May. He's worked

PDF created with pdfFactory trial version www.pdffactory.com

## Martucci - Opening Statement

1  there since 1988. We know Otto May. Tony Minneyfield said

2  hello to Otto May today. They've got a good working

3  relationship.

4      We regret that some things are up on the wall and

5  notes. These are not pretty things. These are ugly. But we

6  also believe that we did everything we could that was reasonable

7  within the context and the confines of what we could do to stop

8  it, and we are thankful it stopped. And we're thankful for your

9  time.

10      In the end, this is a story about people exhibiting

11  responsibility, about caring, about making it stop, and you'll

12  find through their testimony, as the items narrow down, that

13  they were so very happy that in 2005 this ended and that Otto

14  May has continued to work there without incident for these last

15  five years.

16      Ladies and gentlemen, thank you so much for your

17  attention.

18      THE COURT: Plaintiff may proceed with his first

19  witness.

20      MS. DORAN: Your Honor, the plaintiff calls Otto May,

21  Jr.

22      THE COURT: Mr. May, please face me and raise your

23  right hand.

24   (Witness duly sworn.)

25      THE COURT: Take a seat at the witness stand.

May - Direct

1    OTTO MAY, JR., PLAINTIFF'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MS. DORAN:

4    Q.   Good afternoon, Otto.

5    A.   Good afternoon.

6    Q.   You have some water there?  Are you all set?

7    A.   All set.

8    Q.   I wanted to start out by talking to you a little bit about

9    your background so that the jury can understand who you are and

10   what's going on here.   Where were you born?

11   A.   I was born in Cuba in a suburb of Havana called El Vedado.

12   Q.   Okay.   And when did you come to the United States?

13   A.   It was September of 1961.

14   Q.   How old were you?

15   A.   I had just turned eleven years old.

16   Q.   How old are you now?

17   A.   I just turned 60.

18   Q.   And how did you get here?

19   A.   Well, at that time Pan Am was flying back and forth making

20   trips from Havana into Miami.

21   Q.   Who did you come over with?

22   A.   Came over with my two brothers.

23   Q.   Were they older or younger?

24   A.   They were younger than I was.

25   Q.   Where were your parents?

PDF created with pdfFactory trial version www.pdffactory.com

### May - Direct

1    A.  Well, my parents stayed behind because they wanted to get us

2    out of Cuba at that time before school started because they had

3    a program that they were going to instill as far as brainwashing

4    and indoctrination.  So, they wanted to get us out as quickly as

5    possible.

6    Q.  So, this is right after the Castro takeover?

7    A.  No.  Castro took over in 1959, but it took him a little bit

8    of time to just start instilling his will into businesses and

9    the people, etc., etc.

10    Q.  I see.  And who did you stay with as a young boy when you

11    came over here to Florida?

12    A.  After the three of us got here, they placed us -- we already

13    had family here.  So, each one of us went to like an uncle or an

14    aunt that were already living here.  So, we were separated.

15    Q.  And how long were you separated from your family?

16    A.  We were separated from -- I was separated from my parents

17    and my two brothers roughly about six months.

18    Q.  And then what happened?

19    A.  My parents came over in February of 1962.

20    Q.  And then your family settled in Miami?

21    A.  My family settled in Miami Beach, Florida.

22    Q.  Okay.  Now, tell us a little bit about your family history.

23    You have what I consider to be sort of an unusual name.  Otto.

24    What's your background?

25    A.  Well, that comes from the old country, what we say old

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   country, from Germany, and my grandfather was born in Fuhrt,

2   Germany, and his job was to deliver kosher meat around town

3   because his father was a kosher butcher.

4   Q.   Okay.  So, your family was Jewish?

5   A.   Yes.

6   Q.   And then your grandfather moved to Cuba?

7   A.   In 1911, I believe, as he had told me, he left Germany and

8   ended up in Cuba after a couple of stops someplace else.

9   Q.   Okay.  But eventually the family sort of settled in Cuba?

10  A.   Yes.

11  Q.   Okay.  And did your grandfather marry a Jewish gal?

12  A.   No.  He married a Cuban lady.

13  Q.   Okay.  And she was Protestant?

14  A.   I believe so because I know my father told me he was raised

15  more of a Protestant, and the college he went to was Candler

16  College in Havana.

17  Q.   I see.  And did your father marry a Protestant?

18  A.   No, I don't believe so.  My mom was from -- she was born in

19  Asturias, Spain.  So, predominantly it's -- not to say that

20  there isn't other religions there, but predominantly it's a

21  Catholic country.

22  Q.   I see.  So, your mother was a Catholic?

23  A.   Yes.

24  Q.   Okay.  And you've been married, right?

25  A.   You can say that.

### May - Direct

1    Q.    How many times have you been married, Otto?

2    A.    I guess I'm a glutton for punishment.    Four times.

3    Q.    Okay.    And your first wife, you married her when you were

4    how old?

5    A.    I was 17 years old.

6    Q.    Okay.    Were you still in school?

7    A.    Yes, because she -- we had a little accident, you know.    She

8    was expecting.    So, I was still in high school.

9    Q.    Okay.    So, you married her?

10    A.    Yes, I got married to her.

11    Q.    Okay.    And was she a Catholic or a Protestant, or what was

12    her religion?

13    A.    No.    Her mom was a Holocaust survivor from one of the

14    concentration camps, and even though I had the Jewish lineage

15    going back, because I wasn't really raised as a Jew, she wanted

16    me to convert before marrying her daughter.    So, I had to go

17    through some classes and convert to Judaism at that time, and

18    that was back in '68.

19    Q.    And did you?

20    A.    Yes.

21    Q.    You mentioned that you got married when you were still in

22    school.    Did you graduate high school?

23    A.    At that time I don't know about the rest of the country, but

24    down in Miami Beach, Florida, Miami Beach High, you were not

25    allowed to continue school if you were married.    So, I was told

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    I could no longer attend school. Neither could she.

2    Q.  So, you chose to marry this girl rather than graduate from

3    high school?

4    A.  It was the proper thing to do at the time.

5    Q.  Okay.  Do you have a high school diploma?

6    A.  I got my GED later on, a couple of years later.

7    Q.  And right now who is your employer?

8    A.  My employer is Chrysler Corporation.

9    Q.  Okay.  And how long have you been working for Chrysler?

10   A.  I started there back in January of 1988.  That's my

11   seniority date is January 18th, 1988.

12   Q.  Okay.  And you're in the UAW?

13   A.  Yes, I am

14   Q.  And that's because you're a pipefitter, right?

15   A.  Well, I was a pipefitter welder on the outside, and that's

16   how I got in.  I was already a journeyman.

17   Q.  Okay.  Well, can you explain to the jury what a journeyman

18   pipefitter does for Chrysler?

19   A.  What it does for Chrysler?

20   Q.  Yes.

21   A.  Well, there's all kinds of different jobs because each area,

22   the equipment is so different.  Like you go to the paint shop,

23   and you have paint robots.  Well, you go to body shop, and

24   everything is completely different.  You go to assembly, that's

25   where they put the cars together on the way out the door.  So,

May - Direct

1  the equipment is completely different.

2          So, you have to be kind of specialized in order to work

3  on all the different equipment within the plant.  So, I mean,

4  you just can't take a pipefitter and take him from one area to

5  the other and say fix this equipment that he's never seen in his

6  life because it takes specialized skill.  You have to be able to

7  know the equipment, troubleshoot it in order to fix it.

8  Q.  So, as a pipefitter, your job is to maintain and fix

9  equipment for Chrysler?

10 A.  That is correct.

11 Q.  And this equipment that you handle for them, that you care

12 for them, this is pretty sophisticated stuff?

13 A.  Well, right now since the last changeover from the Neon

14 to -- well, take the paint department, the paint shop.  I'm

15 sorry.  The paint booth or the spray booths.  They went from

16 automation where they had what they called belts that sprayed on

17 the cars to all robotics, and they also had manual sprayers

18 before it got to the automation, and now it's all robotic.  So,

19 it's changed quite a bit just from 2004 to 2006 when the new

20 cars started.

21 Q.  Okay.  And so, as a pipefitter for Chrysler, you've been

22 fixing their machinery since 1988, correct?

23 A.  Yes.

24 Q.  Okay.  Let's talk now, Otto, about why we're here today.

25 You have a lawsuit against Chrysler.  What is it based on?  What

May - Direct

1    are you alleging?

2    A.   It's based on harassment, discrimination, retaliation, and

3    hostile work environment, and the fact that, as you will see as

4    this progresses, that I did go to all the individuals.  I did do

5    everything I could do.  And it was nice listening to a nice

6    fairytale from Mr. Sanducci (sic), but the fact is is that talk

7    is cheap.  Actions speak louder than words.  And all I ever got

8    from Chrysler was a lot of rhetoric, talk.

9    Q.   Okay.  So, this harassment that we've already heard a little

10   bit about, this harassment begins in 2002, right?

11   A.   Yes.

12   Q.   Okay.  Let me do it this way.  What was the first incident

13   of harassment that you can recall?

14   A.   Are we talking 2002?

15   Q.   2002, sir.

16   A.   The first incident that I can recall, I believe it was a

17   name tag that had some graffiti on it.

18          MS. DORAN:  Your Honor, I want to hand the jury the

19   exhibit binders and give an exhibit binder to the witness.  I

20   don't know that we've given you your exhibit binder yet.

21          THE COURT:  I have it.

22          MS. DORAN:  You do.  Okay.  So, if we can just take a

23   couple minutes to --

24          THE COURT:  Sure.  Do you need help from the CSO?  Jim,

25   you can help out.

May - Direct

1    MS. DORAN:  Your Honor, we had that ruling earlier

2    today, and we have not had the time to take it out, but if you

3    can instruct the jury.

4        THE COURT:  I will.

5        MS. DORAN:  Thank you.

6        THE COURT:  Again, folks, as I told you earlier, after

7    you receive your exhibit books, write your name on it, and it

8    will remain in the courtroom  Whenever you leave, leave the

9    book on your chair next to your chair.

10       And I'll reiterate for you once again, and I'm very

11   serious about this, do not look at an exhibit until I tell you

12   to look at the exhibit.  Okay?  And, again, folks, these are

13   given as a benefit to you, as an accommodation to you, as an aid

14   to you.  We're trying to help make your job as easy as possible.

15   We only ask in return that you follow our directions.  Okay.

16   BY MS. DORAN:

17   Q.  All set?  Okay.  Great.

18       Otto, I'd like you to turn to Exhibit Number 6 in your

19   binder.

20       THE COURT:  Folks, you can turn to Exhibit Number 6.

21   BY MS. DORAN:

22   Q.  Do you recognize this document?

23   A.  Yes, I do.

24   Q.  What is that?

25   A.  It's vandalism to both of my vehicles.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    Q.   Okay.   And I see a date on the top here, 2-21-02.   Is

2    that -- so, you had vandalism occur to your vehicles around

3    2-21-02?

4    A.   Yes.

5    Q.   Okay.   And this at the top you'll see it says

6    DaimlerChrysler Corporation incident report.   Is that a document

7    that was created by Chrysler?

8    A.   It was a document created by security after I reported the

9    incidents.

10   Q.   And can you tell us a little bit about this incident?   What

11   was this concerning?   You said vandalism to your car, but can

12   you be a little more specific?

13   A.   Yes.   It boiled down to there was sugar found in both of

14   my -- sugar found in both of my tanks in both of the vehicles.

15   Q.   Okay.

16          THE COURT SECURITY OFFICER:   They're having a problem

17          A JUROR:   Is it tab 6?

18          MS. DORAN:   I'm sorry.   Tab number six.

19          A JUROR:   Thank you.   Sorry.

20          MS. DORAN:   Thank you.

21          THE COURT:   The exhibit appears after the tab.   So,

22   when I say tab six, you can open tab six, and the exhibit will

23   be right after it.

24          MS. DORAN:   Okay.

25          THE COURT:   And excuse me.   Again, folks, they're your

May - Direct

1    exhibit books.  They're your exhibits.  You can mark on them

2    You can underline them  You can make notes in them  It's to

3    aid you in understanding the evidence and evaluating the

4    evidence so that when you go to deliberate, you'll have a fuller

5    understanding of the evidence in this case.

6              I'm sorry for the interruption.  Please proceed.

7    BY MS. DORAN:

8    Q.   Okay.  So, you had some sugar in your gas tank.  Why would

9    you report that to Chrysler?

10   A.   Well, the only place that it could have happened would have

11   happened there at work.

12   Q.   How do you know that?

13   A.   Because from the time I drove in -- with the first vehicle I

14   drive in, everything is fine, and many times, working first

15   shift, we came in at quarter to 2:00, 2:00 in the morning to

16   work twelve hours.  So, I come in, and on my way home after I

17   got in my car, I get a check engine light, and it was running

18   real rough.  So, I pulled up at the gas station in front of

19   CherryVale Mall, and I filled it up with gas, and as soon as I

20   drove out and got to the light, it shut down, and when it shut

21   down, I mean, it wouldn't start up.  So -- and I mean, I tried

22   many times.

23              Then I called my wife.  I said, "You better come and

24   get me."  While I was doing this, an officer from Cherry Valley

25   Police Department came and asked me what was wrong.  I told him

PDF created with pdfFactory trial version www.pdffactory.com

### May - Direct

1    So, because it was blocking traffic at that light, he took his

2    car and pushed me into the Hilander parking lot.

3    Q.  Okay.  So, just so that we get this straight, you had gone

4    to work at the Belvidere -- the Chrysler Belvidere plant, and

5    you parked in Chrysler's parking lot, and then when you got in

6    your car, you drove home, and that's how you deduced that the

7    damage must have happened when you were in Chrysler's parking

8    lot, right?

9    A.  Well, at the time, of course, I didn't know what was wrong

10   with the car, and it took the dealer -- it got towed to Bryden

11   Motors, and it took them, I don't know, probably a couple of

12   weeks, three weeks to figure out what was wrong.  Every time

13   they would tell me they got it fixed, I go get it, boom

14   Nothing would happen.  I mean, it wouldn't run.

15           So, finally, after doing much search in there, they

16   found that all the fuel injection ports were all plugged up with

17   sugar, and they looked in the tank, and it was full of sugar.

18   Q.  Okay.  And let me just direct your attention to the second

19   page, the next page.  Is that the bill that you got from Bryden

20   Motors?

21   A.  That is on the Grand Caravan.  The first one is on the Grand

22   Caravan.

23   Q.  But you mentioned two vehicles.

24   A.  Correct.

25   Q.  Okay.  Was there any other vandalism done to your cars?

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   A.   Well, while the first car, which was a Stratus, was in the

2   shop trying to figure out what was wrong with it, I got the

3   loaner.   And while I had the loaner, of course, it wasn't like I

4   drove it for one day.   They said I had it probably two, three

5   weeks.   I don't remember the time span.   It's been many years

6   ago.   But they gave me a loaner, and one day after parking

7   there -- I know there was snow on the ground -- on my way home,

8   my right rear tire disintegrates by the time I get home.

9   Q.   Did anything else happen besides that?

10  A.   Yeah.   I went -- and, of course, I had to change the tire

11  and all that.   I went back to the dealership, and I told them

12  what had happened, and I was able to kind of talk my way out of

13  them charging me for that tire.

14          So, they gave me another vehicle, which was a Jeep, if

15  I remember correctly, and I drove that for a short period of

16  time, and next thing you know, on my way to work -- now, by that

17  time the snow had melted, and I know I was on my way home, and

18  my right rear again disintegrates, and I had to pull over just

19  before the intersection -- before that bridge before 20 and Mill

20  Road.

21  Q.   So, around this time in early 2002, Otto, did you experience

22  any other problems with the tires of your vehicles?

23  A.   Yes, there was another incident.   Now, that one I couldn't

24  talk my way out of it.   I had to pay to get --

25  Q.   About how many cars did you experience problems with?

May - Direct

1    A.   Well, right in a very short period of time while these

2    loaners were being used, there was three vehicles that the tires

3    were messed with.

4    Q.   Okay.

5    A.   And what I know from talking to experts, it was being

6    done -- the tire was being deflated to a certain point, and it

7    was always the right rear because you get in the left-hand side

8    to get into -- you know, to the steering wheel.  So, you don't

9    really notice it.  So, they lower it down so far, and as you're

10   driving, between the friction of the rim, the road, and the

11   rubber, they just disintegrate.

12   Q.   Okay.  And I notice on this exhibit, the first page now, the

13   Belvidere report talks about problems with your tires.  Now, why

14   did you tell Chrysler about the problems that you were having

15   with your tires?  I understand -- you know, you explained to us

16   about the sugar, that you suspected it was happening in the

17   parking lot at Chrysler because it happened when you drove the

18   car home, but why the tires?

19   A.   I don't know why the tires -- I mean, I don't know why they

20   were messing with the tires, but it could have only happened

21   there.  I come to work.  Everything is fine.  I leave work, and

22   I have all kinds of problems with tires.

23   Q.   I see.  Okay.  So, after you told Chrysler that you were

24   having these difficulties with your car, what did Chrysler do?

25   A.   Well, let me just say that these first incidents -- I'm a

### May - Direct

1  burden to Chrysler.  Regardless of what they say, I was a burden

2  to them because they don't want to spend time messing with this

3  stuff.  So, after I report it, they make a nice little report,

4  but guess what?  They don't do nothing about it.

5  Q.  So, to your knowledge, did they interview anybody?

6  A.  Not to my knowledge.

7  Q.  Okay.  Did they at this time say, "Hey, why don't you park

8  in a designated parking spot so we can watch your car"?

9  A.  Oh, no.

10  Q.  Okay.

11  A.  No way.

12  Q.  Now, what was the next thing that happened to you in '02?

13  A.  The next thing -- are we talking about cars, or are we

14  talking about anything?

15  Q.  I'm talking about any act of harassment that happened to you

16  in 2002 after this.

17  A.  Well, after this incident with this car, in May of 2002

18  there was that incident with the spike put in my right rear tire

19  again.

20  Q.  Okay.  Now, I want to direct your attention to Exhibit

21  Number 7.

22           THE COURT:  All right.  Ladies and gentlemen, you can

23  turn to Exhibit Number 7.

24  BY MS. DORAN:

25  Q.  Is this the spike you're talking about?

May - Direct

1    A.   Yes.   Even though it doesn't do it much justice with the

2    picture, but it was quite overwhelming.

3    Q.   Where were you when you found this spike?

4    A.   It was a Sunday morning, and it was Mother's Day.   And I

5    know I had come in that morning at quarter to 2:00,

6    2:00 o'clock.   I don't remember if we started at quarter to 2:00

7    or 2:00.   Anyway, when we were getting ready to go home, it was

8    a dreary, windy, cloudy day, and something caught my eye, a

9    certain individual's vehicle caught my eye that I know never

10   parks there.

11   Q.   Who was that?

12   A.   That was John Myers.

13   Q.   Okay.

14   A.   And because of everything that had happened, I always

15   thought that he was behind a lot of the stuff, but I can't

16   accuse somebody without proof, you know.

17   Q.   Okay.

18   A.   So, anyway, there was what appeared to be a rag or two in

19   front of my right rear tire.   And because it was a windy day, I

20   never gave it much thought, you know.   I don't see as well

21   without my glasses, and I didn't have them on.   So, I proceeded

22   to get into my car.   As soon as I drove, I heard a big thump.   I

23   said, "What was that?"   So, I got out of the car.   I go look,

24   and here's this huge metal piece of plate -- probably it was

25   about seven to eight inches long with three huge spikes wrapped

### May - Direct

1   in them rags.  And I just couldn't believe my eyes.  I said, "My

2   goodness."

3           So, after that, I felt the tire to see how much damage.

4   Well, the perpetrator, what his intentions were did not work the

5   way he wanted to because it didn't go completely all the way

6   through.  It just barely poked one hole.  And so, I felt it

7   going out, and I said -- well, I took that metal with the rags.

8   I threw it into the back of my car, and I proceeded to go home

9   because, otherwise, I was going to have a flat tire.  So -- and

10  I got home, and then we went out.  We had -- what do you call

11  it.  A luncheon Mother's Day --

12  Q.   Reservation?

13  A.   Reservation.  So, by the time I got home, the tire was flat.

14  Q.   Okay.  And then did you tell Chrysler?

15  A.   Yes.  I told Chrysler I believe it was the following day.

16  This was a Sunday.  I told them on a Monday.  I think it was --

17  I don't remember the date, but I know --

18  Q.   If you turn to the fourth page of this exhibit, that might

19  refresh your recollection.  It says at the top of this report,

20  "On 5-13-02 employee Otto May reported."

21  A.   Yes.  That's when I spoke to Mr. Todd Hudson, who was one of

22  their -- I think he was like a supervisor, but I'm not sure.

23  But I know he was with security in the plant.

24  Q.   Okay.  And did you show them the spike?

25  A.   At first they didn't even want to look at it or do anything

### May - Direct

1    about it.  Finally, I said, "You know what?  Don't worry about

2    it.  I won't trouble you.  I'll just go right to the police

3    station."  So, he said, "No, no, no, Otto.  Come here.  Let's

4    go."

5         So, we went to the office.  I showed him the spike.

6    Because I had it hidden.  I had it in a bag.  I don't want to

7    walk around with a spike in my hand, you know.  So, I went

8    ahead, and we went into the office.  He made the report, took

9    the pictures, and I told him I was turning it over to the

10   Belvidere Police Department, which I had done with the previous

11   vandalism to the vehicles.

12   Q.   Okay.  And did you, in fact, call the Belvidere Police?

13   A.   Of course.

14   Q.   Okay.  And who has the spike now?

15   A.   As far as I know, Belvidere Police Department is still in

16   possession of it.

17   Q.   Okay.  And did you have an idea or did you have an opinion

18   about where this spike came from?

19   A.   By looking at the spike, it appeared to be that it could

20   have been -- it could have been made right there in the plant.

21   We have shops there that have metal, and people have access to

22   that and have access to welders, and it was a piece of plate

23   with three spikes welded to it.

24   Q.   But why couldn't some guy just do it in his home garage?

25   A.   I'm thinking well -- because after looking at it and seeing

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    it -- of course, it could have been done in a garage, but you

2    need what they call a MIG welder, and that's a sophisticated

3    welder.  For anybody that's done any welding, it's a wire feed

4    that uses gas, and as you're welding, automatically as you push

5    on the trigger, you got gas going in, and you're welding it.

6    You're fusing the two metals together.  So, it's a continuous

7    flow.

8    Q.   Okay.

9    A.   And that's what that appeared to be.

10   Q.   To your knowledge -- after you reported this to Chrysler, to

11   your knowledge did they go and investigate around the area where

12   there are MIG welders in their plant?

13   A.   Not to my knowledge.

14   Q.   So, this happened to you on Mother's Day 2002.  So, it's

15   May 12th, 2002.  Oh, let me ask you, too.  What parking lot were

16   you in when this happened?

17   A.   That particular day, because it was a Sunday -- we

18   weren't -- hourly was not allowed to park in the salaried lot.

19   Where I park, and I've been parking there since 1988 since I

20   hired in, is called the east lot.  The east lot was divided in

21   three places.  To the left is all hourly.  To the right

22   immediately after the turnstiles, there was a fenced in area,

23   and that was salaried lot.  Then you had -- that was two rows

24   accommodated to park in there.  And then after that, meaning on

25   the west side, the same side as the salaried lot, you had an

May - Direct

1  hourly lot, also.  This particular Sunday I was parked very

2  close to the turnstile, and I was parked in the salaried lot.

3  Q.  Why?

4  A.  Because it was Sunday.  Production wasn't running.  The only

5  people there usually on a Sunday is either skilled trades,

6  maintenance personnel -- and when I talk maintenance, that

7  includes janitors, booth cleaners, and others -- and a few

8  material handlers.  So, there's not that many people.  It's not

9  like you got production running.  So, I was able to park there,

10  and that's why I parked there.

11  Q.  Okay.  And after you told Chrysler about this spike, they

12  allowed you to park in the salaried parking lot, right?

13  A.  What?

14  Q.  After you told Chrysler about this spike, at some point

15  someone told you that you were allowed to park in the salaried

16  parking lot, correct?

17  A.  First of all, we need to clarify this.

18  Q.  Okay.

19  A.  After the spike incident, Chrysler Belvidere plant did

20  nothing.  Nada, zilch.  Like they always have done.  So, I had

21  to get on the phone and talk to a gentleman in Detroit or Auburn

22  Hills.  I'm not sure which one.  His name was Marvin Moore.  And

23  I spoke to him on the phone, and I told him what had been going

24  on, and he said to me, "Well, what are they doing about it?"  I

25  said to him, "The same thing they've done all this time.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1  Nothing."  So, he said to me, "I'll be back."  He hung up.  He

2  says, "I'll get back to you."

3          Okay.  Next thing I know, I think it was about ten days

4  later, I get a call from Kim Kuborn.  Now all of a sudden I'm

5  allowed to park in the salaried lot.  But it took a call outside

6  of the plant for them to call Belvidere for them to do something

7  about it.  That's how it happened.

8  Q.  Okay.  This Mr. Moore, was this Mr. Moore from corporate

9  diversity in Auburn Hills, Michigan?

10  A.  To be honest with you, I don't know if he was corporate

11  diversity or just an HR gentleman from Detroit or Auburn Hills.

12  I'm not sure.

13  Q.  You never met him?

14  A.  I never met him  I got the name from the EEOC investigator

15  that was investigating my case and complaints at that time.

16  Q.  Okay.  And so, Kim Kuborn told you after the spike that you

17  were allowed to park in the salaried lot.  Now, just to be

18  clear, that's the same lot where you ran over the spike, right?

19  A.  That is correct.  But I don't want you to say immediately.

20  It took a phone call and ten days later --

21  Q.  Okay.

22  A.  -- for them to do anything about anything.

23  Q.  Okay.  What was the significance of parking in the salaried

24  lot?

25  A.  Here's another one that's -- another little fairytale that I

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    got.   This way we can keep an eye on your car.   The problem with

2    that is they had one camera that wasn't working.   They never

3    taped anything or record anything.   There wasn't always a person

4    looking at all the monitors that are up there watching all the

5    parking lots.   So, it was really just to make me feel better.

6    Q.   Okay.   So, they told you that there were going to be cameras

7    on your car?

8    A.   Oh, yeah.   That's what they said.

9    Q.   Okay.   But there came a time that you found out that these

10   cameras weren't working?

11   A.   That is correct.   I was told by a security fire marshal

12   officer.

13   Q.   What was his name?

14   A.   His name was Robert Lowery.   And he came to me.   He told me,

15   he says, "You know, that whole thing with the camera" --

16          MR. BALOGH:   Your Honor, I'd object at this point.

17   We're getting into hearsay.

18          THE COURT:   Can you cite an exception?

19          MS. DORAN:   He's a party opponent.   He's in security.

20          MR. BALOGH:   Your Honor, Mr. May is going to talk about

21   matters that are pure hearsay and conjecture.   The state of the

22   cameras and so forth.

23          THE COURT:   All right.   Well, the plaintiff

24   acknowledges it's hearsay.   She says it's an exception because

25   it's an admission by a party opponent.

May - Direct

1    MR. BALOGH:  Mr. -- and I didn't even catch the fire

2   marshal's name, but he does not have any supervisory authority

3   or right to speak on behalf of the company.  He wasn't even a

4   Chrysler employee.  He was an employee of a contractor called

5   Wackenhut.

6    THE WITNESS:  Your Honor, may I say something?

7    THE COURT:  No.

8    MS. DORAN:  No.

9    THE COURT:  Well, it's your burden to get the evidence

10   in.  Is there any indication that he represents -- that the

11   person Mr. May talked to represented Chrysler?

12   BY MS. DORAN:

13   Q.  Who was Mr. Lowery working for at the time?

14   A.  Chrysler.  Wackenhut didn't come into play 'til around 2004,

15   somewhere along in there.

16   Q.  And when did you have this conversation?

17   A.  This was in 2002.

18   Q.  Okay.

19    MR. BALOGH:  Your Honor -- and I'm not going to argue

20   with Mr. May on the switch from Chrysler to Wackenhut for fire

21   marshals, but this gentleman was not a supervisory employee.  He

22   was a fire marshal.

23    THE COURT:  But I've got testimony under oath that he

24   is a representative of Chrysler, and I've got your

25   representation that he's not.

May - Direct

1    MR. BALOGH:  If I may have a sidebar, your Honor?

2    THE COURT:  Well, let's do this.  I'll send the jury

3  out for the afternoon break.

4    Folks, I'll release you for 15 minutes.  Come back at

5  3:20.  Again, as jurors in this case, you're not to discuss the

6  case among yourselves or with anyone else or permit anyone to

7  discuss it in your presence.

8    (The following proceedings were had in open court, out of

9      the presence and hearing of the jury:)

10    THE COURT:  All right.

11    MR. BALOGH:  Judge, my problem here isn't that this guy

12  is or is not a Chrysler employee.  My problem is that when we

13  took Mr. May's deposition, he told this story.  There was an

14  objection at the time that it was hearsay, and there was

15  testimony from later witnesses that said that what this guy said

16  was wrong.  All of the cameras were working.

17    THE COURT:  Well, then you have a right to present

18  evidence that all the cameras were working and that what he

19  heard was wrong, but right now I'm dealing with the

20  admissibility of what Mr. May heard from this person, and if he

21  was an employee of Chrysler, then I believe it's a party

22  admission.

23    MR. BALOGH:  Your Honor, I'm a little taken aback

24  because there was an objection to this testimony on the record,

25  this exact same testimony, as hearsay when this was taken.  So,

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    there's no surprise here that we were going to fight this

2    testimony.  Having said that, you know, he was -- and I just

3    checked with corporate counsel.  The change to Wackenhut was in

4    2003.  So, he was a Chrysler employee at the time, but not a

5    management employee.

6         THE COURT:  All right.  I think it's admissible then

7    under the exception.

8         MR. BALOGH:  I'll withdraw the objection, your Honor.

9         THE COURT:  All right.  Let's come back at 20 after.

10        MS. DORAN:  Thank you.

11     (Brief recess.)

12        THE COURT:  I want to make a clarification, and that is

13   by definition under the Federal Rule of Evidence 801(d)(2),

14   testimony is not hearsay.  It kind of is counterintuitive, but

15   that's just the way they define it.  Ready for the jury?

16        MS. DORAN:  Yes.

17        THE COURT:  Val, bring the jury in, please.

18     (The following proceedings were had in open court, in the

19        presence and hearing of the jury:)

20        MR. BALOGH:  Your Honor, just for the record, we would

21   like to make sure that this keeps moving, and I will withdraw

22   our objection.  Thank you.

23        THE COURT:  Please proceed.

24   BY MS. DORAN:

25   Q.  I think we were last talking about the conversation that you

May - Direct

1    had with security employee Robert Lowery about the state of the

2    cameras on your car in the salaried parking lot after Chrysler

3    allowed you to park there.   Do you remember that?

4    A.   Yes, I do.

5    Q.   And so, he told you that some of the cameras weren't

6    working.   What else did he tell you about the cameras?

7    A.   Well, he just told me that it was just to make me feel good,

8    that some cameras weren't working and the other cameras do not

9    record.   And if you ever go and look at the monitors where all

10   the cameras that were looking at different things for the

11   turnstiles and parking lot, there wasn't an attendant there all

12   the time.   So, it was impossible to keep an eye on your vehicle

13   when, number one, it's not being recorded.   Number two, somebody

14   can't be staring at it every minute that it's there in the

15   parking lot.

16   Q.   Okay.   So, after the vehicle damage, when did the graffiti

17   start?  We were talking about graffiti.   When did the graffiti

18   start?

19   A.   If my recollection is correct, the graffiti started with a

20   form of -- they used to have us -- you know, we wear coveralls

21   at work because you're required -- in certain areas, you have to

22   have a certain attire.   And these coveralls had our name tags on

23   it.   And the first graffiti that I can recall, it was somebody

24   had written in my name tag certain very derogatory comments.

25   Q.   Do you remember when that was?

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    A.   It was sometime, I believe, in 2002, but I can't recall the

2    time frame on that.

3    Q.   Okay.   And do you recall what was written on your name tag?

4    A.   Well, I just want you to know that I don't use this type of

5    language, but it said -- it was embroidered.   You know, it was

6    all sewn into the coverall.   My name is embroidered.   On one

7    side it had f-u-c-k, the other side it said sucks, and on the

8    bottom it said Cuban.

9    Q.   Okay.   I want to turn your attention to a document behind

10   tab eight.

11          THE COURT:   Folks, you may turn to tab eight.

12   BY MS. DORAN:

13   Q.   Do you recognize that?

14   A.   Yes.   That was graffiti that went up in one of the freight

15   elevators, normally known as T-6 elevator, which is mostly for

16   moving material up and down from first to second floor.

17   Q.   And did you see this graffiti?

18   A.   How could you not see it?

19   Q.   When did it first appear?

20   A.   It first appeared in June of 2002.   The date I don't

21   remember exactly.

22   Q.   If you look on this document in the second row -- well, it

23   says this was put up in the T-6 material elevator on the weekend

24   of June 16th, 2002.   Does that refresh your recollection?

25   A.   That sounds about right.   That's my handwriting.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    Q.  That's your handwriting there.  Okay.  And did you tell

2    anyone about it?

3    A.  Of course.  I complained to management about it.

4    Q.  Who?

5    A.  If I remember correctly, I probably mentioned it to Larry

6    Martin, Lewie Tucker, and I would say probably Jim Fransen,

7    also.

8    Q.  Okay.  And to your knowledge, did Chrysler conduct an

9    investigation to find out who put this stuff up?

10    A.  No.

11    Q.  And this graffiti was at some point taken down, right?  It

12    was covered up?

13    A.  It was finally taken down around the middle of August after

14    it had been up almost two months, after rigorously complaining

15    now to Mr. Craig Anderson.

16    Q.  Okay.  And the graffiti says -- it's a heart with Chuck plus

17    Otto in it, correct?

18    A.  Yes.

19    Q.  And Chuck is Mr. Chuck Finch, a friend of yours at the

20    plant?

21    A.  Yes.

22    Q.  And to your knowledge, are you the only Otto that works at

23    the Belvidere Chrysler plant to your knowledge?

24    A.  To my knowledge, I'm the only one, but I can't be a hundred

25    percent sure.

PDF created with pdfFactory trial version www.pdffactory.com

## May - Direct

1    Q.    Now I want to direct your attention to tab number ten.

2              THE COURT:    Ladies and gentlemen, you may turn to ten.

3    BY MS. DORAN:

4    Q.    What is this, Otto?

5    A.    After the previous graffiti was painted over, the next thing

6    I know, there's some more graffiti on the same elevator, but

7    this time it's on -- the other one was on the back wall of the

8    elevator.  This one, as you're walking into the elevator,

9    driving in, it's on the right side of the elevator.  So, it

10   would be the east wall of the elevator.

11   Q.    Is this the same elevator you said?

12   A.    Yes, T-6.

13   Q.    And I'm going to move over here closer to the ELMO.  Who

14   took this picture?

15   A.    I probably did.

16   Q.    Okay.  So, you saw the graffiti when it was up in the

17   elevator?

18   A.    The graffiti when it first went up, it didn't have certain

19   writing on it.

20   Q.    And are you referring to this writing?

21   A.    I'm referring to where it says Cuban fag Jew.

22   Q.    Okay.  So, that writing wasn't there originally?

23   A.    Originally it was just a heart with Chuck and Otto.

24   Q.    Just like the last?

25   A.    That's correct.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1  Q.  Okay.  And do you recall when this heart went up?

2  A.  It was toward the end of August.  I mean, we're talking many

3  years ago, but I believe it was toward the end of August because

4  we were approaching I think it was Labor Day weekend.

5  Q.  Okay.  Well, let me direct your attention to the next page

6  in there.  Do you recognize that?  That's a note that you wrote,

7  right?

8  A.  Yes, that's my handwriting.

9  Q.  And this note is in reference to what?

10  A.  To that heart with the Chuck and Otto graffiti.

11  Q.  And so, on here you write that you found the heart on

12  August 28th, 2002; is that correct?

13  A.  That is correct.

14  Q.  And then later on you say that you complained, and there was

15  a Lotus note from Craig Anderson to Larry Martin telling them to

16  paint it over; is that correct?  Is that what happened?

17  A.  That's correct.  And that was on the following day,

18  August 29th.

19  Q.  Okay.  And was it painted over on the 29th?

20  A.  No.  It was ignored by Mr. Martin.

21  Q.  Okay.  And then you took this photo.  So, when did you find

22  out that this graffiti, this Cuban fag Jew, when did that

23  appear?

24  A.  I can't remember exactly when it appeared, but I do know

25  that it was shortly a few days afterwards that that writing

May - Direct

1    appeared after Mr. Martin ignored painting it over or cleaning

2    it.

3    Q.   Well, your note says here that on Saturday the 31st, you

4    went into the elevator, and you saw that someone had added under

5    your name in red ink Cuban fag and under that in black ink Jew;

6    is that correct?

7    A.   Yes, that is correct.

8    Q.   And was that graffiti cleaned up that day?

9    A.   No.

10   Q.   When was it cleaned up?

11   A.   It stayed up 'til Tuesday, September 3rd, and I believe it

12   was cleaned up somewhere between 10:00 and 11:00 a.m  After I

13   had a discussion with one of the painters, they painted -- he

14   told me that they were told by Mr. Anderson to go up there and

15   paint over it.

16   Q.   Were you offended by this?

17   A.   Of course I was.   Anybody would be.

18   Q.   Did anyone from HR talk to you about it?

19   A.   No.

20   Q.   To your knowledge, did Chrysler investigate who put that

21   graffiti up?

22   A.   No.

23   Q.   I'm going to direct your attention now to the next tab, tab

24   number eleven.   Can you tell the jury what this document is?

25             THE COURT:   Folks, you may turn to eleven.

May - Direct

1   BY THE WITNESS:

2   A.   This was a letter that had been circulated -- I don't know

3   if it was the whole plant, but we had seen it in the paint

4   department.   It's called "Yes, I'm a Bad American" by George

5   Carlin.

6   BY MS. DORAN:

7   Q.   Okay.   The note that we're looking at right here has some

8   additional writing on it, right?

9   A.   That is correct.

10   Q.   And did you find this note?

11   A.   It was put inside my toolbox.

12   Q.   Okay.   You have a toolbox that's at the plant, right?

13   A.   At that time it was in the paint shop, paint booth area,

14   which is called the clean room, the middle room, and it was

15   right there.   It had been there since 1995.

16   Q.   Okay.   And how did you find it?

17   A.   It was on my -- when I opened my toolbox and I got my tools

18   out, it was on my second drawer where all my tools are.   But the

19   note was folded in four, you know.   It wasn't like sticking out

20   like this.   It was folded up.

21           And if I remember correctly, I think I just took it,

22   put it on top of my toolbox.   After going through my notes, I

23   remember that, you know, at that particular day I had a call

24   right away to attend to.   So, I never got back to it 'til after

25   later that day.

May - Direct

1   Q.   Okay.   And then that's when you read it?

2   A.   That's when I opened it up and I saw what it said.

3   Q.   Okay.   And is it safe to say that you were offended by this

4   language, too, this handwriting?

5   A.   I believe I was, and I believe anybody would be.

6   Q.   So, what did you do when you found this note, when you read

7   it and figured out what it was?

8   A.   The first thing I did, I reported it to my supervisor, which

9   I believe at that time was Jim Fransen, and then I proceeded, if

10  I'm not mistaken, and, like I said, I called labor relations and

11  let them know about this.

12  Q.   Okay.   And I want to direct your attention to the next page.

13  This is another one of those DaimlerChrysler incident reports.

14  Did you report it to security?

15  A.   That is correct.   I reported it to security, also.

16  Q.   Okay.   And did you report it to anybody else aside from

17  Chrysler?

18  A.   I reported it to the Belvidere Police Department later on.

19  Q.   Okay.   And did you provide the police with a copy of the

20  note?

21  A.   Yes.

22  Q.   Okay.   Did you give them the original note?

23  A.   They said it wouldn't do them any good because it had

24  already been handled by too many people.

25  Q.   Did you ever find out who wrote that note?

May - Direct

1    A.    No.

2    Q.    What's the next thing that happened, do you recall?

3    A.    I believe after that, there was some more graffiti, but --

4    Q.    Well, let me direct your attention to tab number twelve, the

5    next.

6          THE COURT:   Folks, you may turn to tab twelve.

7    BY MS. DORAN:

8    Q.    What's this document?

9    A.    This was another note that had been left in my toolbox.

10   Q.    Okay.   And there's some writing in the top right-hand

11   corner.   It says 9-12-02.   Do you know who wrote that?

12   A.    I wrote that.

13   Q.    What does that signify?

14   A.    That's when it was found.

15   Q.    Okay.   So, the first note was found on 9-3-02.   The second

16   note was found on 9-12-02?

17   A.    Yes, ma'am

18   Q.    What did you do when you found this note?

19   A.    Well, I notified security, I notified labor relations, and I

20   also notified the police department, Belvidere Police

21   Department.

22   Q.    And did the police department take the note?

23   A.    I went down there and I provided them with the note, but

24   there was a little problem

25   Q.    What was the problem?

May - Direct

1  A.   When I took the note, I put it in a baggie, you know, a

2  sealed bag, and I handed it to a clerk behind the, you know, the

3  glass, and she took it.  But what ended up happening is because

4  she had taken it and it ended up in what they call incoming mail

5  or outgoing mail -- I don't remember which one -- they said it

6  didn't meet -- it didn't meet what they call chain of custody,

7  had broken chain of custody, and they could no longer use it.

8  Q.   I see.

9  A.   Meaning to analyze it.

10  Q.   How are you feeling at this point after seeing this graffiti

11  and getting these notes?

12  A.   Pretty low, pretty -- how would you say?  No self-esteem,

13  pretty discouraged, upset.

14  Q.   Okay.  Well, you mentioned there was some more graffiti.

15  Let me direct your attention now to Exhibit Number 13.

16          THE COURT:  Ladies and gentlemen, you may turn to 13.

17  BY MS. DORAN:

18  Q.   Do you recognize that?

19  A.   I believe so.

20  Q.   There's some writing at the top of it.  Again, is that your

21  handwriting?

22  A.   I'm sorry.  I don't have any writing at the top.

23  Q.   Oh, you don't have it.  I'm sorry.  Do you recognize this as

24  being graffiti that you saw at the Belvidere plant?

25  A.   Yes, ma'am

PDF created with pdfFactory trial version www.pdffactory.com

### May - Direct

1  Q.   And let me direct your attention to the last page of that

2  exhibit.  There's an e-mail exchange between Zach Budden and

3  Rick McPherson dated 9-19-02.  In this it talks about Craig

4  Anderson finding some graffiti at 2:00 o'clock relating to this.

5  So, you didn't find this graffiti, correct?

6  A.   No.  It was Craig Anderson who found it.

7  Q.   How did you find out about it?

8  A.   He told me about it.

9  Q.   Okay.  And did you talk with Zach Budden about it?

10  A.   As far as I can remember, yes.

11  Q.   Okay.  And it says here that, "May expressed concern about

12  his lunchbox."  Do you recall telling him that you were

13  concerned about your lunchbox?

14  A.   That is correct.

15  Q.   What's the concern?

16  A.   That somebody might put something in my lunchbox, you know.

17  I carry water, food in there, and it was kept in the same room

18  from what I can see B-22 in paint.  I know that was in the back

19  room someplace.  And I used to keep my lunchbox there while I

20  was working upstairs in the paint booth.

21  Q.   Okay.  Did Mr. Budden offer you any solutions to that

22  concern?

23  A.   Not to my knowledge.

24  Q.   So, what did you end up doing?  You just carried your lunch

25  around with you?

May - Direct

1    A.   It was after that I decided that it was not safe for me to

2    leave it there.   So, I started carrying my lunch into the clean

3    room with me.   My lunchbox.   Let me rephrase that.   Lunchbox

4    with me.

5    Q.   Okay.   And a lunchbox because -- tell the jury what your

6    lunchbox looks like.

7    A.   It was an Igloo type box at the time, and it was about, I

8    don't know, maybe 18-inches long and about maybe 16-inches deep,

9    and it opens up, you know.

10   Q.   It's a cooler.

11   A.   Right.   It's a cooler.

12   Q.   Okay.   So, that was found by Mr. Anderson on 9-19-02.   And

13   then let me direct your attention to the next tab, tab number

14   14.

15           THE COURT:   Members of the jury, you may turn to 14.

16           MS. DORAN:   Your Honor, could you ask the jury if they

17   can see this okay?   I mean, what I'm doing here.

18           THE COURT:   Ladies and gentlemen, can you see the

19   screen?

20           MS. DORAN:   Kind of hard?

21   BY MS. DORAN:

22   Q.   Let me direct your attention to the second page of that

23   exhibit, Otto.   This is a note that you wrote?

24   A.   Yes, that is a note that I wrote.

25   Q.   Okay.   And what is this note concerning?

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    A.   It's in regards to this particular graffiti at the L-37

2    elevator.

3    Q.   Okay.   And does this note tell you when you found that

4    graffiti?  At the very top, you have a date 9-22-02.

5    A.   Oh.   About 12:30 p.m, I believe.

6    Q.   So, you found it on September 22nd, 2002, correct?

7    A.   That is correct.

8    Q.   Okay.   And you said you found this in an elevator.   Was it

9    the same elevator that you mentioned before?

10   A.   No.   There's two freight elevators that go from first floor

11   to second floor in paint, and, like I said, it's mainly to move

12   material or, you know, access to both floors.   This one happens

13   to be at what we call L-37 elevator, which is a complete

14   different elevator almost on the east end -- it would be the

15   southeast end of the plant, of the paint shop and body shop.

16   Q.   Of the paint shop within the plant.

17   A.   Right.

18   Q.   So, not the opposite end of the plant building itself, but

19   of the paint department.

20   A.   That is correct.

21   Q.   Okay.

22   A.   It's opposite to Uniprime, what we call Uniprime system

23   there.

24   Q.   And at this time how big is the paint department?   Can you

25   give the jury some kind of indication of what --

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   A.   Are we talking about the whole paint department?

2   Q.   Yes.

3   A.   The whole paint department is pretty good size.  It covers a

4   lot of -- the second floor is the paint department.  It covers

5   mostly all -- part of body shop or quite a bit of the body shop.

6   It goes from where the offices for the salaried personnel are

7   all the way to -- it would be what we call the caustic room, and

8   then it goes all the way into powder, where they powder the

9   cars.  So, it's a pretty good size area.

10  Q.   And so, this was found in the elevator on the other end of

11  T-6.  Why are we talking about these elevators in terms of

12  letters and numbers?  Is there a system, like a grid system,

13  that Chrysler has?

14  A.   Yes.  Everything is marked with columns.  You have your Ts,

15  meaning your letters run mainly -- how would I say -- from east

16  to west, and your numbers run from north to south.

17  Q.   Okay.  So, when you found this graffiti -- I'm sorry.  I'm

18  not sure if I asked you this.  Did you tell anyone about it?

19  A.   I believe -- I know I probably did.  I just can't really

20  remember at this time.  I know I called Chuck, and I told him

21  what I had found.

22  Q.   Okay.

23  A.   But I also -- I know I reported it, also.

24  Q.   Okay.  Did anyone from Chrysler come and talk to you about

25  the note or interview you about the graffiti, rather?

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    A.   No, no one talked to me about it.

2    Q.   Okay.  So, now we're into late September 2002.  We talked

3    about -- a man's name has been mentioned so far, a guy by the

4    name of Richard McPherson.  Who is that?

5    A.   Richard McPherson at the time was head of HR, human

6    resources.

7    Q.   Okay.  And prior to September of 2002, had you ever met

8    Mr. McPherson?

9    A.   No.  I think prior to that meeting, I don't believe that I

10   had met him

11   Q.   What meeting are you referring to?

12   A.   The first meeting that -- the only meeting I attended that

13   McPherson, Bob Kertz, some members of skilled trades, a couple

14   of supervisors attended up in the paint shop.

15   Q.   And who was Bob Kertz?

16   A.   Bob Kertz at the time was head of LR, which is labor

17   relations.

18   Q.   Okay.  And do you recall when this meeting took place?

19   A.   I think it happened somewhere around -- I think it was

20   around September 30th or something like that, if I recall, but

21   I'm not sure about dates.

22   Q.   If I told you September 26th, does that ring a bell?

23   A.   That sounds about right.

24   Q.   Okay.  And so, this was a meeting that you attended with

25   Mr. McPherson, Mr. Kertz, and some other skilled tradesmen.  In

## May - Direct

1   what department?

2   A.   We had the meeting in one of the conference rooms in the

3   paint shop department.

4   Q.   Okay.   Were there supervisors that were involved in that

5   meeting?

6   A.   I believe there was a couple of them, but I can't recall who

7   at this point in time.

8   Q.   Anybody else in the meeting?

9   A.   I can't recall.

10  Q.   Okay.   And how long did the meeting last?

11  A.   I think it lasted somewhere around 15 to 30 minutes.

12  Q.   Okay.   And during this meeting, who was leading the meeting?

13  A.   Well, Mr. McPherson led the meeting.

14  Q.   And what was the purpose of the meeting?   What was he

15  talking to you about?

16  A.   The purpose of the meeting was to talk about their

17  harassment policy.

18  Q.   Okay.   And you had seen their harassment policy before?

19  A.   Yes, I've seen it before.

20  Q.   Okay.   Well, let me ask you this.   All this stuff that had

21  happened up until this point, you know, the vandalism to your

22  car, the spike, the graffitis in the elevators, and the notes in

23  your toolbox and things like that, who had access to those

24  areas?   Just skilled trades and paint?

25  A.   No.   Anybody in the plant has access to any area in the

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    plant.  You have to remember that we have material handlers, we

2    have janitors, we have booth cleaners.  Now, they go all over

3    the plant.  Then you have your production workers that also can

4    go anywhere in the plant, especially during -- I mean, they're

5    not going to wander off while they're putting a car together,

6    but they do get breaks and they get lunch, and they can go

7    anywhere in the plant.

8    Q.  Okay.  Did you say anything at this meeting?

9    A.  I said something to Mr. McPherson.

10   Q.  What did you say?

11   A.  I told him that this was the only meeting he was having and

12   why just the small group because there's more than 15 of us in

13   the paint department, and there's certainly a lot more than that

14   in the whole Chrysler Belvidere plant.

15   Q.  What did Mr. McPherson say?

16   A.  He said that they were concentrating mainly, if I remember

17   correctly, on the paint department and skilled trades.

18   Q.  I'm sorry.  He said that he was going to --

19   A.  He was mainly concentrating on the paint department and

20   skilled trades.

21   Q.  Okay.  And you mentioned before that anybody had access to

22   these areas.  Do you have any idea how many people worked at the

23   Chrysler plant at that time in '02?

24   A.  In '02 there had to be over a thousand people working there.

25   Q.  Okay.  I'm sorry.  Just give me a second here.

May - Direct

1    THE COURT:  Sure.

2    MS. DORAN:  There are a lot of pages.

3    BY MS. DORAN:

4    Q.  I want to direct your attention to an exhibit in defendant's

5    central documents binder.

6    MS. DORAN:  I don't know if your Honor wants to give

7    the jury a moment to get them or --

8    THE COURT:  Do you have copies for each member of the

9    jury?

10    MS. DORAN:  I know that that is for the convenience of

11    the jury, but I don't know that, you know, they need to actually

12    look at the document.

13    MR. BALOGH:  We do, your Honor.

14    THE COURT:  Sure.

15    MS. DORAN:  Do you want to do that?

16    THE COURT:  Yes.  Val, do you want to help out?  They

17    need help with the documents, getting them to the jurors.  This

18    is a defense exhibit, Defense Exhibit Number 1.

19    (Brief pause.)

20    THE COURT:  Thank you.  And where would you like us to

21    turn?

22    MS. DORAN:  There's a tab that says graffiti 9/22/02.

23    THE COURT:  You may turn to that tab, everyone.

24    MS. DORAN:  Do you not have it?  Not in that one.  The

25    central documents binder.  Do you not have one for the witness?

May - Direct

1      MR. MARTUCCI:  Sure.  I think this is the right spot.

2  9-22-02.  But there's Bates numbers, also.

3      THE WITNESS:  Thank you.

4      MR. MARTUCCI:  Sure.

5  BY MS. DORAN:

6  Q.  You know what?  Actually, can you turn to Page 164?  It's

7  behind tab 9-22-02.  Do you see that?  I just want to find out

8  something.

9      These are some notes.  There's some writing in the

10  notes where down sort of towards the bottom of the notes, it

11  says, "I can't work with John.  I'm putting you on notice if

12  something happens, you're responsible."  Do you know what this

13  is in reference to?

14      THE COURT:  Where are you reading from?

15      MS. DORAN:  I'm sorry.  Page 164.  This is like

16  three-quarters of the way down after tab 9-22-02.

17      A JUROR:  Judge, can we open ours?

18      THE COURT:  Yes, yes.  I thought I told you that it was

19  all right.  But always get my attention.  Raise your hand, stamp

20  your feet, whistle, whatever you need to do, but if you have a

21  question about those kinds of things, let me know.  But yes, you

22  can turn to tab graffiti 9-22-02, and we're on Page 164.  It's

23  written in at the bottom  It's a little bit obscured, but I

24  think you can make it out.

25

May - Direct

BY MS. DORAN:

Q.   Yes.   I'm just drawing your attention to this here, Otto.
Do you know what that's in reference to?

A.   I had had a lot of problems with Mr. Myers.

Q.   John Myers?

A.   John Myers.

Q.   This is the guy you spoke about before when we were talking
about the spike, right?

A.   That is correct.

Q.   Okay.

A.   And Herb Jacoby, who was a supervisor there, wanted me to
work with John, and I told him that I didn't think that was a
very good idea because I didn't feel safe working around John.
So, I told him that -- I told him, I said, if you force me to
work with John, I'm just putting you on notice right now that if
anything happens to me that you're going to be responsible for
it.

Q.   And do you remember when you told Mr. Jacoby that?

A.   Date and time?  No, I don't remember.

Q.   Do you know if it was around the time of this graffiti, the
start of the graffiti and the notes?

A.   It's very possible, yes.

Q.   So, you mentioned the meeting that you had with
Mr. McPherson, and that was on September 26th, 2002, and that's
when he reiterates the antidiscrimination policy, right?

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    A.   Right.   Exactly.

2    Q.   Did anybody else speak up at this meeting?

3    A.   There was a couple of individuals, skilled tradesmen, that

4    felt a little bit offended by the meeting and what they were

5    talking about and why just a small group, and that was the

6    whole --

7    Q.   Do you remember what they said?

8    A.   They were offended by the whole thing of reiterating the

9    harassment policy.  I know -- I can't remember which one, but

10    said something about, "We can't have no fun on the radios" and

11    stuff like that.  And that's about it.  I can't recall

12    everything.

13    Q.   Do you remember if Mr. McPherson brought up all of this

14    graffiti and the notes and the vandalism that had happened?

15    A.   I don't know if he brought everything up, but he just

16    reiterated that the harassment policy doesn't allow for any

17    graffiti, notes, or anything to that effect.

18    Q.   Okay.  And did that stop the graffiti?  Did the graffiti

19    stop then?

20    A.   No.

21    Q.   Let me direct your attention to -- I'm sorry.  I know that

22    there are so many binders here.  The initial binder, please.

23    Direct your attention to the next tab, which is tab 16.

24           THE COURT:  It's 15, isn't it?

25           MS. DORAN:  Sorry.  The next one that I want to talk

May - Direct

1    about is tab number 16.

2              THE COURT:  All right.

3              MS. DORAN:  You're right, though, that I was on 14

4    before.

5              THE COURT:  Sixteen, folks.  You can turn to tab 16.

6    In the blue binder, you can turn to tab 16.

7              A JUROR:  Which tab?

8              MS. DORAN:  In the plaintiff's binder.

9              THE COURT:  All right.  The plaintiff's binder.  Tab

10   16.  Okay.  Go ahead.

11   BY MS. DORAN:

12   Q.  Do you recognize this document?  This first document, this

13   is another incident report?

14   A.  Yes.  This is an incident report by security.

15   Q.  Okay.  And it's dated 9-30, 2002?

16   A.  Yes.

17   Q.  Were you made aware of the -- it references some graffiti.

18   Were you made aware of the graffiti?

19   A.  Only after the fact.

20   Q.  Okay.  So, were you able to take pictures of it?

21   A.  No.  I never knew about this graffiti 'til after -- like I

22   said, after the fact.  I didn't even know it existed until

23   someone told me.

24   Q.  So, you weren't able to take photographs of it?

25   A.  No.

May - Direct

1    Q.   And at this time point, Otto, did you take any pictures of
2    the graffiti or the notes or anything like that?
3    A.   The reason I was taking pictures of the graffiti --
4    Q.   Well, let me ask the question.  Did you take photographs?
5    A.   Yes, I definitely did.
6    Q.   Okay.  And tell us why.
7    A.   Because if I didn't have any kind of documentation to show
8    that this happened, this existed, because of my dealings with
9    management, they could just paint over it, clean it up, and say
10   it never happened.  So, I was just trying to show that all this
11   did exist, did happen, and it was part of my life.
12   Q.   And we've actually already seen some of the photographs that
13   you took, correct?
14   A.   Correct.
15   Q.   So, just turning your attention to the last two pages in
16   that Exhibit Number 16, these photos were not photos that you
17   took, right?  Is that right?
18   A.   Not that I know of.
19   Q.   And as far as you know, these are the only photographs of
20   that graffiti, or do you know of others?
21   A.   As far as I know, these are the only existing ones.
22   Q.   Did anyone from Chrysler come and talk to you about the
23   graffiti and interview you about the graffiti from HR?
24   A.   No.
25   Q.   Labor relations?

May - Direct

1    A.   No.

2    Q.   Anyone from corporate diversity?

3    A.   No.

4    Q.   How did you find out about it?

5    A.   That fire marshal security, Rob Lowery, is the one that made

6    me aware of this.

7    Q.   I see.  So, let me ask you.  I'm sorry.  So, this is dated

8    9-30, 2002.

9         After that meeting that you had with Mr. McPherson and

10   the other guys on the 26th of September, did you have a

11   follow-up meeting with Mr. McPherson?

12   A.   Yes, I went and spoke to Mr. McPherson.

13   Q.   When was that?

14   A.   It was, I don't know, probably -- it might have been

15   somewhere between the 26th and this date.  I don't remember

16   exactly.

17   Q.   Okay.  And who was there at the meeting?

18   A.   I believe it was myself.  I can't remember if it was one

19   member of -- either the steward, Brad Meyer, and I believe

20   either Bob Kertz or Zach Budden was there.

21   Q.   Okay.  And did you call the meeting, or did Mr. McPherson

22   invite you?

23   A.   I believe I wanted to talk to Mr. McPherson, but, really, I

24   can't recall for sure.

25   Q.   Okay.  And what did you guys talk about in that meeting?

May - Direct

1    A.   We talked about what took place, you know, with this meeting
2    of reiterating the harassment policy for Chrysler and to find
3    out what they were doing about it and what else are you going to
4    do.
5    Q.   Did you tell them that you were satisfied with that one
6    meeting, the 9-26-02 meeting?
7    A.   No.   I told them that -- I think I told them that that
8    wasn't good enough.
9    Q.   Okay.   Did you have any other suggestions to them?
10   A.   From the very beginning, I suggested cameras, and I
11   suggested that they could isolate areas with doors that would
12   require a badge or some kind of code or something to go in and
13   out.   I also asked them if they could beef up security.   And to
14   all this I wasn't given an answer to.
15   Q.   How did you come up with the idea about access doors?  Does
16   Chrysler have anything that has some kind of coded access to
17   areas?
18   A.   Well, we have -- take paint mix room  You have to have a
19   badge in order to get in.   It reads the badge, and it lets you
20   in.   So, they can know who went in there, when -- not so much
21   when you left because you don't use it to leave, only to get
22   entrance.
23        So, that was part of the idea was if they could put
24   some access -- some doors that they could at least segregate
25   certain areas so if somebody did go in, they would have to use a

May - Direct

1  badge or something that would let them know who went in and, you

2  know, at what time.

3  Q.   Where would you have liked to have seen some restricted

4  access?

5  A.   Well, they could have done it to go into the paint booths

6  because most of the people that worked in the paint booths were

7  regular people all the time.   So, it wasn't like you have to go

8  get something else.   They could have used the same badge we used

9  to gain access into the plant.   They could have used the same

10  thing in those areas, just put up doors.

11          They put up these what we call -- I don't know how to

12  describe it.   But they're doors that you go in, and it blows air

13  on you.   Now, they did put those up.   That don't mean nothing.

14  What I'm trying to say that they could have done something to

15  isolate the whole paint booth where some of this graffiti might

16  have been found, or especially the two elevators, they could

17  have put a camera in there.

18  Q.   Okay.   So, well, let's talk about the cameras a little bit.

19  You had found the graffiti in elevators.   So far you had found

20  the graffiti in your toolbox.   Where else did you find the

21  graffiti or the notes at that point?

22  A.   Well, they said they found the one in the back room where I

23  change clothes.   Craig Anderson had found that.   These are areas

24  that, first of all, a camera could have -- a covert camera could

25  have been put up, and that's what I required.   You can't put a

May - Direct

1 camera through that whole place. It's an impossibility to put a

2 camera every nook and cranny. But if you could have put cameras

3 in certain areas, it would have been a different story.

4 Q. Okay. The notes and the graffiti, they weren't showing up

5 in every nook and cranny of the Chrysler shop, right?

6 A. No.

7 Q. They were showing up in specific areas?

8 A. Yes.

9 Q. And so, you suggested to Chrysler to put up cameras during

10 this meeting with McPherson, this follow-up meeting?

11 A. I suggested it even before that that they should put

12 cameras.

13 Q. What did he say to you?

14 A. He said they would have to check on it.

15 Q. Okay. Did they ever get back to you on that?

16 A. I don't remember when they got back to me. I think I'm the

17 one that always pushed the issue to find out if they had put any

18 cameras up, meaning are you going to put cameras or what. And

19 to my knowledge, no cameras ever went up.

20 Q. Okay. You mentioned during that first meeting that you had

21 said to Rick, "Hey, why just these paint shop skilled tradesmen?

22 Why not more people," you know, reiterating the policy to more

23 people. Did you bring that up again in the follow-up meeting

24 with McPherson?

25 A. I believe I did.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    Q.   And what did he say?

2    A.   He said that they were mainly concentrating on people in the

3    paint shop area.

4    Q.   Okay.  Let me direct your attention to Exhibit Number 17,

5    the bottom of the page there.

6              THE COURT:  Folks, I'm going to tell you one more time,

7    or I'm going to have to take the exhibit books away from you.

8    Do not turn to an exhibit unless I tell you.  Don't look at any

9    exhibits that I don't tell you to go to.

10             All right.  Please turn to 17.  Again, folks, this is

11   for you.  All jurors do not get these exhibit books.  It's a lot

12   of trouble, a lot of expense to give these to you.  We do it so

13   it can help you so it will make this trial easier for you, so it

14   will make your service easier.  The only thing I ask from you is

15   one rule.  Don't turn to an exhibit unless I tell you.  Just

16   follow that one rule, and this trial will go a lot smoother for

17   you, believe me.

18             I've been to trials where jurors have had to deal with

19   mountains of exhibits, and they have to wait 'til they go into

20   the jury room, and then each exhibit has to be passed around

21   from juror to juror to look for them  This is a much easier way

22   to deal with it.  It's a much more expedient way.

23             The danger is that jurors will look at exhibits that

24   they're not supposed to.  In order to avoid that danger, I ask

25   the jurors not to look to an exhibit unless I tell them to do

### May - Direct

1    so.  And so, I'm asking you to return the parties' favor to you

2    by just following that one rule.  Do not turn to an exhibit

3    unless I say.

4              All right.  Let's resume.

5              MS. DORAN:  All right.  I'm sorry, your Honor.  I will

6    make an effort before I talk about an exhibit to sort of pause

7    on that.

8              THE COURT:  All right.

9              MS. DORAN:  I'll do that.  I apologize.

10             THE COURT:  All right.  We're on 17 now.

11             MS. DORAN:  Yes, sir.

12   BY MS. DORAN:

13   Q.   Towards the bottom of the page there, Otto, this document

14   talks about your asking the company about a zero tolerance

15   policy.  Did you ask the company about a zero tolerance policy

16   during that follow-up meeting?

17   A.   Yes.

18   Q.   What did you say?  What's a zero tolerance policy, as you

19   understood it?

20   A.   Zero tolerance, as far as I understand, is that there would

21   be no harassment, discrimination, retaliation in the workplace.

22   None, absolutely none.  Zero.

23   Q.   Were you feeling harassed at that point?

24   A.   Definitely.

25   Q.   And what did you expect would happen if Chrysler found

May - Direct

1  somebody who was doing this?

2  A.  I expected them to be fired, and, according to myself, also

3  have them prosecuted outside -- you know, within the law.

4  Q.  Okay.  And at this point did you suspect one person?

5  A.  No, I didn't suspect one person.  I suspected more than one

6  person.

7  Q.  Did you suspect that one person was doing it or more than

8  one person was doing it?

9  A.  I suspected there was more than one person.

10  Q.  Why is that?

11  A.  Because of the way -- the notes, the graffiti, the times.

12  And one person can't be there 24 hours.  So, I just assumed that

13  it was different people.

14  Q.  Was there anything about the notes themselves or the

15  graffiti itself that led you to believe it was more than one

16  person?

17  A.  Well, at this point in time, are we talking about all the

18  notes or up to this point?

19  Q.  All the notes.  All the notes in general.

20  A.  Yeah, because of some of the writing in the notes and the

21  wording that was used in the notes and the graffiti.

22  Q.  And the wording that was used.  What gave you the idea?

23  A.  Well, the N word, for example, in some of the graffiti and,

24  if I can recall, notes is spelled with one G.  We're talking

25  about all the notes and the graffiti, not just up to this point.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   Q.   Yes.

2   A.   And then it changes.  It goes back to two Gs.  There are

3   certain words that are being used, like if you tell somebody to

4   go get F'd, you would put an i-n-g at the end.  You wouldn't put

5   an e-n at the end.  The word mother, if I recall, they were

6   using a U instead of an O.  And just other words that I just

7   can't recall all of them

8   Q.   Okay.  So, down here in this Exhibit 17, which purports to

9   be a meeting summary between you and Mr. McPherson, it talks

10  about the zero tolerance policy, and it says, "May indicated his

11  question was specific to an individual who had recently been

12  returned to the plant after being out for workplace violent act.

13  May did not refer to Eldon Kline by name."  What's that

14  referring to?

15  A.   That was referring to -- again, going back, I had an

16  altercation with Mr. Kline when he was a supervisor.

17  Q.   Well, let me ask you this.  It says that he's been recently

18  returned to the plant.  What's that referring to?

19  A.   That's referring to that he struck a Hispanic by the name of

20  Omar Sepulveda because Eldon Kline went to work with the tools

21  as a pipefitter, and he was -- he struck him, he was fired, and

22  then brought back again.

23  Q.   When was Mr. Kline fired for striking Mr. Sepulveda?

24  A.   Well, date I don't know because I wasn't privy to that

25  information, but I know that they had plenty of witnesses when

May - Direct

1    it happened.  He struck him with the elbow, knocked him down,

2    and he was fired for that act.

3    Q.  So, was it your understanding that that was in compliance

4    with the zero tolerance policy of Chrysler?

5    A.  Being fired, yes.  Bringing him back, I would have to say

6    no.

7    Q.  Okay.  And then down here at the very bottom, it talks about

8    Mr. McPherson responding to your discussion about zero

9    tolerance, and the last sentence says, "It means the company

10   will take action, but that action does not always equate to

11   discharge."  Do you recall talking to McPherson about that?  Did

12   he make that statement?

13   A.  Yes, he did.  He made that statement.

14   Q.  Now I'd like to direct your attention to Exhibit Number 18.

15          MS. DORAN:  And, again, your Honor, this is a new

16   exhibit for the jury.

17          THE COURT:  You may turn to 18, folks.

18          MS. DORAN:  Is that better?

19          THE COURT:  That's much better.

20          MS. DORAN:  Okay.  I'll do that.

21   BY MS. DORAN:

22   Q.  Do you recognize this?

23   A.  I recognize it's graffiti directed at me.

24   Q.  Did you find that?

25   A.  To be honest, I don't remember.  I found so much.  I can't

### May - Direct

1  remember a lot of it.  The wording was about the same.  It's

2  hard to say by the picture.

3  Q.  All right.  Well, let me ask you.  At this point were you

4  taking photographs of the graffiti that you saw?

5  A.  The graffiti that I would see or find or if someone told me

6  and I had an opportunity to go and take the photograph with my

7  own camera, yes, I would do it, just so there would be no way

8  that management could deny that that took place or that

9  happened.  Not only if I saw it, but other people see it.

10  Q.  Okay.  So, is it safe to assume then if you don't have a

11  photograph, your own photograph of the graffiti, that you

12  weren't able to -- at this point that you weren't able to see

13  it, that you didn't actually see it when it was up?

14  A.  Right.  Correct.

15  Q.  And to your knowledge, do you have your own photograph?

16  This is one that was produced by Chrysler in this case.  Do you

17  have your own photograph?

18  A.  I don't know of this particular incident.

19  Q.  And then we have -- if you can go now to --

20  　　　　MS. DORAN:  And, again, your Honor, this is a new

21  exhibit.  Exhibit Number 19.

22  　　　　THE COURT:  Turn to 19, please, folks.

23  BY MS. DORAN:

24  Q.  Do you recognize that writing?

25  A.  Do I recognize the writing?

May - Direct

1 Q. Yes. Do you recognize the photograph, the writing in the

2 photograph?

3 A. Yes.

4 Q. What is this? Is this new graffiti, or is this old graffiti

5 that we've already talked about?

6 A. No, this is new graffiti.

7 Q. Okay. And what are we looking at here? Tell the jury what

8 these are. These are lockers?

9 A. These are lockers where when the company would bring us our

10 clean coveralls, at the time they were putting them in these

11 lockers, and you can see they have names on them

12 Q. Okay. And whose locker is that that says Cuban Jew on it?

13 A. Well, it says my name on it.

14 Q. That's it right there, little tiny Otto. That's your

15 locker?

16 A. That was my locker at that time, yes.

17 Q. Okay. And do you remember seeing this graffiti on your

18 locker?

19 A. Yes.

20 Q. Okay. Let me direct your attention to the last page of this

21 exhibit where it says Monday 11-11-02 in your handwriting. Do

22 you see that?

23 A. Yes.

24 Q. What is this?

25 A. That is saying that it's been two weeks since I reported it,

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    and nothing has been done about it.

2    Q.   Okay.   So, you reported the graffiti.   You reported the

3    graffiti to Chrysler?

4    A.   Yes.

5    Q.   Okay.   And the graffiti was still up on your locker after

6    two weeks?

7    A.   If I remember correctly, I believe it stayed up for about

8    three weeks.

9    Q.   About three weeks?

10   A.   Right.

11   Q.   Okay.   And that's your note at the very bottom here.   "Cuban

12   Jew was finally removed from my coverall locker after being

13   there for three weeks"?

14   A.   That is correct.

15   Q.   Okay.

16            MS. DORAN:   And, again, your Honor, I have a new

17   exhibit, Number 20.

18            THE COURT:   Ladies and gentlemen, you may turn to 20.

19   BY MS. DORAN:

20   Q.   And do you recognize that photograph, Otto?

21   A.   I might have taken it.   I just don't remember.

22   Q.   Well, do you recognize the graffiti that you see in that

23   photo?

24   A.   It's got my name on it.

25   Q.   So, you've seen this graffiti before?

May - Direct

1   A.   Yes.

2   Q.   Okay.   Let me direct your attention to the second page.

3   This is dated 10-28-02.   Tell the jury what this is.

4   A.   Underneath -- there used to be underneath the booth a break

5   area.   That break area had a telephone, icemaker, coffee

6   machine, and tables.   People would sit there, have a break, and

7   at the time you could smoke in there.   And Dawn Lindquist, one

8   of the sprayers, is the one that found the graffiti, and she

9   made me aware of it.

10  Q.   She works in the paint department?

11  A.   At the time -- I believe she still does work in the paint

12  department.   At the time she was a sprayer up in the booths.

13  Q.   Was she skilled trades?

14  A.   No.   She's a regular production worker.   At the time her job

15  is to spray the cars, spray paint.

16  Q.   All right.   So, as far as you know, that sprayer had access

17  to the graffiti because she found it, correct?

18  A.   Of course.

19  Q.   And who had access to the break room?

20  A.   Anybody that works in the paint department or anybody in the

21  plant.

22  Q.   So, the thousand people or so that worked at Chrysler at the

23  time?

24  A.   Yes.   Anybody has access to anywhere in the plant.

25  Q.   Okay.   Let me --

May - Direct

1      MS. DORAN:   Again, your Honor, a new exhibit.   Number

2   21, please.

3              THE COURT:   21, folks.

4   BY MS. DORAN:

5   Q.   Direct your attention to Exhibit Number 21.   This purports

6   to be notes of a conversation between you and Zach Budden, labor

7   relations representative.   Do you remember having a conversation

8   with Mr. Budden around this time?   This is October 31st, 2002,

9   and November 1st, 2002.

10  A.   Yes.

11  Q.   And what did you talk to Mr. Budden about on October 31st,

12  2002?

13  A.   Well, without looking at these notes, truthfully, I can't

14  remember what we talked about, but I'm sure it had to do with

15  graffiti and giving me copies of photographs that maybe were in

16  their possession that I didn't have.

17  Q.   So, you remember talking with Mr. Budden around this time

18  asking him to provide you with copies of the photos that

19  Chrysler had taken of the graffiti that you weren't able to take

20  photos of?

21  A.   Correct.

22  Q.   Okay.   And did Mr. Budden give you an answer?   Did he tell

23  you yeah?

24  A.   No.   He said that he'd have to get back to me.

25  Q.   And did he?

May - Direct

1   A.   I believe that there was a next conversation on
2   November 1st.
3   Q.   What did he say?
4   A.   He told me he couldn't give me any copies of any of the
5   photographs.
6   Q.   Did he tell you why?
7   A.   He just told me that he wasn't supposed to or allowed to.
8   Q.   Did he tell you who told him he wasn't allowed to give you
9   photographs of the graffiti?
10  A.   The company was denying the request.
11  Q.   Okay.  So, let me direct your attention to --
12          MS. DORAN:  Again, your Honor, a new exhibit.  Number
13  22.
14          THE COURT:  Go to 22, please, ladies and gentlemen.
15  BY MS. DORAN:
16  Q.   Do you recognize what's depicted in this photograph?  You
17  can look up at the screen, too, if that helps you.
18  A.   Oh, that's better.  After my lockers disappeared out of
19  phosphate, where I had been changing for a long period of
20  time -- I came back from vacation, and the lockers had
21  disappeared.
22          So, I went to Mr. Ackerman at the time, and I asked him
23  to provide other lockers for me up in the paint shop.  At first
24  he refused, and I made him aware that there was other people
25  changing in certain areas.  So, he allowed me to get three

### May - Direct

1    lockers and put them up in what we call the pipefitters crib,

2    which was behind the paint booths at the time.

3    Q.   What's in the pipefitters crib?

4    A.   In the pipefitters crib -- well, you can see I had three

5    lockers.  I had a mat in front of my lockers, so when I

6    change -- I'm a pretty neat person.  I try to -- you know, I

7    don't want to change in dirt.  So, I kept it clean.  And at the

8    same time there was parts in there, other lockers, but not so

9    much for people changing.  Mainly it was a storage place to keep

10   parts, so you could go in there and get the parts because we

11   didn't have the room upstairs to do it.

12   Q.   Okay.  Do you recognize these lockers?

13   A.   Those are my lockers.

14   Q.   These are your lockers.  And did you see this graffiti on

15   your lockers?

16   A.   Yes.

17   Q.   Okay.  And when you saw the graffiti, what did you do?

18   A.   Well, like I've stated before, the first thing I used to do

19   is take pictures of anything that I found.

20   Q.   And that's what we have here, right?  This is your picture

21   that you took?

22   A.   I believe so.

23   Q.   Okay.

24   A.   And then I would notify the proper authorities, meaning I'd

25   notify my immediate supervisor.  Then I would notify a lot of

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   times labor relations, but a lot of times just my supervisor.  I

2   felt it's his job to notify labor relations.  I had already been

3   doing that all myself.  So, to ask me every instance who did I

4   notify, for sure, my immediate supervisor, and more than likely

5   I took it a step further and notified labor relations.

6   Q.   Okay.  Do you recall when you found this?

7   A.   Date?

8   Q.   Yes.

9   A.   No.

10  Q.   Okay.  Well, let me direct your attention to --

11            MS. DORAN:  And I apologize because I don't have the

12  little Bates stamp, I'm sorry, in our binder, but it's the first

13  note that follows the photographs.  The last photograph was a

14  photograph of a cooler, and then there's a note.

15  BY MS. DORAN:

16  Q.   Do you see that?  Does that refresh your recollection?

17            THE COURT:  It looks like Page 4 of tab 22, right?

18            MS. DORAN:  Yes, sir.

19            THE COURT:  All right.

20  BY MS. DORAN:

21  Q.   Does that refresh your recollection as to when you found --

22            THE COURT:  By the way, let me say something.  Folks,

23  when I instruct you to turn toward a tab, that means you can

24  look at any of the pages in that tab.  You don't have to wait

25  for me to tell you page one, two, three, and four.  But when I

### May - Direct

1    say a tab, everything in that tab is available to you, and you

2    can use it as you see fit.   Please proceed.

3              MS. DORAN:   Thank you.

4    BY MS. DORAN:

5    Q.   Does this refresh your recollection, Otto, as to when you

6    found that graffiti?

7    A.   Yes.

8    Q.   When did you find it?

9    A.   It happened somewhere between 11:45 and 12:00 p.m

10   Q.   What day?

11   A.   1-13-02.   It was a Sunday.

12   Q.   Okay.   And did you find graffiti on anything else?

13   A.   There was more graffiti on another wall.   As a matter of

14   fact, from looking at it -- and I can't recall -- it was right

15   where I used to sit between two benches, and I used to sit back

16   up against that particular wall.

17   Q.   You used to -- I have it up on the screen here.   You would

18   sit up against this particular wall?

19   A.   Yeah.   I had a chair, and I would just sit back up against

20   that wall.

21   Q.   And what's this a picture of?

22   A.   When this series of graffiti took place, I had my lunchbox

23   in there, and that's what I found written on it.

24   Q.   The word Jew?

25   A.   Yes.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1   Q.   How did that make you feel?

2   A.   Terrible.

3   Q.   Well, at this point were you feeling more comfortable about

4   your lunchbox?

5   A.   No.   That's one of the -- why I started taking it up to the

6   booth with me after that -- if I remember, after that incident.

7   Q.   I see.   At this point did Chrysler have any meetings with

8   you telling you, you know, hey, this is what we're planning on

9   doing to fix this problem?

10  A.   No never.

11  Q.   Let me turn your attention now to a new tab, tab number 23.

12          THE COURT:   You may turn to 23, ladies and gentlemen.

13  BY MS. DORAN:

14  Q.   Do you recognize this document?

15  A.   Yes, it was a death threat note.

16  Q.   Did you find this?

17  A.   Yes.

18  Q.   Okay.   Let me direct your attention to the second page in

19  this exhibit.   That looks to be like a picture of somebody

20  holding up a note.   Who is that person, do you know?

21  A.   That was the Belvidere Police Department, and he's holding

22  it up so security -- we were at the security gate, and he

23  removed it with gloves, and he was holding it up so they could

24  take a picture of it.

25  Q.   Okay.   Well, why don't you tell us a little bit about this

May - Direct

1   note.   Where did you find it?

2   A.   To be honest with you, I just can't remember right now.   I

3   can't remember every instance where I found it.

4   Q.   Well, let me direct your attention to the third page in this

5   tab.   This is another DaimlerChrysler at Belvidere incident

6   report dated 12-7-02, and you'll see in that narrative section

7   sort of halfway in there it says, "Otto May's complaint was that

8   he found a note in his toolbox this morning which stated," and

9   then it goes on to state the contents of the note.   Does that

10  refresh your recollection as to where you found it?

11  A.   Sounds right.

12  Q.   Okay.   So, you found it again in your toolbox?

13  A.   Yes.

14  Q.   Tell us a little bit about this toolbox, Otto.   How are

15  people getting into it?

16  A.   Well, you don't have to get into it.   The toolbox itself has

17  about five drawers where in between the drawers there's about a

18  quarter inch gap in between the drawers.   So, I mean, you can

19  slip anything in the toolbox through those gaps.

20  Q.   Was it locked or something?

21  A.   I always kept my toolbox locked because of previous

22  experiences.   Before this happened, for safety purposes I was --

23  people were -- I was missing tools.   So, I always kept it

24  locked.

25  Q.   Okay.   And so, as far as you know, someone was just pushing

May - Direct

1   the notes through the slots to put it into your drawers?

2   A.   That is correct.

3   Q.   And so, you reported this to security, and you reported it

4   to the Belvidere Police Department?

5   A.   Yes, I did.

6   Q.   Okay.   And is that something that you did normally with the

7   notes or not?

8   A.   Well --

9   Q.   Reporting them to the Belvidere Police Department.

10   A.   That's pretty much -- I was doing that.   I got the Belvidere

11   Police Department involved after the first death threat note.

12   That's when they got involved.

13   Q.   Okay.

14   A.   So, the answer is yes.

15   Q.   Let me -- if you would just look at the very last page of

16   that exhibit.   That's another security incident report dated

17   that same date, 12-7, 2002.   It talks about a maintenance

18   supervisor A -- I think it's Al -- is it Surges?

19   A.   That is correct.   Al Surges.

20   Q.   Okay.

21   A.   At the time Al was a supervisor down in body and white, what

22   we call body and white, which is a body shop.

23   Q.   Okay.   And it says in here -- it purports that he found some

24   graffiti in the R-24 men's restroom   Do you know where that is?

25   A.   It's R-42.

May - Direct

1    Q.   I'm sorry.  I'm a little backwards today.  R-42, men's

2    restroom?

3    A.   Yes, I know where that's at.

4    Q.   Did you use that men's restroom?

5    A.   Not at that time.

6    Q.   Okay.  It says pictures were taken, and the graffiti was

7    removed.  Do you remember seeing that graffiti?

8    A.   No, I never saw it.

9    Q.   Okay.  And did Chrysler give you a copy of the photograph?

10   A.   No, of course not.

11   Q.   Did anyone from Chrysler tell you, "Hey, we found some

12   graffiti about you in the men's restroom"?

13   A.   No, of course not.

14   Q.   So, you talked about getting the Belvidere Police Department

15   involved.  Did you get any other outside agencies involved?  Did

16   you tell anybody else?

17   A.   Yes.  I called -- I myself called the FBI.  I called the --

18   what do you call it.  The office here in Rockford.  They

19   directed me to a different number, and finally I got ahold of

20   somebody -- I don't remember at the time who it was, but

21   eventually I did meet with an FBI agent at the Belvidere Police

22   Department.

23   Q.   And when was that?

24   A.   That was sometime early January of 2003.

25   Q.   Okay.  So, just after this note?  You found this note on

May - Direct

1    12-7-02.  So, it would have been just about a month or so after

2    finding this note?

3    A.   Roughly.

4    Q.   Well, before we get there, I wanted to talk to you about a

5    new exhibit, Number 25.

6           THE COURT:   Ladies and gentlemen, you can turn to 25.

7    BY MS. DORAN:

8    Q.   Specifically, Otto, about the second page of this exhibit.

9    A.   I'm sorry.

10    Q.   Take your time.  It's the second page of the exhibit.  Do

11    you know anything about this letter?

12    A.   I initiated this letter.

13    Q.   How so?

14    A.   I felt so frustrated and so, you know, like nobody was doing

15    really anything concrete to put a stop to this harassment, the

16    letters, the graffiti, that I went and contacted the ADL,

17    Anti-Defamation League.  I thought maybe they could lend a hand

18    in maybe putting enough -- because it's a big organization, they

19    pack a pretty good punch, you know, in those terms, and I felt

20    that maybe then they could do something with Chrysler to see if

21    maybe they could get them to do something.  I felt they weren't

22    doing anything.

23    Q.   Okay.  Why the Anti-Defamation League?  What is so special

24    about the Anti Defamation League?

25    A.   Because I'm a Jew, and a lot of the graffiti, the notes, the

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    death threats were directed at being a Jew.

2    Q.   So, the Anti-Defamtion League is an organization that does

3    what?

4    A.   How would I say it.  It investigates, you know, and deals

5    with a lot of the anti-Semitism that Jews are subject to.

6    Q.   Okay.  So, this is a letter that is from the ADL to general

7    counsel of Chrysler over in Farmington Hills, Michigan, dated

8    December 26th, 2002.  Did you after this have any conversations

9    with anyone from Chrysler who was from Michigan?

10   A.   It was shortly after this letter was sent, that's when

11   Mr. Scott Huller introduced himself, and he mentioned, as a

12   matter of fact, when we met early January -- I don't remember

13   the date -- of 2003, he mentioned this letter going to wherever

14   it went to, and it got directed to the diversity office, and he

15   was coming down to talk to me about it.  So, finally, I had

16   gotten somebody outside Belvidere to come and talk to me.

17   Q.   Okay.  All right.  Now, I'm sorry, but I need you to go to

18   the other binder.

19           THE COURT:   Defendant's Exhibit Number 1?

20           MS. DORAN:   Right.

21           THE COURT:   It's black.  My binder is black.  Do you

22   have the same black colored binder?  Defense 1.

23           MS. DORAN:   I think that might be our exhibit book.

24           A JUROR:   The blue is plaintiff.

25           THE COURT:   Yours is blue, also?  No, yours is black.

May - Direct

1    It says central documents at the front.  That's right.  That's

2    Defense Exhibit Number 1.  We're going to go to that now.

3    There's a blue sticker at the bottom  It says Defendant's

4    Exhibit 1.

5              All right.  We're on track now.  Where do you want us

6    to go?

7              MS. DORAN:  Please go to Page Number 425.

8              THE COURT:  The page numbers are marked at the bottom,

9    folks.

10   BY THE WITNESS:

11   A.  I'm sorry.  Did you say 425?

12   BY MS. DORAN:

13   Q.  425.  Otto, how are you doing?  Are you comfortable?

14   A.  My back's bothering me.

15             THE COURT:  All right.  You can turn to 425.  It's

16   behind the tab marked meetings Huller 1-16-03.

17             MS. DORAN:  Thank you, your Honor.

18   BY MS. DORAN:

19   Q.  Did you get it?

20   A.  Yes.

21   Q.  Okay.  Now, this is some notes marked attorney-client

22   privilege communication, Otto May initial interview,

23   January 16th, 2003, notes by S. Huller.  S. Huller is the fellow

24   from Michigan that you spoke with?

25   A.  He said he was from diversity from Detroit or Auburn Hills,

May - Direct

1    one of those.

2    Q.    Okay.    And do you recall -- did you, in fact, meet with him

3    in mid January of that year?

4    A.    I thought it was earlier than that, but if it was the 16th,

5    that's fine.

6    Q.    Okay.

7    A.    Yes, I did meet with him

8    Q.    Okay.    And what did you talk to Mr. Huller about during this

9    meeting?

10   A.    I asked him what brought him here, and he told me that it

11   was the ADL letter that had brought him to talk to me.    It got

12   their attention.    That's what he said to me.

13   Q.    And then did you talk to him about any of the incidents of

14   graffiti and vandalism and notes that you had been subjected to

15   up to that point?

16   A.    We covered a lot of stuff and mostly the vandalism    Just

17   the graffiti, notes, etc., etc.

18   Q.    How long did the meeting last?

19   A.    I think it lasted about -- I know it was two to three hours

20   because I stayed over, which I never got paid for, anyway, which

21   I was a little bit upset about.

22   Q.    In other words, you were working that day, and then you

23   remained to talk with this man?

24   A.    Yes.

25   Q.    Okay.    And what did you tell him during this meeting, and

May - Direct

1   what did he say to you?

2   A.   Mainly, his -- how would I say.   He wanted names.   And at

3   that time --

4   Q.   Names of what?

5   A.   Of suspects.

6   Q.   He wanted you to give him a list of suspects?

7   A.   That is correct.   That was the whole purpose of the meeting.

8   He wanted names.   And Ms. Dwyer, may she rest in peace, had told

9   me that not to point the finger at anyone without proof.   So, at

10  this point in time, I was very reluctant to give a bunch of

11  names that I don't have any proof of.

12  Q.   When you say proof, what do you mean by proof?

13  A.   With proof means you got to catch somebody in the act.   I

14  mean, if you don't catch somebody in the act, you're just

15  speculating.   You're saying, well, it could have been him, it

16  could have been him, it could have been her.

17  Q.   So, in other words, you had not caught anyone red-handed?

18  A.   To my knowledge, nobody had been caught red-handed,

19  especially myself.

20  Q.   Okay.   So that you had not caught anybody yourself

21  red-handed?

22  A.   Right.

23  Q.   So, the conversation was sort of focused on your giving

24  Mr. Huller a list of suspects?

25  A.   That is correct.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1  Q.   Did you tell him that you had suspected certain people?

2  A.   Yeah.   I told him that there was some people that had come

3  to mind, and he wanted me to give him names at this time.

4  Q.   Did you expect that Mr. Huller had looked in your personnel

5  file prior to the meeting or anything to find out about you

6  and --

7  A.   He never mentioned anything to that effect.

8  Q.   During this meeting, Otto, did you break down and give him a

9  list of people that you thought perhaps could be involved?

10 A.   Not at this meeting.   Not at this time.

11 Q.   Okay.   And the reason was because you hadn't caught anyone

12 red-handed?

13 A.   I hadn't caught anybody red-handed.   I had no proof of who

14 was doing what.   And at the advice of counsel, an attorney, she

15 had told me not to give him any names.

16 Q.   Okay.   I want to direct your attention to the third

17 paragraph there on that first page.   It says, "He indicated he

18 never knows what's going to happen next.   Feels as if he's on a

19 roller coaster.   In addition to occasional feelings of rage, he

20 suffers from low self esteem and feels humiliated."   Did you say

21 that to Mr. Huller?

22 A.   Of course.

23 Q.   And you were talking about what?

24 A.   I was talking about all the graffiti and notes and how it

25 made you feel.   You know, how it made me feel.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    Q.   Right.

2    A.   And the fact that nothing was being done about it.

3    Q.   Okay.

4    A.   I felt helpless.

5    Q.   Okay.  And then directing your attention to -- well, you

6    know, actually, let me ask you one quick question about this

7    meeting.  Did Mr. Huller indicate to you that he came all the

8    way from the Detroit area to Belvidere, Illinois, just because

9    of you, solely to talk to you?

10   A.   That's what he indicated to me, and I asked him at this

11   meeting, "Have you ever worked here at the plant," because I

12   didn't trust a lot of the people in the plant because of

13   everything that had happened.  And he told me no, that he never

14   worked here at Belvidere.

15   Q.   He told you that?

16   A.   Yeah, he told me that.  Okay.  And later on I come to find

17   out that wasn't the truth.

18   Q.   We'll get to that.

19   A.   Okay.

20   Q.   But I guess my question to you, Otto, is did Mr. Huller

21   indicate to you that he made this one special trip to come all

22   the way out to Belvidere solely for the purpose of talking to

23   you?

24   A.   That's what he indicated, but I know that's not factual.

25   Q.   How did you find out that that's not factual?

PDF created with pdfFactory trial version www.pdffactory.com

### May - Direct

1   A.  Because he came to investigate some other harassment or --

2   Q.  Some other issues?

3   A.  -- issues, right.

4   Q.  How did you come to find that out?

5   A.  I don't remember who told me about it.  I really don't.  I

6   can't remember right now.

7   Q.  All right.  Well, let me direct your attention to this page

8   number, the next page, which is 426, that second paragraph.

9         THE COURT:  You can go to 426, folks.

10  BY MS. DORAN:

11  Q.  That second paragraph there says, "May said that he

12  genuinely fears for his safety.  He said he told his wife that

13  if anything were to happen at work, if he were to be killed and

14  it was called an accident, to look closely and make sure it was

15  really an accident.  He implied that the use of the words die

16  and kill in the notes and graffiti constituted death threats."

17  Did you tell him that?

18  A.  Yes.

19  Q.  Okay.  Did you talk to your wife about your concerns?

20  A.  Yes.

21  Q.  What did you say -- and your wife's name at the time was

22  Sossity; is that correct?

23  A.  That is correct.

24        THE COURT:  What's the name again?

25        MS. DORAN:  Sossity.

May - Direct

1  BY MS. DORAN:

2  Q.   S-o-s-s-i-t-y?

3  A.   That is correct.  I told her -- you know, I was trying to

4  share as much as I could with her because she saw I was very

5  distraught, and I would -- you know, I would go into very deep

6  moods, you know.  So, I was just trying to let her know that if

7  something did happen to me to make sure that it was really an

8  accident.

9  Q.   You say deep moods.  What do you mean by deep moods?

10  A.   You know, like a depression type deal where I just didn't

11  even feel like going out of the house or dealing with anybody or

12  any issues.

13  Q.   So, is this true?  Did you believe that your life was being

14  threatened?

15  A.   Of course I did.  I think anybody in their right mind when

16  they start getting stuff like this would take it very seriously,

17  considering all the things that are happening and have happened

18  in the workplace.

19  Q.   Now, let me direct your attention -- that same page down

20  towards the bottom, the next to the last paragraph, the next to

21  last sentence of the next to last paragraph, where it says, "He

22  realized, however, that cameras would not be effective because

23  people would discover them and render them useless."  Did you

24  say that?

25  A.   No.  That's -- he put that in there.  I would never say

May - Direct

1    something like that.

2    Q.   Okay.  Well, did you believe that putting cameras up, people

3    would find out about them, and they would just be useless, and

4    so what's the point of putting cameras up to try to stop the

5    harassment?

6    A.   First of all, even the police department even shared in that

7    about cameras.  But you have to remember that there are cameras

8    that are so small you could just about put them anywhere.

9    Nobody would ever even know they existed.

10   Q.   How did you know about that?

11   A.   I've read it in the Internet.  I've seen it.

12   Q.   Did you do this Internet search for cameras back then?

13   A.   Yes.

14   Q.   In 2003 and 2002?

15   A.   Yes.

16   Q.   Okay.  This wasn't your only meeting with Mr. Huller,

17   correct?

18   A.   Correct.

19   Q.   You had a follow-up meeting with him, correct?

20   A.   Yes.

21   Q.   And that was the next day?

22   A.   That was the next day.

23   Q.   Okay.  So, let me just -- yeah, you can go ahead and turn

24   the page to 427.

25            THE COURT:  Ladies and gentlemen, you can go to 427.

PDF created with pdfFactory trial version www.pdffactory.com

May - Direct

1    BY MS. DORAN:

2    Q.   These are notes --

3              MS. DORAN:   I'm sorry, your Honor.   I'll pause.

4    BY MS. DORAN:

5    Q.   These are notes from the January 17th, 2003, meeting with

6    Huller.   These are Huller's notes, correct?

7    A.   Correct.

8    Q.   Okay.   In this meeting -- you mentioned in the first meeting

9    that Mr. Huller was trying to get your list of potential

10   suspects or folks that might be involved in this harassment.   In

11   this meeting did you give him that list?

12   A.   Yes.   After I spoke to my attorney after this meeting, the

13   day before it took place, I talked to Ms. Dwyer, and we talked

14   about it, and the way she told me to word it is that don't point

15   the finger, but just say that these are persons that have

16   harassed you, bothered you, made derogatory remarks, and use

17   that, and then give him the list of names.

18   Q.   Okay.   And then at the bottom of that page and even at the

19   top of the next page, we have a list of names.   We have hourly,

20   and then there's a list of names, and management and a list of

21   names.   Are these the names that you gave to Mr. Huller?

22   A.   Yes.

23   Q.   Okay.

24             MS. DORAN:   Your Honor, it's 4:56 right now.   This is

25   probably going to take me a little while to go through.

PDF created with pdfFactory trial version www.pdffactory.com

1     THE COURT:  Do you want to break?

2     MS. DORAN:  I think it might be a good time.

3     THE COURT:  Folks, I'll release you for the evening.

4  Again, I want to admonish you that as jurors in this case,

5  you're not to discuss the case among yourselves or with anyone

6  else or permit anyone to discuss it in your presence.  You must

7  not read any newspaper articles or listen to any radio or

8  television broadcasts relating to this case.  Do not make any

9  independent investigation of the case by reading materials,

10  attempting any testing, or going to any location where any of

11  the events in this case took place.  If anyone contacts you or

12  attempts to do so, either directly or indirectly, notify me

13  immediately.

14     Have a good night.  We'll start tomorrow morning at

15  9:00 o'clock.  And so, you have to be in the jury room at

16  9:00 o'clock.  If you come at 8:30, courtesy of the Clerk's

17  Office, you can have free coffee and donuts from the United

18  States.  You don't have to have them, but they're available to

19  you.  You're welcome to them at 8:30.  But, in any event, I need

20  you here at 9:00 o'clock.  I hope we can start promptly and go

21  on with Mr. May's testimony.  Have a good night.

22     (The following proceedings were had in open court, out of

23     the presence and hearing of the jury:)

24     THE COURT:  All right.  Mr. May, you may step down.

25     Let me ask you about exhibits.  Will we be touching on

1 every exhibit in the book?

2    MS. DORAN:  With him we're touching on the vast

3 majority of them.  But I can tell your Honor that if you don't

4 mind, we can go through it tonight so that in the morning those

5 five exhibits are not in there.

6    THE COURT:  That's fine.

7    MS. DORAN:  So, everything else is good.

8    THE COURT:  Right.  And everything else is good.  So, I

9 don't really have to worry about the jurors going to other

10 exhibits that I haven't referred to.

11    MS. DORAN:  And I apologize for that inconvenience.

12    THE COURT:  I'm going to tell them that tomorrow

13 morning then, that they can look at any of the exhibits in the

14 book.  The parties agree?

15    MR. MARTUCCI:  That will be true for Chrysler exhibits,

16 as well, your Honor.

17    THE COURT:  All right.

18    MS. DORAN:  Yes.

19    THE COURT:  I'll let them know then.  But before you

20 leave tonight, you'll remove one through five?

21    MS. DORAN:  Yes, sir.

22    THE COURT:  Anything else we have to take care of?

23    MR. MARTUCCI:  No, your Honor.

24    THE COURT:  Okay.  9:00 o'clock then we'll continue

25 with Mr. May.

1          MS. MEDINA:   Okay.

2          THE COURT:   Have a good night.

3          MR. BALOGH:   Thank you, Judge.

4          THE COURT:   You're welcome.   Court's in recess.

5      (Whereupon, the within trial was adjourned to Thursday,

6      August 26, 2010, at 9:00 o'clock a.m)